IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

    v.                                :          CRIMINAL NO. 18-101-1

MEHDI NIKPARVAR-FARD, a/k/a       :
MEHDI ARMANI

## GOVERNMENT'S MOTION IN RESPONSE TO DEFENDANT'S EMERGENCY MOTION FOR RECONSIDERATION OF HIS PRE-TRIAL DETENTION

In his Emergency Motion for Reconsideration of his Pre-Trial Detention, *see* D.D.E. 247, Mehdi Nikparvar-Fard is attempting for the *fifth* time to secure his release from prison. The Court has issued two memorandum opinions that explain, in great detail, why Nikparvar-Fard should be detained pending trial.[1] The factual and legal bases supporting his pre-trial detention remain as compelling now as they did then. In the first memorandum opinion, the Court wrote:

> The Government has carried its burden to establish by a preponderance of evidence that **no set of conditions can assure Dr. Nikparvar-Fard's presence at trial**. The Government has shown that the doctor has strong incentives to flee—given the seriousness of the charges and apparent weight of the evidence—even when compared to the aspects of Dr. Nikparvar-Fard's life that might cause him to hesitate before running. Moreover, given the added charges—and increased sentence—he now faces, Dr. Nikparvar-Fard has even more reason to flee than he did when Judge Rueter initially ordered pretrial detention. **Most consequential, however, is Dr. Nikparvar-Fard's record of blatantly ignoring court orders and disrespecting the Rule of Law. Dr. Nikparvar-Fard has offered nothing to suggest that he has renounced his antipathy for authority or that he has developed a newfound likelihood to obey the Court's orders.**

D.D.E. 137, page 20 (my bold).

---

[1] *See* Memorandum Opinion, July 11, 2019, at D.D.E. 137; Memorandum Opinion, April 20, 2020, at D.D.E. 231.

Ignoring the Court's prior findings, the defense uses the present emergency motion to make the absurd claim that Nikparvar-Fard "is not a flight risk." D.D.E. 247-1, page 10. The defense then proposes conditions of release that include $50,000 cash bail. *Id.* at 11. Notably, the Court has already rejected a much larger cash amount as insufficient to assure Nikparvar-Fard's appearance at trial. *See* D.D.E. 137, page 20-21 ("The sureties proposed by Dr. Nikparvar-Fard [which included $240,000 of cash] also do not provide adequate assurance that the doctor will not flee."). The defense offers no evidence that Nikparvar-Fard is now inclined to comply with judicial orders, instead contending these concerns "can be negated through the imposition of several conditions." D.D.E. 247-1, page 2. The defense's proposed solution is inherently flawed, for it disregards the Court's repeated concerns about Nikparvar-Fard's history and characteristics and why they make detention necessary. In the second memorandum opinion, the Court wrote:

> The Court **has no basis on which to alter the previous conclusion that the defendant harbors an attitude of personal entitlement and at least disdain, if not worse, for judicial or law enforcement authority.** The case against the defendant in terms of seriousness and potential persuasiveness has certainly not lessened; it remains substantial.

D.D.E. 231, at page 11 (my bold).

The Court still has no basis to alter its conclusion in this regard. The defense contends "the situation is different than it was when Dr. Nikparvar-Fard filed his prior emergency motion," and argues the balance tips in favor of his release. D.D.E. 247-1, page 2. While the situation may be different, Nikparvar-Fard remains the same. The government submits his pre-trial detention has been meticulously briefed and argued, subject to multiple evidentiary hearings, and carefully considered by the Court at every juncture. The arguments set forth in the present defense motion, which focuses largely on a COVID outbreak at the FDC, the alleged violation of due process due to prolonged pre-trial detention, and the challenges in reviewing

discovery, are no more persuasive than the many arguments which preceded them. The government urges the Court to conclude that Nikparvar-Fard presents a rare set of personal facts and circumstances that do not support his pre-trial release, and as such, asks the Court to deny the emergency motion.

I.    **Overview of the FDC outbreak**

BOP had a Pandemic Influenza Plan in place since 2012, and developed it further beginning in January 2020, in consultation with the Centers for Disease Control and Prevention (CDC) and World Health Organization, upon the emergence of the COVID-19 threat. BOP implemented that plan on March 13, 2020, applying exceptional changes to its operations in order to prevent and mitigate the spread of COVID-19. In part, BOP significantly restricted the intake and movement of inmates; it reduced the movement and congregating of inmates within institutions by confining inmates to their cells for longer periods; it severely restricted visits by non-BOP staff members to institutions; and it distributed face masks and cleaning supplies to all staff and inmates.

For over seven months, these and other steps were remarkably successful in preventing the spread of the virus within FDC Philadelphia, even as tens of thousands of people were infected in the surrounding city. Until late October, there was no known instance of COVID-19 in the general inmate population. One method developed by BOP to protect inmate populations – the screening of arriving inmates – proved particularly successful. BOP developed a plan in which every newly arriving inmate is tested for COVID-19, then placed in quarantine for 14 days regardless of the result, then tested again and not released to the general population until a negative test is returned. A handful of positive cases were detected at the FDC using this method through the months.

Then, on October 30, the FDC received a positive test result revealing that the virus had finally entered the prison population. An inmate who was scheduled for transfer to another institution had been tested on October 26, and that result came back positive. Through subsequent testing, it was learned that scores of inmates in that inmate's housing unit were also positive. FDC officials acted with alacrity, locking down the entire institution and thus quarantining all inmates to prevent further spread. BOP also tested the entire inmate population. In the end, it was determined that approximately 230 of the 1,000 inmates in the institution tested positive. As of this writing, many weeks later, nearly all are deemed recovered. Fortunately, most infected inmates remained asymptomatic throughout, no inmate exhibited significant illness, and no inmate required medical care outside the institution.

During the lockdown, all housing units were on quarantine status. Inmates were confined to their cells. On each housing unit, only two cells were released at a time. Specifically, each two-person cell was released for 30 minutes, three times a week, to shower and make phone calls. Inmates were provided with cleaning supplies for their cells and shower area. The FDC continued to provide all health services, meals, laundry, commissary, and other essential services in an orderly manner.

An inmate who tested positive was not housed with an inmate who tested negative or whose status was unknown.

The BOP, consistent with CDC guidelines, uses a clinical symptom-based model to determine when an inmate is deemed recovered and may be released from isolation status. Under the BOP clinical guidance, after a minimum isolation period of ten days, the timeline for release from isolation is based on a multifactor clinical analysis encompassing: 1) whether the inmate displayed symptoms; 2) the severity of the illness; and 3) whether the individual is severely

immunocompromised. All inmates who tested positive were reviewed under these guidelines before release from isolation status.

As for inmates who tested negative, they remained in quarantine status until they were tested again, at least 14 days later, and returned another negative result.

Each housing unit is released from quarantine status only once every inmate in the unit is either deemed recovered after a positive test, or has produced two negative test results as explained above.

As of December 3, there remained 11 inmates in the institution in positive status, while 228 were deemed recovered, and all other inmates in the population of 933 had tested negative at least once. Four of the institution's nine housing units had been released from quarantine, with operations resuming consistent with BOP's action plan for mitigating the spread of COVID-19.

## II.     Release of an FDC inmate is not warranted

Having explained this, the fact remains that the mere existence of the virus, and the possibility of an outbreak despite BOP's best efforts, cannot support the release of every inmate and detainee. The Court has expressly addressed this point in a prior memorandum opinion, writing "as concerning as the common calamity of COVID-19 is, resolving a challenge to an order of detention still calls upon the Court in the first instance to assess an individual defendant's position under the factors identified by the Bail Reform Act, 18 U.S.C. § 3142(g). Each case . . . rises and falls on its individual facts as measured against the statutory factors." D.D.E. 231, page 9.

The government's position regarding compassionate release of a sentenced prisoner (or release of a detained defendant, like Nikparvar-Fard) does not depend on the current status of the virus at an institution. Even when an institution currently presents no cases, and we commend

BOP for its efforts and make the Court aware of those endeavors, we are always aware of the pernicious nature of this virus and that it may enter a facility at any time and spread rapidly. But the Third Circuit has made clear that the mere existence of the virus is not a basis for release of a federal prisoner. *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). *See also United States v. Labuda*, 2020 WL 6886222, at *3 (N.D. Ind. Nov. 24, 2020) ("an outbreak within a prison does not justify compassionate release unless the inmate's medical conditions are sufficiently serious.").

Rather, in responding to release motions, this office focuses not on the institution's status at the moment, but on whether an inmate would be at risk, according to the CDC, for a severe outcome from COVID-19 if the virus did arrive, and if so, whether incarceration remains necessary regardless upon consideration of all pertinent 3553(a) sentencing factors (or bases for detention). Following this approach, this office has agreed to the release of dozens of inmates during the pandemic, regardless of the immediate situation at the institution, where the inmate would be at risk upon infection and all other considerations do not foreclose release. And we have advocated denial of many more motions where these circumstances are not present.

**III.    Nikparvar-Fard does not have moderate or severe asthma**

The CDC reports that individuals with moderate-to-severe asthma "might be at an increased risk" for severe illness from the virus that causes COVID-19.[2] The FDC medical records do not appear to support a finding that Nikparvar-Fard has moderate or severe asthma.[3] Indeed, on October 2, 2020, the medical records read as follows:

---

[2] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

[3] See https://www.uofmhealth.org/health-library/hw161158

> Asthma: Patient denies cough, wheezing, chest pain, SOB, difficulty breathing, dizziness, or other respiratory complaint. He reports compliance with Inhaled Corticosteroid, Mometasone, and uses his Albuterol rescue inhaler daily in evening from habit, not due to exacerbations. Reviewed proper use of medication. Continue current treatment.

In the present defense motion, there are repeated allegations that Nikparvar-Fard has asthma, but no allegations that Nikparvar-Fard suffers from moderate or severe asthma. *See* D.D.E. 247-1. This omission is fundamentally important because moderate and severe asthma is what matters in assessing risk. The government asserts here, as it has in the past, that Nikparvar-Fard is not at risk of a severe outcome if he contracts COVID-19, and that, in addition, detention is appropriate based on his risk of flight, the danger he presents to government witnesses, and his history of openly defying court orders.

The Court has expressly agreed with each of these government arguments. Regarding the risk of flight, the Court wrote the "sureties [proposed by the defense] therefore do not substantively alleviate the flight risks identified in the Court's analysis of the § 3142(g) factors nor do they appear to be based on a full understanding of Dr. Nikparvar-Fard's past behavior. To the extent that the sureties posted by Dr. Nikparvar-Fard's friends represent their confidence in the doctor (as opposed to trust in his family), the record does not encourage the Court to join in that trust." D.D.E. 137, page 22. Regarding danger presented to government witnesses, the Court wrote "Judge Rueter expressed the court's 'concern that [Dr. Nikparvar-Fard] poses a risk to threaten, injure, or intimidate prospective witnesses'. . . [t]he Court today shares Judge Rueter's concern that releasing Dr. Nikparvar-Fard could pose a risk to witnesses in this case." Id. at 19. Regarding the defiance of judicial orders, the Court wrote Nikparvar-Fard "has an established history of ignoring court orders and lying to law enforcement." *Id.* at 23. The government

submits there is nothing in the present defense motion that should change the Court's conclusions about these important topics.

The Court agreed that the defendant has no qualifying risk factors that subject him to any exceptional risk to the virus.[4] The defendant presents nothing to reconsider that factual finding. The FDC medical records show that Nikparvar-Fard has tested negative for COVID-19, that he has not been treated emergently for any complications relating to asthma, and that he is not reporting a worsening of asthma symptoms to FDC medical staff. The defendant's motion for reconsideration, based on the current circumstances at the FDC, should be denied.

### IV.     The challenge in trial prep, and the delay of trial, are not a basis for release

Counsel's concern regarding the ability to meet with his client does not raise a sufficient reason for release. Legal visits are resuming at the FDC, by appointment, with detainees who are no longer in quarantine. At the same time, the FDC is making accommodations for all detainees to allow private telephone calls with counsel. Further, at present, pursuant to an order of the Chief Judge, all trials are suspended through at least January 15, 2021. Once trials resume, there will be ample opportunity, subject to the oversight of each judge, for counsel to prepare for trial in consultation with clients.

Nikparvar-Fard has been in a position to review discovery for the majority of the past two years. During that time-frame, Nikparvar-Fard raised this same allegation - - inability to review discovery and confer with counsel - - in a prior motion for release. The Court was unmoved,

---

[4] In Footnote 10 of the April 20, 2020, memorandum opinion, the Court observed: The record and arguments relating to this defendant vacillate as to the degree of severity (mild, moderate, moderate-to-serious, serious) of his asthma at this time. No medical testimony or actual diagnosis was presented to the Court. For purposes of this decision today the Court assumed that the defendant's condition is chronic-not acute-at least moderate and being managed by a conventional inhaler. To date, the defendant has not presented himself for any respiratory emergency. D.D.E. 231, page 12.

writing "[a]s a threshold issue, Dr. Nikparvar-Fard cites to no case supporting his argument that due process requires he be released to assist his counsel in reviewing discovery. And the only relevant cases that the Court was able to identify directly reject Dr. Nikparvar-Fard's argument." D.D.E. 137, page 28. The government urges the Court to reach the same conclusion in resolving this emergency motion.

Nikparvar-Fard also previously alleged his due process rights were being violated, citing the length of his pre-trial detention. The Court engaged in lengthy analysis of multiple reported cases addressing this legal issue, *see* D.D.E. 137, pages 23-29, before denying his claim. The delay of Nikparvar-Fard's trial, scheduled on April 20, 2020, June 15, 2020, and December 7, 2020, is due entirely to COVID-19. None of the cases previously analyzed by the Court presented a global pandemic, and the accompanying delay(s) of trial, as a fact to be considered in resolving a due process claim. That said, the standard for assessing when pre-trial detention violates due process, as detailed in *United States v. Accetturo,* 783 F.2d 382 (3d Cir. 1986), warrants repeating here:

> Because due process is a flexible concept, arbitrary lines should not be drawn regarding precisely when defendants adjudged to be flight risks or dangers to the community should be released pending trial. Instead, we believe that due process judgments should be made on the facts of individual cases, and should reflect the factors relevant in the initial detention decision, such as the seriousness of the charges, the strength of the government's proof that defendant poses a risk of flight or a danger to the community, and the strength of the government's case on the merits. Moreover, these judgments should reflect such additional factors as the length of the detention that has in fact occurred, the complexity of the case, and whether the strategy of one side or the other has added needlessly to that complexity.

Id. at 388.

As detailed above, the facts justifying Nikparvar-Fard's initial detention remain compelling. The seriousness of the charges, the risk of flight, the potential danger to the

government's witnesses, and the strength of the government's case all weigh in favor of detention. While it is true the length of Nikparvar-Fard's pre-trial detention has grown longer, it is also true that there is no "arbitrary line" to draw in measuring what is too long. Further, the delay(s) in trial is not a result of strategic choices made by the government, but rather, a pandemic that is unprecedented in its impact on all parties. Given these factors, the government submits there has not been a due process violation in the pre-trial detention of Nikparvar-Fard.

**V.     Conclusion**

When all these factors are viewed in light of the potential jail sentence the defendant faces if convicted, it is clear that no condition or combination of conditions will reasonably assure the presence of the defendant as required and/or the safety of the community.

WHEREFORE, the government respectfully submits that the Defendant's Emergency Petition for Reconsideration should be denied.

> Respectfully submitted,
>
> WILLIAM M. MCSWAIN
> United States Attorney
>
> */s Jason P. Bologna*
> Jason P. Bologna
> Assistant United States Attorney

## CERTIFICATE OF SERVICE

I certify that a copy of the Government's Response Motion was served by electronic filing (ECF) and e-mail on the following defense counsel:

Joseph Poluka, Esq.
Frank DeSimone, Esq.
Counsel for Mehdi Nikparvar-Fard

*/s Jason P. Bologna*
Jason P. Bologna
Assistant United States Attorney

Date: December 14, 2020