# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| MEHDI NIKPARVAR-FARD | : | No. 18-101-1 |
| a/k/a "Mehdi Armani" | : | |

## M E M O R A N D U M

PRATTER, J.                                         SEPTEMBER _14_, 2021

The Fifth Amendment forbids coerced confessions. But it does not protect defendants who volunteer incriminating information or boast about their crimes.

Defendant Mehdi Nikparvar-Fard, a medical doctor, is charged with maintaining a drug-involved premises, and aiding and abetting of the same, in violation of 21 U.S.C. § 856 and 18 U.S.C. § 2, and conspiring to unlawfully distribute oxycodone, in violation of 21 U.S.C. § 846. Dr. Nikparvar-Fard owns Advanced Urgent Care, a minute clinic with four locations throughout the Eastern District of Pennsylvania. He is charged with using his clinics to distribute thousands of allegedly illegal prescriptions of oxycodone and methadone.[1]

In 2017, Dr. Nikparvar-Fard was arrested on a civil bench warrant in an unrelated case. As the U.S. Marshals drove him to the Federal Courthouse in Philadelphia, he made incriminating statements about prescribing oxycodone to patients who "need [him]" and "pay good" for his prescriptions. He now moves to suppress the Government's use of those statements in this case because he did not receive *Miranda* warnings before making them.

---

[1]      Defendant was charged with 13 co-defendants, including eight doctors, four physician's assistants, and an office manager, all of whom worked at Advanced Urgent Care.

The Court held a hearing on July 15, 2021. The Government presented live testimony from one of the arresting Marshals and audio recordings from another Marshal's phone. Following the hearing, the Court invited the parties to submit supplemental briefs to address whether the recordings are admissible.

Having evaluated the credibility of the testifying Marshal, the contents of the recordings, and the circumstances under which they were made, the Court denies Dr. Nikparvar-Fard's motion to suppress the statements.

## FINDINGS OF FACT[2]

At the suppression hearing, United States Marshal John Grandison testified about Dr. Nikparvar-Fard's arrest. The Court finds his testimony credible. The Government also introduced recordings of the conversation from one of the Marshal's phones, plus a transcript of the recordings. Dr. Nikparvar-Fard did not object to either, nor does he dispute that the voices on the recording belong to him and the Marshals.

The history of Dr. Nikparvar-Fard's interactions with federal law enforcement and judicial processes is important to the Court's ruling here. In an earlier, separate civil case, United States District Judge Cynthia M. Rufe found Dr. Nikparvar-Fard in contempt of court and issued an arrest warrant. To execute that arrest warrant, three United States Marshals—John Grandison, Johannes Jarkowsky, and Thomas Gabriel—drove to the Advanced Urgent Care clinic on City Line Avenue in Philadelphia.

The Marshals arrived at the clinic around noon and surveyed the entrances. Marshal Jarkowsky got out of the car to monitor a side door of the building; Marshals Gabriel and Grandison parked in front of the clinic and then entered the premises. Once inside, the Marshals

---

[2]    The Court finds the following facts based on evidence presented at the evidentiary hearing.

identified themselves as law enforcement personnel to the attendant at the front desk and told her that they needed to speak with Dr. Nikparvar-Fard. The Marshals were led to one of the back offices. There, they identified themselves to Dr. Nikparvar-Fard and told him they had a warrant for him.

Dr. Nikparvar-Fard began hurling racial epithets and other offensive language at the Marshals. Slapping the papers in Marshal Gabriel's hands, he denied that he was Mehdi Nikparvar-Fard,[3] the name on the arrest warrant, and rifled through identification cards until he found one with a different name.

The Marshals briefly searched Dr. Nikparvar-Fard and handcuffed him. Then they led him out of the clinic through the front door, past waiting patients. Marshal Grandison testified that leaving through the side door, out of the sight of patients, was not considered an option because their car was parked out front.

During the half-hour drive to the Courthouse, Dr. Nikparvar-Fard unleashed a tirade of offensive statements. Marshal Jarkowsky recorded the conversation on his personal phone. Not all of the conversation was recorded, although Marshal Grandison testified that "most" was. Hr'g Tr. at 42:10-12.

From the start, Dr. Nikparvar-Fard verbally abused the Marshals. He launched a steady stream of homophobic and racial slurs and repeatedly called them "dumb," "bald," "poor," and "stupid." Doc. No. 164 at 10, 12–14. He attacked their sexual orientation. He mocked their jobs, touting his own success and complaining that his tax dollars went to their salaries. He even accused one Marshal of having an STD.

---

[3]     Nikparvar-Fard legally changed his name to Mehdi Armani in 2014. As the Court has done in prior Memoranda, it will refer to him only as Nikparvar-Fard, which is the name used in the indictment and in the defendant's motion and supplementing documentation.

Dr. Nikparvar-Fard then stated that he could pay someone "five grand to put a f—ing bullet in [Marshal Jarkowsky's] head if I want to do that." Doc. No. 164 at 12. Marshal Jarkowsky responded, "no no no." At that point, the second recording stops. The third recording begins with Marshal Jarkowsky speaking again, saying "I think you're a criminal." Doc. No. 164 at 12. The recordings do not show how much time elapsed between each. But Marshal Grandison testified that the third recording followed "immediately" after the second. Hr'g Tr. at 45:18-46:2. Dr. Nikparvar-Fard responded, "Yeah, that's what you think, that's the reason you handcuff me." Doc. No. 164 at 12.

He went on to mock the Marshals, asking, "You feel good you handcuff a doctor in front of his patients, huh?" Doc. No. 164 at 12. Marshal Jarkowsky questioned his credentials, stating, "You're not really a doctor, you work at a minute clinic," leading Dr. Nikparvar-Fard to retort that he was "Double Board Certified." *Id.* at 13. Dr. Nikparvar-Fard also insinuated that he would continue to torment the Marshals after the ride was over, saying, "I want to f—k up with your brain … I mess up so much with him, … he can't do nothing. He's hopeless, hopeless, he can't do nothing except of hearing my voice." Doc. No. 164 at 13–14.

Marshal Jarkowsky arguably needled him, "How many patients you gonna have after they put [this arrest] in the newspaper?" Doc. No. 164 at 14. Dr. Nikparvar-Fard countered that his patients relied on him: "You handcuff me in front of my patients, first of all my patients will come back here because they need me. You understand me. … they need me, they need me because I give them oxycodone . . . they come and they pay me. They pay good. And you a—holes can't do nothing." Doc. No. 164 at 14; Doc. No. 149-1 at 2. The Marshals did not ask what he meant by any of this.

Shortly thereafter, they arrived at the Courthouse. The Marshals searched Dr. Nikparvar-Fard again, this time discovering a loaded .380 pistol. Finally, Dr. Nikparvar-Fard appeared before Judge Rufe.

The Marshals never read Dr. Nikparvar-Fard his *Miranda* rights. Hr'g Tr. at 39:14-18. Marshal Grandison had anticipated that the Marshals would locate him and transport him to the Courthouse to appear before Judge Rufe and then he would be released. Hr'g Tr. at 39:7-13. Dr. Nikparvar-Fard also expected to be released; he twice told the Marshals to take a shortcut or drive faster because he needed to get back to his clinic to see patients.

Before their encounter, the Marshals did not investigate Dr. Nikparvar-Fard. Marshal Grandison had never met him before nor visited any of his Advanced Urgent Care clinics. Hr'g Tr. at 30:6-11. Indeed, he did not know at that point that the DEA was investigating the practices at Advanced Urgent Care. Hr'g Tr. at 36:25-37:3. Typically, Marshals do not research the identity of the person on the civil contempt order or conduct a records check prior to executing that type of warrant. Hr'g Tr. at 53:13-19. Had he known about the ongoing DEA investigation, Marshal Grandison stated that he would have contacted the DEA agents to request clearance and input on executing the civil contempt order. Plus, the Marshals would have researched Dr. Nikparvar-Fard and, if they had known about the ongoing DEA investigation, they would have brought along six to eight agents instead of three. Hr'g Tr. at 37:14-22.

## PROCEDURAL HISTORY

Dr. Nikparvar-Fard was later charged with one count of violating 18 U.S.C. § 1001 for making a false and material statement to the Marshals regarding his identity and one count of violating 18 U.S.C. § 115(a)(1)(B) for threatening to murder a U.S. Marshal. In that prosecution, Dr. Nikparvar-Fard's counsel moved to suppress certain statements because he had not been

advised of his *Miranda* rights. The Government opposed, asserting that because the statements at issue were the crimes, the exclusionary rule did not apply. Plus, it argued, Dr. Nikparvar-Fard was not yet in custody when he lied about his identity, and he was not being interrogated when he threatened the Marshal.

United States District Court Judge Jan E. DuBois held a hearing and denied Dr. Nikparvar-Fard's motion. *United States v. Nikparvar-Fard*, No. CR 17-513, 2017 WL 6055289, at *1 (E.D. Pa. Dec. 7, 2017). A jury later found him guilty on both charges. He then appealed, challenging Judge DuBois's finding that he was not interrogated. The Court of Appeals for the Third Circuit affirmed. *United States v. Nikparvar-Fard*, 782 F. App'x 160 (3d Cir. 2019).

## LEGAL STANDARD

Criminal defendants have a Fifth Amendment privilege against self-incrimination. Because investigators must not unduly coerce defendants into confessions during custodial interrogations, investigators must make sure certain procedural safeguards are in place before an interrogation—put simply, they must read him his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 444, 472–73 (1966). Otherwise, prosecutors may not use the defendant's statements at trial. *Id.* at 476.

Deciding if a statement is the result of custodial interrogation must be done "on a case-by-case basis." *United States v. Mesa*, 638 F.2d 582, 584 (3d Cir. 1980). There are a number of analytical steps to follow. First, the defendant had to be in custody. That is, under the circumstances, a reasonable person in the defendant's shoes would have felt that he could not leave. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Second, the defendant must have been interrogated. *Rhode Island v. Innis*, 446 U.S. 291 (1980). In other words, the police must have said or done something that they "should have known [was] reasonably likely to elicit an incriminating response from him," like questioning him about the crime or making "evocative"

comments to nudge him to confess. *Id.* at 303. Once a defendant has made out a colorable claim of custodial interrogation, the Government bears the burden of proof and must show by a preponderance of the evidence that police did not coerce the statement from the defendant. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

## DISCUSSION

Dr. Nikparvar-Fard moves to suppress his incriminating statements about prescribing oxycodone to his patients. Though the Marshals did not question him, he contends that their comments were intended to goad him into saying something incriminating. The Government disagrees but claims that the Court need not even reach that argument: Judge DuBois denied Defendant's prior motion to suppress this exact conversation, and, according to the Government, this Court should too.

## I.   Law of the Case

The Government asserts that the law of the case doctrine bars this Court from reaching the merits. To maintain consistency, courts should "refrain from re-deciding issues that were resolved earlier in" a criminal proceeding. *Pub. Int. Rsch. Grp. of N.J. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997). In a prior case, Judge DuBois ruled upon certain statements from the same recording and denied Defendant's motion to suppress. *United States v. Nikparvar-Fard*, No. CR 17-513, 2017 WL 6055289, at *1 (E.D. Pa. Dec. 7, 2017), *aff'd*, 782 F. App'x 160 (3d Cir. 2019). Based on that, the Government seeks to prevent Dr. Nikparvar-Fard from what it calls a "second bite at the apple." Hr'g Tr. at 10:13-14.

Yet the Government's argument suffers from a fatal flaw: The law of the case doctrine applies only to rulings made in the "*same* case," not a different one. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (emphasis added); *accord Farina v. Nokia, Inc.*, 625

F.3d 97, 117 n.21 (3d Cir. 2010) ("[Even] an identical issue decided in a separate action does not qualify as law of the case."). Judge DuBois presided over a *separate* criminal proceeding, for separate criminal conduct. There, Dr. Nikparvar-Fard was charged with lying to and threatening the Marshals. Here, he is charged with maintaining a drug-involved premises.

Once the Court signaled this mismatch at the hearing, the Government pivoted to the related doctrine of issue preclusion, which bars revisiting issues decided in a prior criminal proceeding. *United States v. Reyes-Romero*, 959 F.3d 80, 92–93 (3d Cir. 2020). But the Government's use of this doctrine has problems too.

For one, using issue preclusion against a criminal defendant "raises difficult due process questions." *United States v. Price*, 13 F.3d 711, 720 (3d Cir. 1994). In each separate criminal proceeding, defendants get a fresh trial, with a new jury that sees the evidence for itself and makes an "independent finding." *United States v. Pelullo*, 14 F.3d 881, 892 (3d Cir. 1994). Issue preclusion necessarily denies a defendant that "trial de novo." *United States v. De Angelo*, 138 F.2d 466, 468 (3d Cir. 1943). Plus, holding a defendant to a loss in a prior case, where he might have had a different defense strategy, undermines his right to thoroughly defend himself now. Because of that, the Court of Appeals for the Third Circuit "has never held that collateral estoppel can be invoked by the government against a defendant in a criminal trial." *Price*, 13 F.3d at 720. Instead, "there has been a strong, unelaborated assumption" to the contrary. *Pelullo*, 14 F.3d at 891. Asymmetry is not unknown in the criminal law. The Government may be held to its prior losses; a criminal defendant may not.

Moreover, for collateral estoppel to apply, the issue had to be "actually litigated and resolved." *Reyes-Romero*, 959 F.3d at 92. The Court is not convinced that Judge DuBois considered the statements at issue here. At the hearing, the Court encouraged the Government to

identify the specific statements before Judge DuBois and the appellate court.  Hr'g Tr. at 25:24-26:2. Yet it did not do so in its post-argument briefing.

In the opinion, Judge DuBois focused on the alleged threats, the core of the 18 U.S.C. § 115(a)(1)(B) charge before that court. He decided that Dr. Nikparvar-Fard volunteered the at-issue inculpatory statement ("We will see each other.") and that the Marshal's specific follow-up question ("Is that a threat?") did not count as interrogation. *Nikparvar-Fard*, 2017 WL 6055289, at *4.[4] The opinion does not mention the statements Dr. Nikparvar-Fard now moves to suppress about his patients, medical practice, and prescribing habits.  Nor does it discuss the Marshals' interactions with him prior to or after these statements. Because Judge DuBois did not decide if *these* statements were the result of interrogation, they were not actually litigated.

For these reasons, the Court finds that Dr. Nikparvar-Fard's current motion to suppress is not precluded by Judge DuBois's prior ruling.

## II.    Whether Defendant Was Interrogated

During the trip to the Courthouse, Dr. Nikparvar-Fard said, "You handcuff me in front of my patients, first of all my patients will come back here because they need me. … I give them oxycodone, they need me. … They come and they pay me." The Government does not dispute that he was in custody when he made these statements. Yet it insists that the statements can still come in at trial because he volunteered them.

If a defendant volunteers incriminating information, police may use it against him. *Miranda*, 384 U.S. at 478. The Fifth Amendment forbids "compelled" confessions, not volunteered ones. But until police read a defendant his *Miranda* rights, they may not question him or probe for

---

[4]     In affirming Judge DuBois's opinion, the Court of Appeals for the Third Circuit did not decide whether Dr. Nikparvar-Fard was interrogated because even if he was, the statements at issue were speech "that is itself a crime."  782 F. App'x at 162.

those incriminating details. *Miranda*, 384 U.S. at 478. That does not mean that the police must work in silence. Officers may make "remark[s] that [they] would normally make in carrying out [their] duties," like discussing evidence or potential charges. *United States v. Calisto*, 838 F.2d 711, 713, 718 (3d Cir. 1988); *accord United States v. Benton*, 996 F.2d 642, 644 (3d Cir. 1993). And if a defendant does offer incriminating details, the police can ask follow-up questions to clarify. *United States v. Rommy*, 506 F.3d 108, 133 (2d Cir. 2007).

The Marshals did not ask Dr. Nikparvar-Fard about his patients' drug use. They did not even mention drugs or prescriptions. *Cf. United States v. Brownlee*, 454 F.3d 131, 146–47 (3d Cir. 2006). Still, Dr. Nikparvar-Fard insists, the Marshals functionally interrogated him: They called him a criminal, questioned his medical credentials, and asked him how his arrest would affect his patients. Dr. Nikparvar-Fard claims that the Marshals should have known that doing so was reasonably likely to provoke him to provide incriminating details about providing Oxycontin to his patients. *Innis*, 446 U.S. at 303. Yet Dr. Nikparvar-Fard's argument misplaces responsibility for his statement. The Marshals did not coerce it out of him; he volunteered it. The Marshals' comments were "at most an emotional response to [his] insult[s]," not "a ploy to obtain incriminating information" from him. *Riley v. Dorton*, 115 F.3d 1159, 1165 (4th Cir. 1997) (en banc), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34, 38–39 (2010).

The Marshals had no prior knowledge of Dr. Nikparvar-Fard's alleged drug crimes or his personal style of conduct, sensitivities, or proclivities. At the time of the civil warrant, the DEA had been separately investigating Dr. Nikparvar-Fard and his clinics. But Marshal Grandison testified that he did not know this. Instead, the Marshals understood that they were executing a routine bench warrant for a civil matter, wholly unrelated to any ongoing criminal investigation. Hr'g Tr. at 38:23-39:13. Corroborating this, Marshal Grandison explained that, had he known of

the investigation, he would have coordinated with the DEA to make sure the Marshals did not compromise the investigation. He did not do so here. Pointing to the DEA's knowledge, Dr. Nikparvar-Fard encourages the Court to impute that knowledge to the Marshals. But the two federal agencies are separate; one's knowledge does not belong to the other. *Cf. United States v. Pelullo*, 399 F.3d 197, 217–18 (3d Cir. 2005).

Absent that knowledge, the Marshals had no reason to suspect that merely mentioning his patients would inspire Dr. Nikparvar-Fard to brag about prescribing Oxycontin. Imagine that police find drug paraphernalia in a bedroom, so they decide to arrest both the father and daughter. Officers might expect "a protest of some kind" from the dad about arresting the absent daughter. *Calisto*, 838 F.2d at 718. But no reasonable officer would expect the dad to state, unprompted, "Don't lock my daughter up. She has nothing to do with that stuff. That's mine. I'm the one you want." *Id.* at 713, 718. For such unprompted admissions are "unforeseeable," particularly if "unrelated" to the officer's comment or question. *United States v. Greene*, 927 F.3d 723, 726 (3d Cir. 2019). Here, Marshal Jarkowsky suggested that the civil arrest might cause Dr. Nikparvar-Fard to lose patients. In response, Dr. Nikparvar-Fard bragged that his patients needed him because he provided them Oxycontin. The Marshal could not reasonably foresee such a boast; his comment "gave [Dr. Nikparvar-Fard] no incentive" to admit to a potential crime. *Benton*, 996 F.2d at 644.

Likewise, Marshal Jarkowsky had no reason to know that telling Dr. Nikparvar-Fard "I think you're a criminal" would cause him to later admit to other alleged crimes. Prior to that comment, Dr. Nikparvar-Fard had insinuated that he could hire a hit man to kill one of the Marshals, a federal crime for which he was later convicted. Though there was a break in the recordings at that point, the Court credits Marshal Grandison's testimony that the Marshal Jarkowsky's statement was made "immediately" after Defendant discussed putting a "bullet into

11

the [Marshal's] head." Hr'g Tr. 45:24–46:2. Logically, Marshal Jarkowsky made that comment to accuse Dr. Nikparvar-Fard of making criminal threats at that moment, not to sniff out other unidentified crimes. Besides, Dr. Nikparvar-Fard did not bring up oxycodone until several minutes after the Marshal called him a criminal. That timing, plus the many insults in between, suggests no "causal connection" between the two comments. *Connelly*, 479 U.S. at 164 & n.2. There is no evidence that any law enforcement officer mentioned or even alluded to drugs or prescriptions. That was all out of Dr. Nikparvar-Fard's mouth.

Losing on the specifics, Dr. Nikparvar-Fard points out that he was visibly agitated during the car ride; the Marshals should have known that he would blurt out *something* incriminating. But "emotional distress" is not enough to show "coercion." *United States v. Clemons*, No. CR 16-76, 2017 WL 3394615, at *4 (W.D. Pa. Aug. 8, 2017). Compulsion is "inherent in custody"; to count as interrogation, the police must impose pressure "above and beyond" the normal stresses of custody. *Innis*, 446 U.S. at 300. No such pressure happened here.

Instead, Dr. Nikparvar-Fard volunteered this incriminating information. He certainly "showed no hint of being intimidated by the" Marshals, as he showered them with slurs and insults and bragged about his own medical practice, virility, and wealth. *Illinois v. Perkins*, 496 U.S. 292, 298 (1990). He shared that incriminating statement to demean the Marshals, not because he felt pressured to: he wanted to prove that "you a—holes can't do nothing" to drive his patients away because "they need [him]." Doc. No. 164 at 14; *see Brownlee*, 454 F.3d at 147–48. In doing so, "he spoke at his own peril"; the Fifth Amendment does not protect "boasting about … criminal activities." *Perkins*, 496 U.S. at 298.

For these reasons, the Court finds that these incriminating statements were not the product of custodial interrogation.

III.     **Admissibility of the Recording**

His constitutional challenge failing, Dr. Nikparvar-Fard contends that the recordings should still be excluded because they violate Pennsylvania's Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. §§ 5704 *et seq*. But the Court is doubtful that the Act covers the recording. Even if it does, the Pennsylvania statute would not prohibit its admission in federal court.

Pennsylvania's Wiretap Act protects private conversations from outside ears. Before recording an "oral communication," both parties must consent. 18 Pa. C.S. §§ 5703, 5704(4). Otherwise, that rendered communication may not come in at trial. § 5721(1). But not every utterance counts as an "oral communication." The speaker must expect that her conversation will not be overheard "under circumstances justifying such expectation." § 5702; *accord Agnew v. Dupler*, 717 A.2d 519, 523 (Pa. 1998). So a boss who eavesdrops on break room gossip through an intercom does not violate the Act. *See id.* at 524. Nor does a concertgoer who takes a video of a crowd singing along, or a concerned shopper who records a screaming match in a store. For none of these speakers has "a reasonable expectation of privacy in the conversation." *Id.* at 523.

Yet Dr. Nikparvar-Fard does not claim an expectation of privacy in his statements, much less a reasonable one. He spewed insults at three Marshals, in the back seat of a Marshal's car, on the way to a civil contempt hearing. Nothing about that suggests that Dr. Nikparvar-Fard intended the conversation to "remain confidential." *Commonwealth v. Henlen*, 564 A.2d 905, 906 (Pa. 1989). In fact, investigative vehicles often contain recording devices. No suspect in the back of a police car can reasonably think it is a "sanctuary for private discussions." *United States v. Clark*, 22 F.3d 799, 802 (8th Cir. 1994). So his conversation with the Marshals is not covered by the Act.

Even if Pennsylvania's Wiretap Act did forbid the recordings, the Government asserts that the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq.*, preempts it. This Federal Wiretap Act permits a federal agent "acting under color of law" to record a conversation so long as he is a party to it. § 2511(2)(c). These two Acts present an actual conflict: Congress told federal agents that they need just one person's consent, but Pennsylvania has demanded consent from all parties.  In other words, "Pennsylvania's law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). The Federal Wiretap Act thus preempts Pennsylvania's stricter statute. *Bansal v. Russ*, 513 F.Supp.2d 264, 283 (E.D. Pa. 2007); *see United States v. Armocida*, 515 F.2d 49, 52 (3d Cir. 1975) ("So long as the information was lawfully obtained under federal law ..., it is admissible in federal court despite a violation of state law.").

These recordings met the requirements of the Federal Wiretap Act. Marshal Jarkowsky was a party to the conversation; in fact, he was often the target of Dr. Nikparvar-Fard's insults. Plus, he acted "under color of law" when he made the recording. § 2511(2)(c). Dr. Nikparvar-Fard objects that Marshal Jarkowsky was not "participating in a federal investigation" when he made the recording. Doc. No. 293 at 6 (quoting *Bansal*, 513 F.Supp.2d at 283). But federal agents have many duties beyond investigations. Marshal Jarkowsky recorded their conversation while executing a civil arrest warrant in his official capacity as a United States Marshal and thus "under color of [] law." *West v. Atkins*, 487 U.S. 42, 50 (1988). So the Federal Wiretap Act poses no bar to the Government offering the recordings at trial.

That does not end the inquiry, however. For these statements to come in at trial, the Government must authenticate them. Fed. R. Evid. 901(a). Dr. Nikparvar-Fard grumbles that it has not done so already. But his protest is premature. The Government had not yet formally moved

to admit the recordings.[5] It may never do so. Even without the recordings, the Marshals can still testify to these statements, which were made by a party opponent. Fed. R. Evid. 801(d)(2). Likewise, Dr. Nikparvar-Fard has not moved *in limine* to exclude the recordings. Thus, the Court reserves its decision on the authenticity question until both parties have had a chance to fully brief the issue.[6] *See United States v. Bereznak*, No. 3:18-CR-39, 2018 WL 1993904, at *4 (M.D. Pa. Apr. 27, 2018), *aff'd*, No. 20-1921, 2021 WL 2822183 (3d Cir. July 7, 2021) (denying motion to suppress with prejudice but denying motion to exclude for lack of authentication without prejudice).

## CONCLUSION

For these reasons, the Court denies the motion to suppress.  An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[5]     The Court of Appeals for the Third Circuit has held that the "burden is on the government to produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings." *United States v. Starks*, 515 F.2d 112, 121 (3d Cir. 1975) (internal quotation marks omitted). The Government has not yet filed a "*Starks* motion" discussing the eight factors as required to meet that burden.

[6] During the hearing, the Court noted that the transcript did not bear the usual indicia of an official transcript. The Government represented that the document was used in the case before Judge DuBois. Still, it acknowledged that the transcript needs to be edited to conform with the statements in the recording and represented that it will present an updated transcript to the Court.