IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| vs. | : | Criminal No. 18-101-01 |
| | : | |
| MEHDI NIKPARVAR-FARD | : | |
| a/k/a Mehdi Armani | : | |

**REPLY IN SUPPORT OF DEFENDANT
NIKPARVAR-FARD'S MOTION FOR RECONSIDERATION
OF PRETRIAL DETENTION**

Defendant Mehdi Nikparvar-Fard is affirmatively stating—not insinuating—that the Government engaged in willful misconduct by withholding the Late Evidence, and his forthcoming motion to dismiss will explain it in detail. For now, Nikpavar-Fard remains focused on the on the constitutionality of his ongoing detention. Contrary to the Government's claim, Nikparvar-Fard does not need to show that he was prejudiced by the Late Evidence to justify his release, although he surely has been. He must only show that, at this point, his prolonged detention amounts to punishment when considering the facts of the case.

The Government is wrong to claim that the only fact that has changed is the length of Nikpavar-Fard's detention. The timing and content of the Government's recent production now tip the weight of various *Accetturo* factors to favor release of Nikparva-Fard, including the length of detention, the Government's reckless discovery strategy causing the delay, the new proof that Nikpavar-Fard does not pose a risk of flight, and the decreased strength of the Government's case. Additionally, the United States Supreme Court's decision in *Ruan v. United States*, 597 U.S. ___ (2022), further decreases the strength of the Government's case, as it now must prove beyond a reasonable doubt that Nikpavar-Fard maintained Advanced Urgent Care

1

("AUC") for the purpose of prescribing drugs that he knew or intended to be outside the usual course of professional practice.

I.    **The *Accetturo* Factors Weigh in Nikparvar-Fard's Favor.**

   A.    **The Length of Detention Favors Release.**

The length of Nikpavar-Fard's detention alone warrants his release from pretrial detention. (Mot. at 6-7). Nikpavar-Fard previously distinguished all the cases the Government cites to claim otherwise (ECF No. 270 at 5; Mot. at 7) and further notes that almost all of them involve detention periods *less* than Nikparvar-Fard's. But, more importantly, in trying to argue what cases do and do not apply here, the Government seems to lose sight of the standard at issue. The length of detention cannot be "excessively prolonged" when viewed in relation to the regulatory goal. *United States v. Millan*, 4 F.3d 1038, 1043 (2d Cir. 1993) (citing *United States v. Salerno,* 481 U.S. 739, 747 n. 4; *United States v. Gonzales Claudio*, 806 F.2d 334, 339 (2d Cir. 1986)). Here, the regulatory goal is to ensure Nikpavar-Fard's appearance at trial. Thus, 42 months and counting of pretrial detention is excessive under these circumstances.

The Government suggests this excessive detention can be justified by the COVID-19 pandemic. Not so. Nikpavar-Fard has been detained every moment since December 2018—that some of the time occurred during a pandemic that caused the detention to be particularly isolating and difficult does not somehow extend the length of constitutionally permissible detention, especially when the most recent delay is unrelated to the pandemic.[1] And contrary to the Government's claims, it did cause this extended delay. Any continuance related to the *Ruan*

---

[1] Furthermore, given that trials could not occur during the COVID-19 pandemic, the Government should have had additional time to ensure that all relevant evidence in this case had been produced, as the Court made clear that it wanted to try the case as soon as it was permitted to do so.

2

decision would have been limited in time until the United States Supreme Court ruled, which has now occurred. Instead, because of the Late Evidence, Nikpavar-Fard will remain detained for six more months while counsel reviews the Late Evidence, prepares a motion to dismiss, and re-works its trial strategy based upon the Late Evidence. Nikparvar-Fard can show that it is the Government's conduct that needlessly added to the complexities of this case.

**B.    That the Government's Strategy Delayed the Case Favors Release.**

First, the Government is wrong to claim that the delay from the Late Evidence can be justified or excused because a new trial team took over the case just months before trial. (Opp'n 11, n. 2). The Late Evidence could have been and should have been produced earlier by both former Assistant United States Attorney Jason Bologna and Assistant United States Attorney Mary Kay Costello, who appeared in this case on February 25, 2021 (ECF No. 260) and were thus on the trial team when the Government claimed to be prepared to begin trial in January 2022. That the Late Evidence was produced so untimely has indisputable needlessly complicated the case and exemplifies the Government's discovery strategy.

The 70,000 pages of charts related to Count Five is a perfect example. The Government claims that the production of these pages is a non-issue because they are "nothing new" and were "made available" to him years prior. (Opp'n 10). But if the Government could produce them to Nikpavar-Fard weeks before the trial date—why could it not produce them years ago? Instead, the Government repeatedly refused to produce these charts to Nikparvar-Fard and made him send someone to physically scan them. That the Government is suddenly able to produce them at the last minute suggests gamesmanship. The Government's suggestion that 70,000 pages is not voluminous, because Nikpavar-Fard blindly should accept the Government's claim, that it is all the same materials, is untenable. Although the Government claims that the production merely

3

duplicates some files—those claimed duplicates have different numbers of pages than prior Government productions. And, to date, the Government has not answered Nikparvar-Fard's questions about those discrepancies. Also notable is the fact that Nikpavar-Fard still does not have access to this production at FDC.

This delay strategy has been on-going, as the Government did the same thing when the trial was scheduled for April 2020. (*See* ECF No. 410 at 1-2). And the Government's claims that no further delay is expected and an end to Nikpavar-Fard's detention is in sight rings hollow, where the Government has just recently refused to provide information about a cooperating witness, because he only "may" be a witness at trial. Thus, it is clear that there is additional discovery that still needs to be produced—the volume of which is unknown to Nikparvar-Fard.

      **C.    That New Evidence Supports Nikpavar-Fard Is Not a Flight Risk Favors Release.**

Some of the Late Evidence is directly relevant to Nikparvar-Fard's flight risk, raising further questions as to why it was not timely produced for the Court to consider it at the outset or before any of the other hearings regarding Nikparvar-Fard's detention. For instance, the recording of Special Agent Chaun Ngo that shows Nikparvar-Fard may not have been detained *but for the ongoing investigation*. Additionally, the 100 plus jail calls from October through December 2017 just produced show that Nikparvar-Fard will not flee. The calls are a stark contrast to the picture the Government has painted of our client for years based entirely upon the Arrest Videos, for which he has duly served his punishment twice-over at this point and that could ultimately be overturned. Nikparvar-Fard is a devoted family man who speaks to his children for hours about schools, sports, and friends—trying to parent the best he can from FDC.

It shows that he would not leave his children or force them to leave their home. Nikparvar-Fard and the Court surely should have had access this evidence years ago.

**D. That the Government's Case Is Weaker Favors Release.**

The Government's claim that "[n]one of the complained of discovery has any negative impact on the government's trial evidence" suggests it has not reviewed the Late Evidence. Consider the following "new" evidence:

- Undercover audio and video recordings from August through December 2017 by Source XXXXX328 who was a patient at AUC and was working for AUC. The hours of recorded conversations include the following:
    - The AUC employee that handles billing explaining that of course you cannot bill insurance and then charge cash.
    - Various background conversations indicate AUC is seeing urgent care patients.
    - Nikparvar-Fard got angry at the source when he called his patients "crack heads."
    - An AUC employee explaining in detail to the source how she believes [co-defendant Joanna] Ramos is stealing money from AUC.
    - The source asking Nikpavar-Fard to write him a script quickly because he needs to leave, to which Nikparvar-Fard tells him that he cannot write a prescription for him in the hallway and that the source must be seen like any other patient. The source then provides a urine sample and is worked up by a medical assistant, as any other patient before being seen by Nikparvar-Fard.
    - Co-defendant Ramos, who has plead guilty and is now apparently a key cooperating witness for the Government, is recorded for hours. Despite the source's trying to actively obtain incriminating evidence from Ramos about

5

Nikparvar-Fard, she makes the following exculpatory or impeaching statements, sometimes multiple times:

- Nikpavar-Fard requires all cash collected from patients to be deposited in the bank. All cash deposited was being used to make payroll.
- Nikparvar-Fard is not rich; he is just an arrogant man.
- Ramos explicitly does not agree that AUC is a "pill mill." She has seen every file that has come across the front desk.
- An AUC employee was discharged for forging prescriptions.
- On September 1, 2017—the day the FBI executed a search warrant at AUC based upon Nikpavar-Fard's August 2017 threats to U.S. Marshals—Ramos made multiple statements:
  - Nikparvar-Fard is not doing anything illegal.
  - The Government is trying to incriminate Nikpavar-Fard but cannot.
  - Ramos claims to be quitting because she cannot take the stress. The Government is going to try to incriminate her with him. But she does not know of anything he is doing that is wrong. "If I knew, I would tell you, and let me tell you, I'll be the first one in that f****** police department."

- Recordings and reports by the FBI from 2020 related to interviews of an AUC patient addressed in the Government's expert's report. The recording included the following exculpatory statements:

- o   The patient was not prescribed any medications until she proved with pharmacy records that she had been receiving the same medications from other doctors.
- o   The patient reported that Nikpavar-Fard completed a physical examination of her.
- o   The patient reported having a urine drug screening every visit.
- o   The patient reported that co-defendant Avrom Brown always did a physical examination of her every time she was seen and was always trying to figure out ways to help her other than prescribing medications.
- o   The patient reported that co-defendant Mitchell White said they needed to figure out a way to help her with her pain without medications.

The reports related to this patient further indicate that one time she was unable to take her prescribed medications because her purse was stolen and that her dentist prescribed her one of the drugs that Dr. Thomas claimed in his report to be illicit.

- FBI Reports for Source XXXXX731 that seem to correlate with a recording that was produced in May 2019.  One report indicated that during his medical exam at Advanced Urgent Care, Nikpavar-Fard reviewed the source's chart and saw a copy of a blank prescription and chastised an unknown Hispanic female regarding its existence.
- FBI Reports for Source XXXXX467, an employee of Advanced Urgent Care who reported that one of the alleged drug-involved premises was busy due to the flu.  In the cover letter to its production, the Government also disclosed that this source previously had been identified by name as a cooperating witness who had pled guilty.  But now, the Government *for the first time* indicated that this witness had provided information to the FBI related to eight other investigations involving healthcare providers.  To date, the

Government has refused to provide any details about this witness's cooperation in the eight other investigations, claiming that he "may" be called at trial.

- September 2017 testimony by an FBI Special Agent regarding Nikparvar-Fard's arrest by U.S. Marshals, during which he describes the arrest and explains why Nikpavar-Fard was not read his Miranda warnings.

All of this evidence makes the Government's case weaker, especially in light of *Ruan*. On June 27, 2022, the United States Supreme Court held that the "knowingly or intentionally" *mens rea* in 21 U.S.C. § 841 applies to the "except as authorized" clause—which is the exact same clause that appears in 21 U.S.C. § 856. *See Ruan*, 597 U.S. \_\_\_ (2022), slip op. at 4-5. Thus, the Supreme Court clarified that, to hold a prescriber criminally liable under the Controlled Substances Act, the Government must prove beyond a reasonable doubt that the prescriber knowingly or intentionally acted illegally—that is, knowingly or intentionally prescribed outside the usual course of professional practice. *Ruan*, 597 U.S. \_\_\_, at slip op. 2-3.

In this case, because the Government charged Nikpavar-Fard with maintaining drug-involved premises (the so-called "crack house" statute), it will need to prove not only that Nikparvar-Fard issued prescriptions knowing or intending those prescriptions to be illegal, but also that he maintained AUC locations for the purpose of that illegal prescribing. 21 U.S.C. § 856(a)(1). Thus, any evidence that shows Nikparvar-Fard and his employees were practicing medicine in the ordinary course, or subjectively believed that what they were doing was legitimate, is exculpatory, because it shows Nikpavar-Fard did not have the requisite criminal intent and that the AUC clinics were not "crack houses," but medical facilities where patients sought care. As counsel repeatedly has pointed out, AUC clinics were real clinics that saw all sorts of patients and that the Government did not them shut down. Indeed, the Late Evidence

shows that this was true. Joanna Ramos is recorded denying that AUC was a pill mill and repeatedly indicating that there was no illegal activity. And a patient was recorded detailing how AUC doctors examined her and were actively trying to get her off prescription medications, which directly conflicts with the Government's expert's conclusion about this same patient. The Late Evidence directly negates the Government's case—a change in circumstances that must be considered when evaluating Nikparvar-Fard's pretrial detention.

## II. Nikparvar-Fard's Pretrial Detention Violates Due Process.

Given the number of *Accetturo* factors that weigh in Nikpavar-Fard's favor, his pretrial detention is unconstitutional. He has provided a fulsome bail package that provides reasonable assurance of his appearance in Court, and the Late Evidence further supports that he will not flee, both because of his family and because the charges against him are substantially weakened. He should be released to re-prepare his defense to incorporate the Late Evidence now that the Government has yet again caused needless delay.

|  |  |  |
|---|---|---|
| Dated: June 30, 2022 | BY: | BLANK ROME LLP<br>/s Joseph G. Poluka<br>Joseph G. Poluka (PA Bar No. 42035)<br>Ann E. Querns (PA Bar No. 314145)<br>One Logan Square<br>130 N. 18th Street<br>Philadelphia, PA  19103<br>Email:  poluka@blankrome.com<br>aquerns@blankrome.com<br>Telephone: 215-569-5500 |

FRANK DESIMONE, ESQUIRE
BY:     /s Frank DeSimone
Frank DeSimone (PA Bar No. 12359)
123 S. Broad St.
Suite 2500
Philadelphia, PA 19109
Email: fdesimone2003@yahoo.com
Telephone:  215-567-3507

*Attorneys for Defendant*
*Mehdi Nikparvar-Fard*

## CERTIFICATE OF SERVICE

I, Joseph G. Poluka, hereby certify that, on June 30, 2022, a true and correct copy of the foregoing was served upon all counsel of record via the Court's Electronic Case Filing System.

      /s/ Joseph G. Poluka
    JOSEPH G. POLUKA