**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| vs. | : | Criminal No. 18-101-01 |
| | : | |
| MEHDI NIKPARVAR-FARD | : | |
| a/k/a Mehdi Armani | | |

**<u>DEFENDANT NIKPARVAR-FARD'S MEMORANDUM OF LAW IN SUPPORT OF HIS
MOTION TO COMPEL DISCOVERY AND DISMISS THE SUPERSEDING
INDICTMENT</u>**

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................................1

II.    FACTUAL BACKGROUND ..................................................................................3

   A.   The Government's Indictments and Deficient Initial Productions ....................3

   B.   The Government's First Late Production Before Trial and Continuations of the
       Trial Date .........................................................................................................6

   C.   Nikparvar-Fard's Additional Discovery Requests and Additional Continuance of
       the Trial Date ...................................................................................................8

   D.   The Government's Second Late Production Before Trial ...............................10

      1.   *May 4, 2022 Production - USAO-131535-134125* ................................10

      2.   *May 4, 2022 Production - HHC000001-069358* ..................................14

      3.   *May 12, 2022 Production - USAO-134125-756* ...................................14

   E.   The Late Discovery Made Adequate Preparation for Trial Impossible Without an
       Extensive Continuance ...................................................................................16

   F.   The Government's Most Recent Productions and Outstanding Discovery Requests ........17

III.   LEGAL DISCUSSION .........................................................................................19

   A.   The Government Should Be Compelled to Produce All Reports Related to All
       Confidential Sources and Information Regarding the Benefits Received by Each
       Confidential Source ........................................................................................19

   B.   The Superseding Indictment Should Be Dismissed Because the Government
       Violated Nikparvar-Fard's Due Process Rights As Articulated in *Brady v.
       Maryland* .......................................................................................................21

      1.   *The Government Withheld Exculpatory and Impeachment Evidence.* ...................22

      2.   *Nikparvar-Fard Was Prejudiced by the Withholding of the Late Evidence
            Because the Evidence Is Material.* .......................................................24

      3.   *Dismissal Is the Appropriate Remedy for the Government's* Brady
            *Violations* .......................................................................................26

   C.   The Superseding Indictment Should Be Dismissed Under the Sixth Amendment
       Right to Speedy Trial ......................................................................................28

      1.   *Length of the Delay* ..............................................................................28

2.  *The Reason for the Delay* ........................................................................29

3.  *Defendant's Assertion of Speedy Trial Right* ..........................................30

4.  *Prejudice Suffered by the Defendant* ......................................................32

5.  *Remedy for the Constitutional Right to a Speedy Trial* ...........................35

D.  The Superseding Indictment Should Be Dismissed Under Fed. R. Crim. P. 48(b) ..........35

IV.  CONCLUSION.............................................................................................................36

Defendant Medhi Nikparvar-Fard, by undersigned counsel, submits this memorandum in support of his Motion to Compel Discovery and Dismiss the Superseding Indictment.

## I.   INTRODUCTION

The Government's gross mishandling of discovery in this case is outrageous.  Since the Government's first production of evidence in early 2019, Nikparvar-Fard—from pretrial detention—has diligently followed up, pointing out when evidence appeared to be missing and asking for confirmation that additional information, such as that related to confidential sources, had not been withheld.  In response, the Government consistently confirmed that all information to which Nikparvar-Fard was entitled had been produced.  Then, just weeks before the April 2020 trial date, the Government learned it mistakenly had neglected to produce 13,000 pages that its expert had relied upon to Nikparvar-Fard's co-defendants.  The trial therefore was continued to allow for additional preparation.  The COVID-19 pandemic then took hold of the United States, making trials of this magnitude impossible and significantly delaying this case, such that a new trial could not occur until January 2022.  Nikparvar-Fard and his counsel prepared for the January 2022 trial, meeting regularly at the Federal Detention Center ("FDC"), despite the ongoing COVID-19 pandemic.  The Government then represented to the Court that it was ready to proceed to trial.  The trial was continued again, only because the Omicron variant of COVID-19 was spreading rapidly, making a lengthy, multi-defendant trial impossible.

The Court set a new trial date—more than five months later—in May 2022.  Weeks before the scheduled trial, the Government disclosed that it had not produced tens of thousands of pages and hours of undercover footage recorded in 2017 by an undisclosed confidential source.  The recordings and documents contain critical exculpatory evidence—involving the Government's primary cooperating witnesses.  The Government has provided no explanation as to how or why this evidence was not produced earlier.  It should have been produced in 2019

with the recordings of other confidential sources or, at least, in response to Nikparvar-Fard's

inquiry as to whether all information related to confidential sources had been produced.  Even

worse, the Government had the entire pandemic, from April 2020 until the January 2022 trial

date, to review its files in preparation for trial and ensure that all the appropriate productions had

been made.  Yet, in the Government's preparation for the January 2022 trial date, it still did not

realize that it had failed to produce these 60-plus hours of recordings and thousands of

documents.  The Government was prepared to proceed to trial in January 2022 without having

produced all exculpatory evidence and forced Nikparvar-Fard to prepare for a trial with

incomplete discovery.

      After all of the foregoing, the Government's attitude toward discovery remains

unchanged.  The Government has denied Nikparvar-Fard's recent requests for information about

confidential sources to which he is entitled under Federal Rule of Criminal Procedure 16 and

*Brady v. Maryland*.  The Court, therefore, should compel the Government to abide by its

discovery obligations consistent with the Federal Rules of Criminal Procedure and the United

States Constitution and produce all reports and evidence related to the confidential sources that

the Government utilized in this case.

      Even more, the Court should examine critically the Government's three-year history of

mishandling discovery in this case and find that the Government acted with reckless disregard of

Nikparvar-Fard's due process rights.  The Government's withholding of exculpatory and

impeachment evidence for years in violation of *Brady*, while Nikparvar-Fard was detained, is

inexcusable and has caused material prejudice that was not cured with disclosure.  The evidence

is stale, requiring witnesses to now recall events that occurred more than four years ago, and

strategic decisions were made without the benefit of this evidence.  But, more importantly, the

Government's past and ongoing actions have so undermined the confidence in this case that a trial cannot result in a fair verdict. Nikparvar-Fard has no confidence that he will ever be provided with all the evidence to which he is entitled. Thus, the Superseding Indictment should be dismissed.

Dismissal is also independently supported because the delay of trial caused by the Government's lack of diligent preparation and its failure to produce required discovery violates Nikparvar-Fard's constitutional speedy trial right and violates Federal Rule of Criminal Procedure 48(b).

## II.    FACTUAL BACKGROUND

### A.  The Government's Indictments and Deficient Initial Productions

On March 18, 2018, the Government indicted Nikparvar-Fard. On December 19, 2018, Nikparvar-Fard was arrested based upon that indictment and his 43-month pretrial detention began. On January 9, 2019, the Government filed a Superseding Indictment—the operative pleading at issue—against Nikparvar-Fard and twelve co-defendants, charging four counts under two statutes: (1) maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) (Counts One through Four); and (2) conspiracy to distribute a controlled substance, in violation of 21 U.S.C. §§ 846 (Count Five). All of the charges arise from Nikparvar-Fard's operation of four Advanced Urgent Care ("AUC") facilities from January 10, 2014 through August 31, 2017. The Government particularly alleges that defendants issued illegal prescriptions for controlled substances that were not medically necessary.

On February 7, 2019, the Government made its first production of documents, which contained a report by its expert witness, Dr. Stephen Thomas, and purportedly the patient files that Dr. Thomas had relied upon when preparing his report. *See* Exhibit A, February 7, 2019 Ltr. from J. Bologna re: USAO-000001-031038. The cover letter accompanying this production

stated that it was the first production in a series and that the Government would "try to produce discovery in batches that will be mailed approximately every two weeks," in the hopes of completing the "vast majority of discovery production by the middle of March." *Id.* The Government also "acknowledge[d] its duty to produce <u>Brady</u> material." *Id.*

It was months before Nikparvar-Fard had access to this first production at the FDC or before the Government made another production. In May 2019, after he received no additional productions from the Government, Nikparvar-Fard alerted the Government that it had not produced files for all the patients listed in Dr. Thomas's report and portions of other patients' files were seemingly missing. *See* Exhibit B, May 1, 2019, Email from A. Querns. In response, on May 23, 2019, the Government made an additional production, which contained audio and video recordings made by five confidential sources and undercover agents, information about those sources and undercover agents, search warrants, patient laboratory reports, statements by defendants, additional patient files reviewed by Dr. Thomas that had been left out of the first production, and other items. *See* Exhibit C, May 23, 2019 Ltr. from J. Bologna. The production also included a chart that the Government represented summarized evidence recovered by the DEA in the investigation. The chart listed the discovery that the Government had produced and other discovery "available" to the defendants upon request. Nowhere in the letter or chart was Source 00084328 or Source 79731 referenced.

Notably, on June 24, 2019, the Court granted the Government's Motion to Declare the Case Complex and set an original trial date of April 20, 2020. ECF No. 134. Nikparvar-Fard continued to probe to ensure that the Government produced all material evidence. Nikparvar-Fard requested additional "available" evidence and explained why he continued to believe the

evidence produced still did not include all the files for the patients listed in Dr. Thomas's report. *See* Exhibit D, July 17, 2019 Email from A. Querns.

Nikparvar-Fard's counsel followed up multiple times regarding when the Government would produce the additional charts related to patients referenced in Dr. Thomas's report. *See* Exhibit E, August 29, 2019 Email from J. Bologna. Finally, on September 12, 2019, the Government produced non-Bates-stamped copies of the patient files that were sent to Dr. Thomas, stating that "*[i]t is the government's position that you have already been provided the AUC patient files reviewed by Dr. Thomas* in the first two discovery productions. However, due to your concerns, I am sending you copies of the DVDs of AUC patient files that were provided to Dr. Thomas." *See* Exhibit F, September 12, 2019 Ltr. from J. Bologna (emphasis added). A couple of weeks later, on September 30, 2019, the Government produced the "available" discovery that Nikparvar-Fard had requested in July 2019. *See* Exhibit G, September 30, 2019 Email from J. Bologna. Around this time, Nikparvar-Fard filed discovery motions, each of which sought to allow Dr. Nikparvar-Fard to have access to additional discovery. *See* ECF Nos. 158, 175, 217. Nikparvar-Fard also filed a motion to suppress recordings that the United States Marshals made during his arrest in August 2017 based upon the Marshals' failure to read him his *Miranda* rights. ECF No. 149.

In the coming months, Nikparvar-Fard continued to follow up. Specifically, in December 2019, Dr. Nikparvar-Fard's counsel wrote to the Government "to confirm that we have all information related to confidential informants." *See* Exhibit H, December 6, 2019 Email from A. Querns. More than a month later, the Government responded. *See* Exhibit J, Jan. 15, 2020 Email from J. Bologna. It did not indicate that it had withheld months of surveillance and recordings

from 2017 made by an undisclosed confidential informant.  *See id.*  Nor did it produce any

additional information, instead claiming that everything had been produced.  *See id.*

One specific follow-up item involved arranging for certain patient charts at the DEA's

warehouse to be scanned.  Early on, Nikparvar-Fard requested that the Government produce all

the charts that it seized from Advanced Urgent Care.  *See* Exhibit D, July 17, 2019 Email from

A. Querns.  The Government agreed to produce all the charts only if Nikparvar-Fard paid for the

costs associated with scanning them, which was anticipated to be more than $10,000.  Nikparvar-

Fard's September 25, 2019 Motion for Discovery specifically addressed this request and sought

to have the Government bear the expense.  ECF No. 158.  While the motion was still pending, to

continue his preparation for the April 20, 2020 trial date, Nikparvar-Fard sought access to a

subset of the requested charts—approximately 34 boxes—which the Government was still

requiring Nikparvar-Fard copy or scan himself.   *See* Exhibit I, January 17, 2020 Email from S.

Scott.  The majority of these files all related to Count Five in the indictment, involving Highland

Campbell's alleged illegal prescribing of medications.  *See* Exhibit H, December 6, 2019 Email

from A. Querns.

### B.  The Government's First Late Production Before Trial and Continuations of the Trial Date

On February 27, 2020—less than two months before the trial date—the Government

produced to Nikparvar-Fard's co-defendants, 46 patient files comprising over 13,750 pages of

medical records that Dr. Thomas had relied upon.  Government counsel advised that, "in

preparing for the April 20th [2020] trial, the case agent recently discovered [that these files] had

not been . . . provided in discovery."  *See* ECF No 197, quoting February 27, 2020 Ltr. from J.

Bologna.  The Government acknowledged that these files should have been provided pursuant to

Federal Rule of Criminal Procedure 16 and it was a mistake that they had not been produced.  *Id.*

Notably, these patient files had been previously produced to Nikparvar-Fard on September 12, 2019 because Nikparvar-Fard continued to insist that he was missing patient files referenced in Dr. Thomas's report.  Despite the Government continuing to claim it had produced all materials that its expert had relied upon, it agreed to produce an exact copy of the patient files reviewed by Dr. Thomas anyways, which contained these 46 missing patient files.  *See* Exhibit F, September 12, 2019 Ltr. from J. Bologna.

Shortly after the late production to Nikparvar-Fard's co-defendants, on March 9, 2020, the Government produced the Jencks Act material.  *See* Exhibit K, March 9, 2020 Ltr. from J. Bologna.  The cover letter accompanying the Jencks Act materials included a section titled "Cooperating Defendants" that indicated Jencks material for all of the individuals was being produced.  The letter also included a section titled "Confidential Sources" that listed sources utilized during the investigation and the benefits, if any, that were provided to each source.  Again, Source 00084328 and Source 00079731 were not mentioned.

Given the nature, volume, and timing of the thousands of pages of late discovery to Nikparvar-Fard's co-defendants, co-defendant Mitchell White had no choice but to request a continuance of the trial date to allow his counsel to review and utilize the late discovery.  White filed a motion to continue the trial date on March 10, 2020.  ECF No. 197.  At this same time, the COVID-19 pandemic began to impact Court operations.  The initial pandemic-related Standing Order issued by the Chief Judge of the Eastern District of Pennsylvania suspended civil and criminal trials through April 13, 2020.  *In re: Temporary Continuance of Civil and Criminal Jury Trials Due to the Exigent Circumstances Created by COVID-19*, March 13, 2020 (E.D. Pa.).

On March 18, 2020, the Court held a hearing on certain pending motions and to discuss the trial date in light of the COVID-19 outbreak and the late discovery.  ECF No. 210.  The

Court then continued the trial until June 15, 2020.  ECF No. 201.  Subsequent Standing Orders

continued to suspend criminal jury trials in the Eastern District of Pennsylvania and/or restrict

criminal jury trials to selected short, single-defendant trials with a minimum of lay witnesses.[1]

As a result, the trial date in this complex, multi-defendant case was continued multiple times.[2]

Trials resumed in the fall of 2021.  On September 8, 2021, this Court set a trial date of January

10, 2022, which was based on the June 7, 2021 Standing Order explaining the anticipated plan

for resumption of trials as well as the unavailability of a co-defendant's counsel due to previous

attachment in another long-delayed trial.  ECF No. 303.

### C.  Nikparvar-Fard's Additional Discovery Requests and Additional Continuance of the Trial Date

Nikparvar-Fard used the delay of the trial date to prepare his defense.  His counsel

continued to follow up with the Government and request missing documents.  *See* Exhibit L,

---

[1] *In Re: Second Extension of Adjustments to Court Operations Due to the Exigent Circumstances Crated by COVID-19*, May 29, 2020 (extending suspension of trials through August 31, 2020); *In Re: Fifth Extension of Adjustments to Court Operations Due to the Exigent Circumstances Created by COVID-19*, August 31, 2020 (continuing all trials scheduled to begin on or before November 2, 2020 with the exception of a limited number of specially designated trials); *In Re: Sixth Extension of Adjustments to Court Operations Due to the Exigent Circumstances Created by COVID-19*, October 30, 2020 (continuing all trials scheduled to begin on or before December 31, 2020 with the exception of a limited number of specially designated trials); *In Re: Seventh Extension of Adjustments to Court Operations Due to the Exigent Circumstances Created by COVID-19*, November 25, 2020 (continuing all trials scheduled to begin on or before January 15, 2021); *In Re: Eighth Extension of Adjustments to Court Operations Due to the Exigent Circumstances Created by COVID-19*, January 15, 2021 (continuing all trials scheduled to begin on or before February 15, 2021); *In Re: Ninth Extension of Adjustments to Court Operations Due to the Exigent Circumstances Created by COVID-19*, February 12, 2021 (continuing all jury trials "until further Court order"); *In Re: Tenth Extension of Adjustments to Court Operations Due to the Exigent Circumstances Created by COVID-19*, March 18, 2021 (continuing all jury trials scheduled to begin on or before April 5, 2021 and conditionally permitting only specially designated trials through at least June 7, 2021); *In Re: Eleventh Extension of Adjustments to Court Operations Due to the Exigent Circumstances Created by COVID-19*, March 30, 2021 (continuing all jury trials scheduled to begin on or before May 3, 2021, then resuming only selected "test period" cases through "at least" June 7, 2021); *In Re: Twelfth Extension of Adjustments to Court Operations Due to the Exigent Circumstances Created by COVID-19*, June 7, 2021 (explaining the plan for resumption of jury trials with the anticipation that only a limited number of trials would be held through September 7, 2021).

[2] Order dated May 4, 2020 (Dkt. 236) (continuing trial to December 7, 2020); Order dated October 20, 2020 (Dkt. 242) (continuing trial date indefinitely); Order dated January 19, 2021 (Dkt. 255) (continuing trial to June 7, 2021); Order dated June 3, 2021 (Dkt. 278) (continuing trial to October 4, 2021); Order dated September 8, 2021 (Dkt. 303) (continuing trial to January 10, 2022).

September 11, 2020 Email from J. Bologna.  In response, on September 11, 2020, the

Government made a supplemental production of Jencks Act material.  *Id.*  Also, at approximately

this time, the DEA allowed Nikparvar-Fard to send a representative to the DEA—who had to be

background checked and provide negative COVID test results—to scan the 34 boxes of charts

related to Highland Campbell.  *See* Exhibit M, October 21, 2020 Email from C. Kozminski.  In

the months that followed, as he prepared for the January 2022 trial date, Nikparvar-Fard again

followed up with additional discovery questions and multiple additional productions followed in

January, February, June, and December 2021.  The Government was unable to produce some of

the documents requested.  *See* Exhibit N, June 9, 2021 Email from J. Bologna.

In July 2021, this Court held a hearing on Nikparvar-Fard's motion to suppress the video-

recordings made by the Marshals during Nikparvar-Fard's 2017 arrest, which the Government

knew had been pending since September 2019.  ECF No. 291.  At issue was whether Nikparvar-

Fard had been interrogated by the Marshals such that he should have received *Miranda*

warnings.  As such, the circumstances of Nikparvar-Fard's arrest was directly at issue and one of

the arresting Marshals testified at the hearing.  On September 14, 2021, the Court denied

Nikparvar-Fard's motion, noting that it had evaluated the credibility of the testifying Marshal.

ECF No. 306.

Moving towards the January 2022 trial date, Nikparvar-Fard and his counsel prepared his

defense, which was particularly challenging because, despite a global pandemic, three years of

detention, and multiple bail motions, the Government insisted that Nikparvar-Fard continue to be

held pretrial based on his alleged flight risk.  Therefore, Nikparvar-Fard's counsel had to visit

him at FDC to prepare for trial, while the Omicron variant of COVID-19 was spreading.  On

December 16, 2021, co-defendant Avrom Brown filed a Motion to Continue based upon the new

rapidly spreading Omicron variant of COVID-19.  ECF No. 332.  Brown was concerned about his own health and about a potential mistrial if a juror contracted COVID-19 during the lengthy trial.  *Id.*  On December 26, 2021, Nikparvar-Fard joined in Brown's request because, as the Omicron variant continued to spread, COVID-19 cases surged, and the trial could not be conducted in accordance with the Eastern District of Pennsylvania's Reopening Guidelines. ECF No. 342.  On January 5, 2022, the Court held a hearing on the Motion to Continue.  ECF No. 364.  During the hearing, ***the Government represented that it was ready to proceed to trial on January 10, 2022*** with no mention of its having additional discovery to produce.  On February 14, 2022, the Court continued the trial to May 31, 2022.  ECF No. 368.

### D.  The Government's Second Late Production Before Trial

On April 18, 2022, the Court held a pre-trial conference regarding the upcoming trial date.  At the hearing, the Government for the first time indicated that it would be making a production of additional materials, despite its many representations over the previous three years that all discovery to which the defendants were entitled had been produced.  ECF No. 387.  The Government made no proffer as to what would be included in the production or why the materials had not been previously produced. Consider Nikparvar-Fard's counsel's reaction when more than two weeks later, mere weeks before trial was to begin, the Government then proceeded to make three productions (collectively, the "Late Evidence"):

#### 1.  *May 4, 2022 Production - USAO-131535-134125*

On May 4, 2022, Nikparvar-Fard's counsel received a discovery production that was dated April 28, 2022 and contained more than 60 hours of surveillance footage and thousands of pages of documents.  The most critical late-produced evidence included:

- Undercover audio and video recordings from August–December 2017 by Source 00084328, who was a patient at AUC and was working for AUC.  The hours of recorded conversations include the following evidence:

  o Co-defendant Joanna Rivera, who has pled guilty and is now a key cooperating witness for the Government, is recorded *for hours*.  Despite Source 00084328 attempting to actively obtain incriminating evidence from Rivera about Nikparvar-Fard, she makes the following exculpatory or impeaching statements, sometimes repeatedly:

    ▪ Nikparvar-fard requires all cash collected from patients to be deposited in the bank.  All cash deposited was being used to make payroll.

    ▪ Nikparvar-Fard is not rich; he is just an arrogant man.

    ▪ Rivera explicitly does not agree that AUC is a "pill mill."  She has seen every file that has come across the front desk.

    ▪ An AUC employee was discharged for forging prescriptions.

    ▪ On September 1, 2017—the day the FBI executed a search warrant at AUC based upon Nikparvar-Fard's August 2017 threats to U.S. Marshals—Rivera made multiple statements:

      • Nikparvar-Fard is not doing anything illegal.

      • The Government is trying to incriminate Nikparvar-Fard but cannot.

      • Rivera claims to be quitting because she cannot take the stress.  The Government is going to try to incriminate her with him.  But she does not know of anything he is doing wrong.  "If I knew, I

11

would tell you, and let me tell you, I'll be the first one in that f****** police department."

o   Nikparvar-Fard got angry at the source when he called his patients "crack heads."

o   The AUC employee who handles billing explaining that of course you cannot bill insurance and then charge cash.

o   Various background conversations indicate AUC is seeing non-pain patients, as there is a discussion about a child's being seen, a patient's coming in for a physical, and at one point, an eye exam is being performed.

o   An AUC employee explaining in detail to the source how she believes Rivera is stealing money from AUC.

o   The source asking Nikparvar-Fard to write him a script quickly, because he needs to leave, to which Nikparvar-Fard responds that he cannot write a prescription for him in the hallway and that the source must be seen like any other patient.  The source then provides a urine sample and is worked up by a medical assistant, like any other patient before being seen by Nikparvar-Fard.

- A September 7, 2017 recording of Special Agent Chuan Ngo of the FBI discussing the U.S. Marshals' August 29, 2017 arrest of Dr. Nikparvar-Fard with his colleague stating, "[The confidential informant Source 00084328] is the one who gave us, uh, Nik, you know, Nik being arrested for the civil contempt.  That's when he threatened all the.  You know that.  Without him [the confidential informant], we wouldn't have been able to, you know, chase that down and kept [sic] him in custody.  Because right away, we charged him with threatening the officers and the false statement."  These statements were directly relevant to the Government's insistence that Nikparvar-Fard be detained pretrial.

Yet, they were not produced until he had been detained for than 40 months and filed multiple bail motions, all of which the Government opposed.

- September 26, 2017 grand jury testimony by Special Agent Daniel Soeffing regarding Nikparvar-Fard's arrest by U.S. Marshals, during which he indicates that he interviewed all the United States Marshals involved in the arrests, describes the arrest, and explains that Nikparvar-Fard was not read his *Miranda* warnings because of alleged exigent circumstances. Furthermore, a grand juror specifically states that he did not accept that the Marshals could not have read Nikparvar-Fard his *Miranda* rights. USAO-132857-79. Despite the direct relevance of this evidence to the issues in Nikpavar-Fard's motion to suppress, this transcript was not produced until months after that motion had been ruled upon.

- A 2020 recording by the FBI of a patient interview. The Government's expert addressed this patient in his report and the recording included the following exculpatory statements:

  o The patient was not prescribed any medications until she proved with pharmacy records that she had been receiving the same medications from other doctors.

  o The patient reported that Nikparvar-Fard completed a physical examination of her.

  o The patient reported having a urine drug screening every visit.

  o The patient reported that co-defendant Avrom Brown always did a physical examination of her every time she was seen and always was trying to figure out ways to help her other than prescribing medications.

  o The patient reported that co-defendant Mitchell White said AUC needed to figure out a way to help her with her pain without medications.

13

- Statements by Nikparvar-Fard to third parties and transcript of a deposition of Nikparvar-Fard.

The production also included agent reports, additional materials related to cooperation plea agreements, photographs of AUC, a revised expert report, and summary expert chart.

### 2. *May 4, 2022 Production - HHC000001-069358*

Also on May 4, 2022, the Government produced more than 300 patient charts, Bates-stamped HHC000001-069358.  The Government represented that these charts were "available" throughout discovery, but had not been formally produced by the Government and that most of the charts dealt with Count Five of the Superseding Indictment, involving Highland Campbell.  Thus, weeks before trial, the Government produced the same charts that it had previously refused to produce to Nikparvar-Fard.  Instead, a year earlier, in the depths of the COVID-19 pandemic, the Government made Nikparvar-Fard send a representative to the DEA with a scanner to physically scan many of these same charts.  Even more, the Government produced patient files for many of the patients listed in Dr. Thomas's expert report.  These files are new scans—not simply reproductions—and in some instances have varying numbers of pages.

### 3. *May 12, 2022 Production - USAO-134125-756*

On May 12, 2022, Nikparvar-Fard's counsel received another production, this time dated May 10, 2022 with documents Bates-stamped USAO-134125-756.  The most critical late-produced evidence included:

- FBI Reports and criminal history information related to Source 00084328.  These reports indicate that the source's information was used in the search warrant affidavit for Nikparvar-Fard's residence that was executed on September 25, 2017.  USAO-134347.  It also indicates that then-AUSA Bologna was briefed multiple times regarding the source's activities.

14

- FBI Reports for Source 00079731 that seem to correlate with recordings that were produced in May 2019.  One report indicated that during his medical exam at AUC, Nikparvar-Fard reviewed the source's chart and saw a copy of a blank prescription and chastised an unknown Hispanic female regarding its existence.  USAO-134369.

- FBI Reports for Source 00082467, an employee of AUC who reported that the Willow Grove location—one of the alleged drug-involved premises—was busy due to the flu.  In the cover letter to this production, the Government also disclosed that this source previously had been identified by name as a cooperating witness who had pled guilty.  But now, the Government *for the first time* indicated that this witness had provided information to the FBI related to eight other investigations involving healthcare providers.  To date, the Government has refused to provide any details about this witness's cooperation in the eight other investigations, claiming that he only "may" be called at trial.

- FBI Reports related to the 2020 patient interview that had just been produced, as well as additional reports related to follow-up interviews the agents had in-person and by telephone with this same patient who is at issue in Dr. Thomas's report.  The reports repeat the exculpatory information related to Nikparvar-Fard and other co-defendants and further explain additional details regarding her treatment, including that one time she was unable to take her prescribed medications because her purse had been stolen and that her dentist prescribed her one of the drugs that Dr. Thomas claimed in his report to be illicit.

- Over 100 jail calls by Dr. Nikparvar-Fard from 2017.

Despite these productions, the Government still claimed to be ready to proceed to trial on May 31, 2022 as scheduled, apparently unconcerned how its late production prejudiced Nikparvar-Fard.

**E.  The Late Discovery Made Adequate Preparation for Trial Impossible Without an Extensive Continuance**

Production of the Late Evidence was akin to the proverbial bombshell being dropped on the defense weeks before trial.  Counsel obviously needed to review all the new discovery produced, which was voluminous, and had to follow up with the Government regarding what seemed to still be missing.  Given the Government's affinity for mishandling discovery, defense counsel could not rely upon the Government's representation as to whether everything had been produced but had to continue to probe the Government to ensure nothing else was again left out. For instance, the Government's May 4, 2022 production included a chart that allegedly listed who made each recording in the production.  One recording clearly did not involve the listed source or individuals.  Nikparvar-Fard's counsel raised this issue with the Government twice— on May 27 and June 10—but the Government did not clarify that there was not another undisclosed source until August 2022.  *See* Exhibit O, August 24, 2022 Ltr. from AUSA C. Parisi. All this, of course, took time.

Nikparvar-Fard's counsel similarly had to utilize the Late Evidence in its defense, which required it to re-work a defense that has been prepared over years (and many meetings at FDC) to incorporate this new significant evidence and investigate new avenues, all of which was made more difficult because of Nikparvar-Fard's detained status.  Additionally, much of the Late Evidence—such as patient files and interviews—had to be shown to Nikparvar-Fard's expert and incorporated accordingly.  None of this could be accomplished within the weeks before the trial or with a limited continuance until the United States Supreme Court ruled on the *Ruan* case.

16

Thus, Nikparvar-Fard joined in co-defendant White's Motion to Suspend Trial Date Due to

Government Breaches of Fed. R. Crim. P. 16 and *Brady v. Maryland*.  *See* ECF No. 410, 413.

The Court then continued the trial date until its current date of January 9, 2023.  ECF No. 418.

### F.  The Government's Most Recent Productions and Outstanding Discovery Requests

Despite the Government's May 2022 production, Nikparvar-Fard still does not have all

the discovery to which he is entitled.  Nikparvar-Fard's counsel continuously has followed up

with the Government to obtain additional missing discovery, and the Government has refused to

provide certain evidence, claiming that Nikparvar-Fard is not entitled to it.  In response to

follow-up requests from Nikparvar-Fard, the Government made an additional production on July

6, 2022.[3]  The July 6, 2022 production contained reports of recent interviews, surveillance

photographs, copies of checks issued by AUC, materials relating to Loretta Brown, certain

PDMP data, and transcripts of depositions recently obtained by the Government, among other

things.  *See* Exhibit P, July 6, 2022 Ltr. from AUSA C. Parisi.

On August 10, 2022, after exchanging multiple emails with the Government regarding

discovery, Nikparvar-Fard's counsel outlined the status of all pending discovery requests in

anticipation of this motion.  *See* Exhibit Q, August 10, 2022 Ltr. from A. Querns.  Of particular

note, Nikparvar-Fard reiterated his requests for (1) reports that seem to be missing related to

certain Confidential Informants; (2) reports and recordings related to a burner phone that,

according to other discovery, Joanne Rivera agreed to utilize for the Government; and (3)

payments and benefits provided to Sources 79731 and 84328.  *Id.*  In response, the Government

agreed to produce certain information, but also reiterated that it would not be providing the

---

[3] The original production received by Nikparvar-Fard was missing items that the cover letter for the production indicated should be included.  The Government therefore sent a replacement production on July 27, 2022.

additional information related to Confidential Sources requested, because it had no obligation to provide any additional information regarding sources who would not be called as witnesses.  *See* Exhibit O, August 24, 2022 Ltr. from AUSA C. Parisi.  On August 25, 2022,[4] the Government made an additional production that contained consensual recordings made by Joanne Rivera, text messages from CS 84328, a plea hearing transcript for Rivera, and information related to an AUC patient, among other things.  *See id.*  No explanation was provided as to why the recordings made by Rivera were not produced years earlier.

On September 9, 2022, Nikparvar-Fard's counsel responded to the Government's letter explaining that it was obligated to disclose all exculpatory and impeachment evidence, citing *Giglio v. United States*, 405 U.S. 150, 154 (1972).  *See* Exhibit R, September 9, 2022 Ltr. from A. Querns.  It also outlined that the Government's refusal to provide reports and information about benefits obtained by sources was inconsistent with previous letters sent by the Government.  *See* Exhibit R, September 9, 2022 Ltr. from A. Querns.  To date, the Government has not responded to the September 9, 2022 letter, nor produced any additional information.

All this follow-up and review of incoming discovery has taken additional time—and Nikparvar-Fard is still without discovery to which he is entitled, more than three-and-a-half years after the Superseding Indictment was filed, and despite Nikparvar-Fard's and his counsel's best efforts to prod the Government to produce all discoverable evidence.  Yet again, Nikparvar-Fard's counsel has had to incorporate the Late Evidence and ongoing productions into the defense.

---

[4] Nikparvar-Fard's counsel did not receive the production until September 9, 2022.

### III.   LEGAL DISCUSSION

**A.  The Government Should Be Compelled to Produce All Reports Related to All Confidential Sources and Information Regarding the Benefits Received by Each Confidential Source**

Federal Rule of Criminal Procedure 16(a)(1)(E) requires the Government to produce all items that are material to preparing the defense and that the Government intends to use in its case-in-chief at trial.  Additionally, criminal defendants have a due process right to access exculpatory and material evidence in the Government's possession with sufficient time to make use of that evidence at trial. *United States v. Alvin*, 30 F. Supp. 3d 323, 333 (E.D. Pa. 2014) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  Prosecutors are required to volunteer exculpatory evidence that is otherwise unknown to the accused.  *United States v. Agurs*, 427 U.S. 97, 107 (1976).  The disclosure obligations include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.  *Giglio*, 405 U.S. at 154.  The purpose of these rules is not to "punish[] society for misdeeds of a prosecutor," but to ensure a fair trial because "our system of the administration of justice suffers when any accused is treated unfairly."  *Brady*, 373 U.S. at 87.

The Government is currently withholding evidence that Nikparvar-Fard is entitled to under Rule 16 and *Brady*.  First, the Government has produced various documents and recordings related to CS-14-147168 (*see* N4-7; N11-12).  Yet, no reports related to any of these documents or recordings were produced.  The recordings are plainly exculpatory, as Nikparvar-Fard refused to prescribe oxycodone to CS-14-147168 because he had a normal MRI.  All reports related to CS-14-147168, therefore, are material to the defense and *Brady* material.  Similarly, the Government identified CS-XX-XXX658 as a source, but has provided no reports or documents related to the source.  If the Government plans to present this source at trial, then all evidence related to him or her must be produced.  And if the Government does not plan to use

the source, then it suggests that CS-XX-XXX658 was unsuccessful in providing inculpatory information and therefore the evidence is likely material to the defense and/or *Brady* material. Either way, all reports and evidence related to CS-XX-XXX658 should be produced.

The Government also is refusing to provide additional information related to the benefits received and assistance provided by Sources 79731, 82467, and 84328.  The Government has indicated that it has no obligation to provide information regarding confidential sources who are not trial witnesses.  This reasoning is directly contrary to *Brady* and its progeny, because the Government must produce all exculpatory evidence, including that which can be used to impeach Government witnesses.  For instance, Source 82467 has been identified as having pled guilty in this case and as having provided information to the FBI on other investigations.  Details about Source 82467's cooperation in other investigations and the benefits he received from his cooperation is all *Brady* material, at a minimum constituting impeachment evidence that must be produced pursuant to *Giglio*.  Yet, the Government has refused to provide this information, claiming that it need not be disclosed unless the Government calls Source 82467 to testify at trial.  This is wrong.  The Government filed an Information against Source 82467 and he entered into a Cooperation Plea Agreement with the Government before testifying against Nikparvar-Fard in the Grand Jury.  The Government cannot credibly claim that he will not testify at trial. And, even if the Government does not call him as a witness, Nikparvar-Fard has a right to know the full extent of Source 82467's cooperation, because *the defense* may want to call him.  Indeed, *Giglio* addresses this scenario, explaining that the credibility of Government witnesses is important in a case such that "evidence of any understanding or agreement as to future prosecutions would be relevant to [the witness's] credibility and the jury was entitled to know of it."  405 U.S. at 154-55.

The Government should not be permitted to withhold evidence related to this—or any other—source until the eve of trial when it "decides" that one of its main witnesses will testify. The Government's refusal to provide this information is an ongoing violation of Nikparvar-Fard's due process rights and is particularly egregious, given the Government's pattern of withholding evidence in this case.  Therefore, the Court should compel the Government to immediately produce all reports and evidence related to all confidential sources, including information regarding any benefits or payments received.

**B.  The Superseding Indictment Should Be Dismissed Because the Government Violated Nikparvar-Fard's Due Process Rights As Articulated in *Brady v. Maryland***

A *Brady* violation has occurred when: "(1) the evidence at issue is favorable to the accused, because either exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.'"  *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011) (internal citations omitted).  Whether the prosecutor had personal knowledge of the evidence is irrelevant, as "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *see also Giglio*, 405 U.S. at 154 ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor.").  Delayed disclosure of material and exculpatory evidence can violate the *Brady* rule even if the defendant eventually obtains the evidence.  *Alvin*, 30 F. Supp. 3d at 334.  "Circuit courts have recognized the importance of such a rule, noting that it would 'eviscerate the purpose of the *Brady* rule and encourage gamesmanship were [courts] to allow the government to postpone disclosures to the last minute[.]'" *Id.* (quoting *United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009)).  Here, a *Brady* violation has occurred.

1.   ***The Government Withheld Exculpatory and Impeachment Evidence.***

The Government withheld the Late Evidence; it was in the Government's possession for years before it was ultimately produced weeks before the May 31, 2022 trial date.  The Late Evidence is also both exculpatory and impeaching.  The Government also continues to withhold exculpatory and impeachment evidence related to confidential sources.  To convict Nikparvar-Fard with maintaining drug-involved premises, the Government will need to prove that Nikparvar-Fard issued prescriptions knowing or intending those prescriptions to be illegal and that he maintained AUC locations for the purpose of that illegal prescribing.  21 U.S.C. § 856(a)(1); *see Ruan*, 597 U.S. ___ (2022), slip op. 4-5.  Thus, any evidence that shows Nikparvar-Fard and his employees were practicing medicine in the ordinary course, or subjectively believed that what they were doing was legitimate, is exculpatory, because it shows Nikparvar-Fard did not have the requisite criminal intent and that the AUC clinics were not "crack houses," but medical facilities where patients sought care.

Thus, the statements and documents that show Nikparvar-Fard and others were treating patients are all exculpatory.  For instance, there are the patient interviews and reports detailing that she was not prescribed medication until she proved with pharmacy records that she had been prescribed the same medications by other doctors.  This same patient explained how co-defendants actively were trying to find ways to get her off the medications and that medications the Government's expert claimed were illicit had been prescribed by her dentist.  Similarly, recordings show that Nikparvar-Fard refused to write a prescription for the confidential informant unless he provided a urine sample and was seen like any other patient.  They also show that AUC was being run like a legitimate business because it was one:  cash was deposited in the bank, the billing department worked with insurance companies, and employees were dismissed for violating company polices.

The statements by the Government's cooperating witness are also exculpatory and impeaching.  Joanne Rivera, a co-defendant and critical Government cooperator who has pled guilty to Counts I and V, was secretly recorded making many statements about AUC that directly contradict such a guilty plea and that indicate Nikparvar-Fard did not knowingly or intentionally prescribe controlled substances illegally.  For instance, she disagrees that AUC was a "pill mill," she repeatedly states that Nikparvar-Fard was not doing anything illegal and she knows of no illegal acts, and she states that she would be the first one to report illegal activity to the authorities.  Voluntary recordings made by Rivera also were not produced until recently.  According to the call logs, Rivera attempted to make dozens of recorded calls for the Government that were not successful.  Yet, this clear impeachment evidence was not produced until August 2022, after it was explicitly requested by Nikparvar-Fard.

The Late Evidence also includes statements of another key coopering witness who indicates he was busy at AUC examining flu patients—again showing that AUC was a legitimate medical practice.  Even more, the Government did not disclose that the cooperator was involved in providing information on various other Government investigations until May 2022—more impeachment evidence that should have been disclosed years ago.  And, as explained above, the Government has refused to provide any additional information about the witness's cooperation, claiming it has no obligation to provide additional details or information.

Unrelated to Nikparvar-Fard's operation of AUC, the Late Evidence further included documents and recordings related to Nikparvar-Fard's pretrial detention and the Marshals' recording of Nikparvar-Fard's arrest, which the Government has indicated it plans to attempt to introduce at trial.  ECF No. 386.  Special Agent Ngo was recorded explaining how and why Nikpavar-Fard was detained after his arrest.  And Special Agent Soeffing's testimony to the

grand jury explained why the Marshals did not provide Nikparvar-Fard with *Miranda* warnings. This evidence was directly relevant to the issues Nikpavar-Fard raised during every bail hearing and during the motion to dismiss hearing.  Nikparvar-Fard should have been able to use this evidence to support his motions and the Court should have had the benefit of this evidence in ruling on those motions.

The Government cannot claim that the Late Evidence is immaterial.  The recordings alone are comprised of months of interactions made by an undisclosed confidential informant who was an AUC patient and employee.  The informant was actively trying to incriminate Nikparvar-Fard but was unsuccessful.  Yet, the Government did not even disclose the existence of the confidential informant, let alone provide the recordings.  In fact, in recent briefing, the Government admitted that it was obligated to produce the Late Evidence.  ECF No. 424 at 9.

> **2.** ***Nikparvar-Fard Was Prejudiced by the Withholding of the Late Evidence Because the Evidence Is Material.***

"Whether a delayed disclosure violates *Brady* depends on the nature of the evidence and the length of the delay."  *Alvin*, 30 F. Supp. 3d at 336 (citations omitted).  For a defendant to receive a fair trial, the exculpatory evidence must be disclosed "in time for its effective use at trial." *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983).  The Government waited years to produce the Late Evidence, knowing that detained Nikparvar-Fard was preparing his defense from the regular communication with counsel about discovery.  The Government knew that information related to confidential informants was of particular interest to Nikparvar-Fard, as counsel specifically inquired about that information.  Still, the Government did not disclose the existence of Source 00084328 or the content of the recordings.  The Government's delayed disclosure has prejudiced Nikparvar-Fard.  The years-long delay prevented Nikparvar-Fard from planning a comprehensive strategy incorporating the Late Evidence and investigating leads.

Nikparvar-Fard obviously could not incorporate the voluminous Late Evidence into his trial strategy with only weeks before the May 31, 2022 trial date.  Instead, Nikparvar-Fard was forced to request the trial date be suspended to allow for Nikparvar-Fard to review the discovery and file necessary motions.

The Court's continuance of the trial to January 9, 2023 does not remedy the prejudice Nikparvar-Fard faces here.  Much of the evidence is now stale.  The witnesses in the recordings will need to recall events that occurred over five years ago.  Additionally, the Government has still not produced all of the evidence to which Nikparvar-Fard is entitled.  Thus, the *Brady* violation and the prejudice faced by Nikparvar-Fard is ongoing.  The Government continues to withhold reports related to confidential sources and continues to refuse to provide information about benefits received by confidential sources, all of which is, at minimum, impeachment evidence.  *See* Exhibit R, September 9, 2022 Ltr. from A. Querns.  Defense counsel thus has no "reasoned opportunity to put the exculpatory material to work," because some of it has yet to be produced.  *See St. Germain v. United States*, No. 03-8006, 2004 WL 1171403, at *12 (S.D.N.Y. May 11, 2004).

Finally, Nikparvar-Fard has to bear the expense and effort of continuously re-doing his trial strategy.  For example, in September 2019, Nikparvar-Fard filed a motion to suppress the videos that recorded his arrest by United States Marshals in August 2017.  After extensive briefing and a hearing on the issue, the Court issued an opinion denying Nikparvar-Fard's motion.  The Late Evidence now contains grand jury testimony of Special Agent Soeffing regarding Nikparvar-Fard's arrest during which he describes the occurrence and explains why Nikparvar-Fard was not read his *Miranda* warnings—the central issue of Nikparvar-Fard's motion to suppress.  This shows the clear prejudice to Nikparvar-Fard, who is now in possession

of evidence that could have directly impacted his motion to suppress, such that the Court need to reconsider its prior decision.  Moreover, Nikparvar-Fard has had to prepare for trial three times—while detained—with incomplete discovery.  First for the April 2020 trial date, then the January 2022 trial date, and then the May 2022 trial date.  Each time, Nikparvar-Fard and his counsel expended significant effort to get the case prepared for trial, only for the Government to pull the rug out from under them, again.  Now again, Nikparvar-Fard is preparing for trial while the Government is refusing to produce *Brady* material that could again require revisions to the defense strategy.

### 3.   *Dismissal Is the Appropriate Remedy for the Government's* **Brady** *Violations*

Dismissal of an indictment on due process grounds is an available remedy for a *Brady* violation that results from deliberate misconduct by the Government which resulted in substantial prejudice to the defendant.  *See Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 254-55 (3d Cir. 2005).  Willful misconduct can be demonstrated through a showing that the Government acted with reckless disregard for a defendant's due process rights in failing to disclose *Brady* material, "because those cases call for penalties which are not only corrective but are also highly deterrent."  *United States v. Lang*, No. CR 2015-0018, 2019 WL 1673317, at *11 (D.V.I. Apr. 17, 2019) (citing *Fahie*, 419 F.3d at 254-55).

It must be underscored:  it is no excuse for the Government to claim that either the agent or the prosecutor was unaware of the non-production of the evidence.  There exists only one Government, and the prosecutor is responsible for the conduct of the agents.  *See Alvin*, 30 F. Supp. 3d at 336 (rejecting AUSA's explanation that an FBI report was not produced because of turnover among FBI agents handling the case).  Moreover, reports produced related to Source 84328 indicate that then-AUSA Bologna was briefed on the source's activities and thus had to have known that these recordings existed.  No explanation has been provided as to why the

26

material was not timely produced with the other confidential source recordings in 2019 or even later produced in January 2022 when the Government represented it was ready for trial.  The delayed disclosure of evidence that the prosecution had in its possession for years, which is currently ongoing, is inexcusable.

Dismissal is warranted given the Government's outrageous conduct.  As set out above, despite Nikparvar-Fard's due diligence, discovery issues have been ongoing in this case since 2019.  The Government twice represented it was prepared for trial—in January and May 2022— when Nikparvar-Fard had not been provided all the exculpatory and impeachment evidence he is entitled to under *Brady*.  The Government now continues to withhold evidence related to confidential sources and cooperating witnesses, despite numerous additional requests from Nikparvar-Fard.  The Government's overly narrow view of what evidence falls under *Brady* and *Giglio* further suggests that there is likely more material evidence that has not been produced. This is supported by the Government's affinity to change its position on whether it would produce documents.  The same charts Nikparvar-Fard was forced to scan at the DEA's office during a global pandemic were later produced willingly by the Government weeks before the May 2022 trial.

More than three-and-a-half years after the first production in this case, the discovery issues have become too significant.  The consistent delayed disclosure so undermines the confidence in this case that a trial cannot result in a fair verdict.  *See Alvin*, 30 F. Supp. 3d at 339 (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).  Indeed, if the Omicron variant of COVID-19 had not delayed the trial in January 2022, the trial would have resulted in a gross miscarriage of justice, because the Government had not disclosed the existence of the Late Evidence, nor even the cooperation of a key Government witness on other investigations.  Since then,

confidence has not been restored.  Thus, dismissal is the only remedy to ensure that an erroneous

verdict is not reached and that similar conduct by the Government is deterred.

### C.  The Superseding Indictment Should Be Dismissed Under the Sixth Amendment Right to Speedy Trial

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall

enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.  Whether or not the Speedy

Trial Act has been violated is immaterial.  The Speedy Trial Act explicitly states that the statute

should not "be interpreted as a bar to any claim of denial of speedy trial as required by

amendment VI of the Constitution."  18 U.S.C. § 3173.

To determine whether the constitutional right to a speedy trial has been violated, courts

consider the following four factors: "(1) the length of the delay before trial; (2) the reason for the

delay and, specifically, whether the government or the defendant asserted his speedy trial right;

(3) the extent to which the defendant asserted his speedy trial right; and (4) the prejudice suffered

by the defendant."  *United States v. Velazquez*, 749 F.3d 161, 174 (3d Cir. 2014) (citing *Barker

v. Wingo*, 407 U.S. 514, 530-32)).  "[N]o one factor is dispositive nor 'talismanic.'"  *Id.* at 174

(citing *Hakeem v. Beyer*, 990 F.2d 750, 770 (3d Cir. 1993) (quoting *Barker*, 407 U.S. at 533)).

#### 1.  *Length of the Delay*

A court first must decide whether the delay is long enough to trigger the analysis of the

remaining *Barker* factors.  *Doggett v. United States*, 505 U.S. 647, 652 (1992).  If it is, then the

length of the delay is also separately weighed in the court's analysis of the remaining factors.  *Id.*

The Third Circuit in *Velazquez* has noted that a delay of fourteen months is "sufficient to trigger

review of the remaining *Barker* factors."  *Velazquez*, 749 F.3d at 174.

The fourteen-month period that triggers the *Barker* factor review came and went years

ago.  Between the Government's pattern of producing evidence on the eve of trial and the delays

caused by the COVID-19 pandemic, trial will begin four years—to the day—from the

Government's indictment.  Had the Late Evidence (and that evidence that the Government has

recently produced and that is the subject of this Motion to Compel) been provided at the outset of

the case, trial of this case would have been completed this summer.  Instead, we are still fighting

about discovery and scheduled to have a trial about conduct that began in January 2014—nearly

nine years ago.

### 2.  *The Reason for the Delay*

The Government "bears the burden to justify the delay."  *Hakeem*, 990 F.2d at 770.  The

United States Supreme Court in *Doggett* described the range of Government conduct causing

delay ranging from "diligent prosecution" to "bad-faith delay":

> Between diligent prosecution and bad-faith delay, official negligence in bringing
> an accused to trial occupies the middle ground.  While not compelling relief in
> every case where bad-faith delay would make relief virtually automatic, neither is
> negligence automatically tolerable simply because the accused cannot demonstrate
> exactly how it has prejudiced him.

*Doggett*, 505 U.S. at 656-57.

In this case, the Court need not find intentional, bad faith on the part of the Government

for the delay to require dismissal of the Superseding Indictment.  The Supreme Court in *Doggett*

noted that negligence is sufficient:

> Although negligence is obviously to be weighed more lightly than a deliberate
> intent to harm the accused's defense, it still falls on the wrong side of the divide
> between acceptable and unacceptable reasons for delaying a criminal prosecution
> once it has begun.  And such is the nature of the prejudice presumed that the weight
> we assign to official negligence compounds over time as the presumption of
> evidentiary prejudice grows.  Thus, our toleration of such negligence varies
> inversely with its protractedness, *cf. Arizona v. Youngblood*, 488 U.S. 51, 109 S.
> Ct. 133, 102 L.Ed. 2d 281 (1988), and its consequent threat to the fairness of the
> accused's trial.

*Id.* at 657.

The suppression of the Late Evidence, which was indisputably in the Government's possession since 2017, rises far beyond the level of "official negligence."  Indeed, the history surrounding discovery in this case shows that, despite Nikparvar-Fard's detained status, the Government spent years recklessly disregarding its obligation to provide timely disclosure of material evidence or, at the very least, was grossly negligent—either of which requires the dismissal of the Superseding Indictment.

The Third Circuit in *Velazquez* opined that "[n]egligence over a sufficiently long period can establish a general presumption that the defendant's ability to present a defense is impaired, meaning that a defendant can prevail on his claim despite not having shown specific prejudice." *Velazquez*, 749 F.3d at 175.  The Government's actions in the instant case went far beyond negligence.  Quoting the Supreme Court in *Doggett*, the Third Circuit stated:

> This general presumption applies because 'impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony 'can rarely be shown.'"

*Id.*, citing *Doggett*, 505 U.S. at 655.  The Third Circuit in *Velazquez* noted that excessive delay imperils the fairness and the public confidence in the trial: "Thus, we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify."  *Id.*  Such a presumption applies here, and it is the Government's "difficult" burden to rebut the presumption by proving "the absence of any prejudice to a defense from the passage of years."  *Id.* (citing *Doggett*, 505 U.S. at 658 n.4).

### 3. *Defendant's Assertion of Speedy Trial Right*

The third *Barker* factor requires a court to examine "[w]hether and how a defendant asserts his [speedy-trial] right," *Barker*, 407 U.S. at 531.  The Third Circuit in *Velazquez* instructed that "[t]he Supreme Court noted in *Barker* that the fundamental 'right to a speedy trial is unique in its uncertainty as to when and under what circumstance it must be asserted or may be

deemed waived.'" *Velazquez*, 749 F.3d at 182 (citing *Barker*, 407 U.S. at 529).  The fact that the defendant previously needed additional time to prepare does not undermine his assertion of the right to speedy trial, however.  The *Velazquez* court explained that *Barker* rejected "a rigid rule that a defendant waives his speedy-trial right 'for any period prior to which he has not demanded a trial.'" *Id.*

Here, the Government's repeated and significant late disclosures have eviscerated Nikparvar-Fard's constitutional right to a speedy trial by requiring Nikparvar-Fard and co-defendants to seek continuances.  In 2019, in response to numerous inquiries from Nikparvar-Fard, the Government repeatedly represented that it had produced all of the patient files that had been provided to its expert.  Then, weeks before the April 20, 2020 trial date, the Government produced more than 13,000 pages of patient files that its expert had relied upon to Nikparvar-Fard's co-defendants that were mistakenly left out of earlier productions.  This late production caused co-defendant White to seek a continuance on March 10, 2020, to review and utilize the late discovery.  ECF No. 197.

The trial was then delayed several more times because of the COVID-19 pandemic's impact on the Court's ability to try lengthy, multi-defendant cases.  The Court ultimately set a May 31, 2022 trial date.  Weeks before trial, the Government again made a late production of significant evidence, also related to discovery that Nikparvar-Fard had specifically asked about (except this was more than two years later).  The Government had more than two years to review its file and productions and ensure that all appropriate discovery had been produced.  Two years.  And, in representing to the Court that it was ready to proceed to trial in January 2022, the Government suggested that it had done just that.  Nikparvar-Fard was prepared for trial in April 2020 before the Government's late production.  He was again prepared for trial in May 2022

31

before the Government's late production.  In requesting the Court to suspend the May 31, 2022

trial date, Nikparvar-Fard specifically objected to exclusion under the statutory speedy trial clock

because the continuance was necessitated by the Government's lack of diligent preparation.  18

U.S.C. § 3161(h)(7)(C).  Nikparvar-Fard thus has asserted his speedy trial right.

### 4.  *Prejudice Suffered by the Defendant*

There is a general presumption of prejudice, instead of a requirement that specific

prejudice be shown, when the Government's negligence lasts for more than one year.  *See*

*Doggett*, 505 U.S. at 658 (finding that the durational requirement for relief without specific

prejudice was met where the delay attributable to the Government's negligence was in excess of

the one-year threshold needed to state a speedy trial claim).  The Supreme Court in *Doggett*

stated, ". . . we generally have to recognize that excessive delay presumptively compromises the

reliability of a trial in ways that neither party can prove or, for that matter identify." *Id.* at 655.

As will be more fully discussed below, prejudice to a defendant is not limited to the possible

prejudice to his defense proceedings.  *Moore v. Arizona*, 414 U.S. 25, 26-7 (1973).

In *Velazquez*, the Government argued that the defense was "unimpaired," because the

defense had all of the evidence relating to the meeting and phone calls that were material to the

case.  The Third Circuit rejected that argument, stating:

> The government's reasoning is flawed in two ways.  First, **it equates the**
> **preservation of evidence the government would rely on with the materials**
> **Velazquez might need to challenge the government's case**.  The Court in *Doggett*
> recognized that 'impairment of one's defense is the most difficult form of speedy
> trial prejudice to prove because time's erosion of exculpatory evidence and
> testimony can rarely be shown.' 505 U.S. 655, 112 S. Ct. 2686 (internal quotation
> marks omitted).  Not only may *Velazquez*, plausibly claim that his own recollection
> of the events at issue has eroded, but he also has argued that the passage of time
> makes it harder to investigate an entrapment defense or find witnesses to 'his
> whereabouts and involvement.' *Velazquez*, 2012 WL 2094061, at *13.  Forecasting
> how faded memories could harm him is precisely the sort of difficult-to-obtain
> proof that supports the finding of general prejudice in a case of extraordinary delay.

*Velazquez*, 749 F.3d at 185 (emphasis added).

The Government waited more than three years after the Superseding Indictment to produce dozens of recordings that a confidential informant made in 2017, among other evidence. As fully detailed above, the informant was an employee of AUC who was attempting to obtain incriminating evidence related to Nikparvar-Fard, but instead obtained exculpatory statements by Nikparvar-Fard, co-defendant Rivera, and others.  The late production of this evidence does not cure the prejudice.  That the Government is not interested in using this evidence highlights precisely why it should have been disclosed at the outset of this case.  It is—and always was— material to the defense.  Yet, Nikparvar-Fard formed a defense strategy for years without it. New evidence engenders the need for further investigation, witness interviews, record collection, etc.; defense preparation does not begin and end with reviewing the evidence produced. Documents must be reviewed and absorbed, and strategies and cross-examinations created and arguments formed.

The defense actively has been preparing this case for years, which has been challenging, given that Nikparvar-Fard was detained until July 2022.  Counsel worked tiredly with the FDC to get Nikparvar-Fard discovery materials and communicate with him regarding the materials. Counsel searched for and retained an expert witness.  Defense counsel used the delays caused by the pandemic to continue to prepare a defense, while the Government put the case on ice.  The revelation of the existence and nondisclosure of the Late Evidence is simply too late.  The excessive delay has "comprised the reliability of a trial" due to the fact that it will be 5-9 years from the criminal acts charged (2014-2017) and four years from the Superseding Indictment before any trial is possible.  *Doggett*, *id.* at 655.  Witnesses' memories fade, witnesses cannot be

located, and "time's erosion of exculpatory evidence and testimony can rarely be shown."

*Velasquez*, citing *Doggett*.

Moreover, prejudice to the defendant is not limited to the prejudice to the trial

proceedings:

> …[P]rejudice to a defendant caused by delay in bringing him to trial is not confined
> to the possible prejudice to his defense in those proceedings.  (footnote omitted).
> Inordinate delay, 'wholly aside from possible prejudice to a defense on the merits,
> may 'seriously interfere with the defendant's liberty, whether he is free on bail or
> not, and . . . may disrupt his employment, drain his financial resources, curtail his
> associations, subject him to public obloquy, and create anxiety in him, his family
> and his friends.'

*Moore*, 414 U.S. at 190 (citations omitted).  The Supreme Court in *Barker* expressly rejected the

notion that an affirmative demonstration of prejudice was necessary to prove a denial of the

constitutional right to a speedy trial.  *Barker*, 407 U.S. at 533.

The impact this proceeding has had on Nikparvar-Fard's life is profound.  He was

detained for 43 months, and more than half that time was during a global pandemic that limited

his ability to see his family or communicate with his counsel.  His mental health and the health

of his family, particularly his children, was impacted, as explained in detail at Nikparvar-Fard's

multiple bail hearings.  Even though Nikparvar-Fard is not currently detained, he remains on

house arrest and is obviously unable to work or continue his medical practice.  The drawn-out

proceeding has caused significant financial strain on his family, as legal fees have continued

throughout the years that this case has been pending.  Multiple bail motions were filed,

Nikparvar-Fard and his counsel have had to continue to alter defense strategy as the Government

produces new evidence, and counsel has to continuously follow up with the Government to

obtain evidence that should have been produced at the outset.  The stigma and prejudice inuring

from this ordeal for over four years now, with no end in sight, coupled with the financial and

emotional drain on his entire well-being, is immeasurable and unbearable.

**5.** *Remedy for the Constitutional Right to a Speedy Trial*

The remedy for a Sixth Amendment speedy trial violation is to dismiss the indictment with prejudice. *Alvin*, 30 F. Supp. 3d at 350. Although a harsh remedy, it is the "necessary cost for the protection of the speedy trial right set forth in the Constitution." *Id.* (citing *Velazquez*, 749 F.3d at 186). Dismissal is thus appropriate here because Nikparvar-Fard's constitutional right to a speedy trial was violated such that the Court can "no longer believe[] that the case against [Nikparvar-Fard] can fairly proceed to trial." *See id.* at 350 (dismissing superseding indictments based upon the Government's violation of the defendants' constitutional right to a speedy trial, even though the Government also committed *Brady* violations).

**D.  The Superseding Indictment Should Be Dismissed Under Fed. R. Crim. P. 48(b)**

Federal Rule of Criminal Procedure 48(b) provides:

(b) By the Court.  The court may dismiss an indictment, information, or complaint if unnecessary delay occurs, in:

> (1)  presenting a charge to a grand jury;
> (2)  filing an information against a defendant; or
> (3)  bringing a defendant to trial.

"The rule serves a much broader function [than simply implementing or enforcing the Sixth Amendment guarantee of a speedy trial]; it is a restatement of the court's inherent power to dismiss a case simply for want of prosecution." *United States v. Zabady*, 546 F. Supp. 35, 37 (M.D. Pa. 1982) (citing *United States v. Dreyer*, 533 F.2d 112, 113 n.1 (3d Cir. 1976), *United States v. Correia*, 531 F.2d 1095, 1099 (1st Cir. 1976), *Mann v. United States*, 304 F.2d 394, 398 (D C. Cir. 1962), Notes of Advisory Committee on Fed. R. Crim. P. 48(b), 3 C.  Wright, Federal Practice and Procedure. § 814 (1969)).

The District Court in *Zabady* held that "[t]he court's power to dismiss under Rule 48(b) is not limited to those situations in which the defendant's sixth amendment right to a speedy trial

has been violated."  546 F. Supp. at 38 (citations and footnotes omitted).  Rule 48(b) allows for the dismissal of an indictment under less stringent standards than are required under the Sixth Amendment.  "Consequently[,] it may be proper for a court to exercise its discretion to dismiss an indictment under Rule 48(b) even though the unreasonable delay in prosecuting does not rise to a constitutional violation." *Id.* (citations and footnote omitted).  Society has a "common interest that the government prosecute, not persecute, those whom it accuses of a crime." *Dicky v. Florida*, 398 U.S. 30, 43 (1970).

Nikparvar-Fard has been persecuted for far too long.  The Government first executed search warrants on AUC in 2015.  The Superseding Indictment was not filed until January 2019, and his trial will begin four years after that filing, in January 2023.  Nikparvar-Fard spent 43 months waiting for his trial to begin in pretrial detention, only for it to be significantly delayed as a result of the Government's lack of diligence and reckless handling of discovery, all while the Government continued to oppose his release on bail.  The Government has no excuse for this drawn-out process.  The Government could have—and should have—timely produced all discoverable evidence.  If it had done so, then this ordeal would not still be ongoing for Nikparvar-Fard.  The Government should be found to be out of time, and the Superseding Indictment should be dismissed.

## IV.    CONCLUSION

The Government's conduct in this case has been outrageous and is inexcusable.  To this day, the discovery issues continue, and Nikparvar-Fard still cannot fully prepare his case.  As such, for the reasons set out above, the Court should compel disclosure of the requested discovery and dismiss the Superseding Indictment.

Respectfully submitted,

Dated:  October 21, 2022

BLANK ROME LLP
BY:     /s *Joseph G. Poluka*
Joseph G. Poluka (PA Bar No. 42035)
Ann E. Querns (PA Bar No. 314145)
One Logan Square
130 N. 18th Street
Philadelphia, PA  19103
Email:  poluka@blankrome.com
aquerns@blankrome.com
Telephone: 215-569-5500

FRANK DESIMONE, ESQUIRE
BY:     /s *Frank Desimone*
Frank DeSimone (PA Bar No. 12359)
123 S. Broad St.
Suite 2500
Philadelphia, PA 19109
Email: fdesimone2003@yahoo.com
Telephone:  215-567-3507

*Attorneys for Defendant*
*Mehdi Nikparvar-Fard*

## <u>CERTIFICATE OF SERVICE</u>

I, Joseph G. Poluka, hereby certify that, on October 21, 2022, a true and correct copy of

the foregoing was served upon all counsel of record by the Court's Electronic Case Filing

System.


               /s/ Joseph G. Poluka_____
              JOSEPH G. POLUKA