**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL ACTION** |
| | : | |
| v. | : | |
| | : | |
| MEHDI NIKPARVAR-FARD | : | |
| a/k/a "Mehdi Armani" | : | No. 18-101-1 |
| MITCHELL WHITE | : | No. 18-101-6 |
| JASON DILLINGER | : | No. 18-101-7 |

## M E M O R A N D U M

PRATTER, J.                                          DECEMBER *29*, 2022

Mehdi Nikparvar-Fard has filed a Motion to Compel Discovery and Dismiss the Superseding Indictment and a Second Motion to Dismiss the Superseding Indictment along with supplemental briefing. Dr. Nikparvar-Fard's co-defendant Mitchell White has joined in Dr. Nikparvar-Fard's motions and filed his own Motion to Dismiss the Charges Against Him. Jason Dillinger, a third co-defendant, also joins in the pending motions.[1] The defendants argue that the Government's negligence in providing discovery mere weeks before a previous trial date certain has resulted in a loss of confidence in the Government, *Brady* violations, violations of their Sixth Amendment speedy trial right, and violations of the Speedy Trial Act. They argue, *inter alia*, that these violations are so egregious as to warrant dismissal of the superseding indictment. For the reasons set forth below, the Court does not find that the alleged violations merit the dismissal of the superseding indictment against the remaining co-defendants.

### BACKGROUND

Dr. Nikparvar-Fard has submitted an extensive factual background in his Motion to Compel Discovery and Dismiss the Superseding Indictment. Doc. No. 462-1 at 3–18. The

---

[1]      Mr. Dillinger's counsel indicated at the December 6, 2022 hearing that the Court had previously granted Mr. Dillinger's motion to join the other defendants' motions. January 6, 2022 Tr. at 4:1–9.

Government, in its opposition brief, does not appear to dispute the accuracy of that factual background. Therefore, with some abridgment and additions as necessary, the Court borrows heavily from Dr. Nikparvar-Fard's background information below.

## I.   Indictments and Initial Productions

Dr. Nikparvar-Fard owned and operated four Advanced Urgent Care ("AUC") facilities between January 10, 2014 and August 13, 2017. On March 18, 2018, Dr. Nikparvar-Fard was charged in a one-count indictment. On December 19, 2018, Dr. Nikparvar-Fard was arrested as a result of that indictment. A five-count superseding indictment was filed on January 9, 2019, charging Dr. Nikparvar-Fard and twelve additional defendants, including Mr. White and Mr. Dillinger, with (1) maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) (Counts One to Four) and (2) conspiracy to distribute a controlled substance, in violation of 21 U.S.C. § 846 (Count Five). The Government alleges that these defendants issued illegal prescriptions for controlled substances that were not medically necessary.

On February 7, 2019, the Government made its initial production, including a report by the expert witness Dr. Stephen Thomas and, purportedly, the patient files that Dr. Thomas had relied on when preparing his report. Because he was incarcerated, Dr. Nikparvar-Fard did not have access to the first production for several months. On May 23, 2019, the Government made an additional production, including audio and video recordings made by five confidential sources or undercover agents, information about those sources, search warrants, patient laboratory reports, statements by the defendants, and other patient files reviewed by Dr. Thomas. On June 24, 2019, the Court declared the case complex and set an initial trial date of April 20, 2020. Through mid-2019, counsel for Dr. Nikparvar-Fard and the other defendants followed up with the Government for the production of the files relied on by Dr. Thomas in his report, and the Government asserted that it

produced all those files on September 12, 2019. For the patient charts seized from AUC, the Government required Dr. Nikparvar-Fard to arrange for copies or scans, at a cost anticipated to be more than $10,000.

## II.   February 2020 Production and Continuance of the April 2020 Trial Date

On February 27, 2020, the Government produced to Dr. Nikparvar-Fard's co-defendants 46 patient files (over 13,750 pages of medical records) that Dr. Thomas had relied on for his report, acknowledging that this production was required under Rule 16. On March 9, 2020, the Government produced Jencks Act material to the defendants' counsel. Mr. White requested a continuance of the trial date to allow counsel to review the new productions by the Government. The Court continued the trial to June 15, 2020 in consideration of Mr. White's motion and concerns around the COVID-19 pandemic. March 18, 2020 Order, Doc. No. 210. Due to a series of Standing Orders[2] issued by the Eastern District of Pennsylvania's Chief Judge suspending criminal jury

---

[2]     The multiple relevant Standing Orders necessitating the rescheduling of this trial are reported by Dr. Nikparvar-Fard as follows: *In re: Temporary Continuance of Civil and Criminal Jury Trials Due to the Exigent Circumstances Created by COVID-19,* March 13, 2020 (E.D. Pa) (continuing trials through April 13, 2020); *In Re: Second Extension of Adjustments to Court Operations Due to the Exigent Circumstances Created by COVID-19*, May 29, 2020 (extending suspension of trials through August 31, 2020); *In re: Fifth Extension of Adjustments to Court Operations Due to the Exigent Circumstances Created by COVID-19,* August 31, 2020 (continuing all trials scheduled to begin on or before November 2, 2020 with the exception of a limited number of specially designated trials); *In re: Sixth Extension of Adjustments to Court Operations Due to the Exigent Circumstances created by COVID-19,* October 30, 2020 (continuing all trials scheduled to begin on or before December 31, 2020 with the exception of a limited number of specially designated trials); *In re: Seventh Extension of Adjustments to Court Operations Due to the Exigent Circumstances Created by COVID-19,* November 25, 2020 (continuing all trials scheduled to begin on or before January 15, 2021); *In re: Eighth Extension of Adjustments to Court Operations Due to the Exigent Circumstances created by COVID-19,* January 15, 2021 (continuing all trials scheduled to begin on or before February 15, 2021); *In re: Ninth Extension of Adjustments to Court Operations Due to the Exigent Circumstances Created by COVID-19,* February 12, 2021 (continuing all jury trials "until further Court order"); *In re: Tenth Extension of Adjustments to Court Operations Due to the Exigent Circumstances Created by COVID-19,* March 18, 2021 (continuing all jury trials scheduled to begin on or before April 5, 2021 and conditionally permitting only specially designated trials through at least June 7, 2021); *In re: Eleventh Extension of Adjustments to Court Operations Due to the Exigent Circumstances Created by COVID-19,* March 30, 2021 (continuing all jury trials scheduled to begin on or before May 3, 2021, then resuming only selected "test period" cases through "at least" June 7, 2021); *In re: Twelfth Extension of Adjustments to Court Operations Due to the Exigent Circumstances Created by COVID-19,* June 7, 2021

trials to cope with the exigencies of COVID-19, the trial was eventually postponed to January 10, 2022.[3] Sept. 8, 2021 Order, Doc. No. 303.

### III.   September 2020 Production and Continuance of January 2022 Trial Date

Responding to Dr. Nikparvar-Fard's additional requests for production, the Government produced more Jencks Act material on September 11, 2020. On December 16, 2021, co-defendant Avrom Brown filed a motion to continue the January 2022 trial date in light of the Omicron variant, a motion in which Dr. Nikparvar-Fard joined and which Mr. White eventually agreed was prudent. Although the Government represented that it was ready to proceed to trial in January, the Court continued the trial to May 31, 2022. Feb. 14, 2022 Order, Doc. No. 368.

### IV.   May 2022 Production and Continuance of May 2022 Trial Date

On May 4, 2022, a few weeks before the trial was meant to begin, the Government produced 60 hours of surveillance footage and a discovery production that included undercover audio and video recordings from August to December 2017 by Source 84328, a patient and employee of AUC who had conversations with cooperating co-defendant Joanna Rivera and Dr. Nikparvar-Fard; a recording of a Special Agent describing Source 84328, which allowed the FBI to keep Dr. Nikparvar-Fard in custody following his interaction with the U.S. Marshals; 2017 grand jury testimony by a Special Agent regarding his report on Dr. Nikparvar-Fard's first arrest; a 2020 FBI recording of a patient interview, during which the patient confirmed she underwent a physical examination, had a drug screening every visit, and discussed managing her pain without

---

(explaining the plan for resumption of jury trials with the anticipation that only a limited number of trials would be held through September 7, 2021). Dr. Nikparvar-Fard's Mot. to Compel & Dismiss Indictment, Doc. No. 462-1, at 8 n.1.

[3]   May 4, 2020 Order, Doc. No. 236 (continuing trial to December 7, 2020); October 28, 2020 Order, Doc. No. 242 (continuing trial indefinitely); January 19, 2021 Order, Doc. No. 255 (continuing trial to June 7, 2021); June 3, 2021 Order, Doc. No. 278 (continuing trial to October 4, 2021); September 8, 2021 Order, Doc. No. 303 (continuing trial to January 10, 2022).

medication; statements by Dr. Nikparvar-Fard to third parties and a transcript of his deposition; 300 patient charts that were never formally produced by the Government, but which Dr. Nikparvar-Fard had been required to send a representative to scan a year prior; FBI reports and criminal history information for Source 84328; FBI reports for Source 79731 that included an instance where Dr. Nikparvar-Fard chastised an employee for having a blank prescription; FBI reports for Source 82467 that stated that the premises were busy due to flu season and that the witness had provided information to the FBI in eight other healthcare provider investigations; and over 100 jail calls by Dr. Nikparvar-Fard starting in 2017.

Dr. Nikparvar-Fard joined in a motion by Mr. White to suspend the trial date due to the Government's alleged breach of Federal Rule of Criminal Procedure 16 and *Brady v. Maryland*, 373 U.S. 83 (1963). Mr. White took the position at the May 12, 2022 status conference that a brief postponement of the trial would be prudent in anticipation of the Supreme Court's ruling in *Ruan v. United States*, 142 S. Ct. 2370 (2022), which addressed issues reportedly relevant to the charges in this case. The Court set a new trial date of January 9, 2023. June 3, 2022 Order, Doc. No. 418.

## V.     Post-May 2022 Requests for Production

On July 6, 2022, in response to Dr. Nikparvar-Fard's requests, the Government made a production of reports of recent interviews, surveillance photographs, copies of checks issued by AUC, materials relating to co-defendant Loretta Brown, Prescription Drug Monitoring Program data, and transcripts of depositions obtained by the Government. In August 2022, the Government produced voluntary recordings of calls made by co-defendant Ms. Rivera, a plea hearing transcript for Ms. Rivera, text messages from Source 84328, and information related to an AUC patient, but it refused to provide additional information regarding sources who would not be called as witnesses.

**VI.     Motions to Dismiss Superseding Indictments as to Certain Co-Defendants**

On November 28, 2022, the Government filed a motion to dismiss the superseding indictments as to defendants Mr. Brown, Debra Cortez, William DeMedio, and Samantha Hollis. The motion states:

> 2. After continuing to investigate and assess the evidence against these individuals, the government has determined that dismissal of the charges against each of them is just and proper and promotes the most efficient use of prosecutorial and judicial resources.
>
> 3. Under these circumstances, and after careful consideration, the government believes that dismissal of the charges against these individuals is in the interest of justice.

Gov.'s Mot. to Dismiss at 2, Doc. No. 486.

On October 21, 2022, Dr. Nikparvar-Fard filed a motion to compel discovery and dismiss the superseding indictment. On the same day, Mr. White filed a motion to dismiss the charges against him. The Government filed its response in opposition to Dr. Nikparvar-Fard's and Mr. White's motions on November 4, 2022. On December 5, 2022, Dr. Nikparvar-Fard filed a second motion to dismiss the superseding indictment. On December 6, 2022, the Court held a hearing on the pending motions. On December 13, 2022, Dr. Nikparvar-Fard filed a motion to supplement his early motion to compel discovery and dismiss the indictment. Having been fully briefed, the motions are ripe for the Court's review.

DISCUSSION

**I.     Motion to Compel**

Dr. Nikparvar-Fard argues first that the Court should compel the Government to immediately produce all reports and evidence related to all confidential sources, including information regarding any benefits or payments received. Specifically, Dr. Nikparvar-Fard argues that Rule 16(a)(1)(E) demands that the Government produce all items that are material to preparing

the defense and that the Government intends to use in its case-in-chief at trial. Citing *Brady,* he says the Government must provide documents and recordings related to (1) Confidential Source 14-147168, a confidential source to whom Dr. Nikparvar-Fard refused to prescribe oxycodone; (2) CS-XX-XXX658, a confidential source for which the Government has provided no reports or documents; (3) Source 79731; (4) Source 82467, a source who pled guilty in this case and provided information to the FBI in various other investigations; and (5) Source 84328. Dr. Nikparvar-Fard's position is that the Government should not be permitted to withhold evidence related to these sources until the eve of trial when it decides that one of its main witnesses will testify.

Congress placed limits on the discovery of reports made by potential Government witnesses when it enacted the Jencks Act. *United States v. Clark*, No. 19-cr-134, 2020 WL 3034832, at *3 (W.D. Pa. June 5, 2020). The Jencks Act provides that in criminal matters, "no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness . . . shall be the subject of subpoena, discovery, or inspection *until said witness has testified on direct examination in the trial of the case.*" 18 U.S.C. § 3500(a) (emphasis added); *see also* Fed. R. Crim. P. 26.2(a) ("*After a witness other than the defendant has testified on direct examination*, the court, on motion of a party who did not call the witness, must order an attorney for the government or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.") (emphasis added). Typically, the Government engages in the salutary practice of producing Jencks Act material before trial, acknowledging that obeying the letter of the statute too strictly could cause delays. *Clark*, 2020 WL 3034832, at *3. But in the Third Circuit, "[t]he blunt command of the [Jencks Act] together with the unequivocal legislative history has led to unbroken precedent in the

Courts of Appeals denying to district courts the power to compel production of the statements of government witnesses until conclusion of direct examination at the trial." *United States v. Murphy*, 569 F.2d 771, 773 (3d Cir. 1978).

In *Giglio v. United States*, 405 U.S. 150, 154–55 (1972), the Supreme Court required the Government to disclose impeachment information it had with regard to its own witnesses, including promises for leniency in exchange for testimony. The Third Circuit Court of Appeals has held that due process requires that *Brady* material, including impeachment evidence, only be disclosed to the defense "in time for its effective use at trial." *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983). In *Higgs*, disclosures relating to the credibility of the government witnesses made the day that the particular witness testified allowed the defendants to effectively use the information. *Id.*

To the extent the discovery Dr. Nikparvar-Fard, Mr. White, and Mr. Dillinger seek is Jencks Act and *Giglio* material, the Court will not compel such discovery now. The relevant statute and caselaw does not empower this Court to demand anything further as to those witnesses not testifying for the Government at trial.

Relatedly, as to Dr. Nikparvar-Fard's argument that he is entitled to the requested credibility information about witnesses that the Government will not call at trial, because the defense may wish to call those individuals during its case, the Government has no obligation to disclose to the defense material that would allow Dr. Nikparvar-Fard to impeach his own witnesses. *United States v. Kimley*, 60 F. App'x 369, 371 (3d Cir. 2003).

As to Source 82467, the Government's repeat informant, the Government states that its production already includes reports of interviews conducted with this individual regarding AUC's operations, charging documents, a copy of the plea agreement, and reports reflecting information

this person provided while working as a source. Plus, the Government argues it reviewed information provided by the witness in investigations unrelated to AUC to ensure there was no exculpatory material related to AUC, and alerted defendants' counsel that this source had provided information on other investigations. But as Dr. Nikparvar-Fard notes, the single case that the Government relies on to support its view that it need not divulge further information about Source 82467's informant activity actually blesses the practice of submitting the issue to a judge for *in camera* review. *United States v. Harmon*, 833 F.3d 1199, 1205 (9th Cir. 2016).

Because the Court understands that "the Government has legitimate reasons for protecting the confidentiality of the material requested," *id.* (quoting *United States v. Dupuy*, 760 F.2d 1492, 1501 (9th Cir. 1985)), and simultaneously appreciates the defendants' concern that all relevant impeachment material be disclosed, the Court will order the Government to submit for *in camera* review Source 82467's informant activity.

Finally, Dr. Nikparvar-Fard asserts that the Court should compel the Government to produce reports on various documents and recordings related to CS-14-147168, a confidential source to whom Dr. Nikparvar-Fard did not prescribe oxycodone, and CS-XX-XXX658, who was identified as a source, but relating to whom no reports or documents were ever produced. Dr. Nikparvar-Fard argues that reports related to these confidential sources are "plainly exculpatory," because CS-14-147168 did not receive an oxycodone prescription after having a normal MRI, and the Government's decision not to use CS-XX-XXX658 at trial suggests that this source could not provide inculpatory information, thus making any evidence from CS-XX-XXX658 likely *Brady* material. As discussed further below, *Brady* requires the production of exculpatory and *material* evidence to the defendant. *United States v. De Peri*, 778 F.2d 963, 983 (3d Cir. 1985).

The Court is loath to endorse the defendants' apparent view and logics gymnastics that any evidence that is *not* inculpatory therefore *must* be exculpatory. On a practical note, that would seem to require the Government to produce mountains of evidence of law-abiding activity gathered as a by-product in any criminal conspiracy case. As to the defendants' contention that its logic is specific to charges like those under 21 U.S.C. § 856, maintaining a premises *for the purpose* of distributing or dispensing medication outside the usual course of professional practice and not for a legitimate medical purpose, the defendants point to no relevant persuasive caselaw supporting such an expansive view of the definition of "exculpatory." But even taking an indulgent view and accepting the defendants' argument that any evidence of AUC medical professionals *not* prescribing oxycodone on a given day with a given patient, or the absence of damning reports from a certain confidential source, qualifies as "favorable" evidence, withholding such information would still not qualify as a *Brady* violation because *lack* of inculpatory evidence would not be sufficiently material to affect the outcome of trial. *De Peri*, 778 F.2d at 983; *see also United States v. Marrero*, 904 F.2d 251, 260–61 (5th Cir. 1990) (holding that, in a case involving false insurance claims, evidence that defendant billed some medical patients accurately was not *Brady* material because it was irrelevant).

Dr. Nikparvar-Fard has not shown that any documents or reports related to CS-14-147168 and CS-XX-XXX658 would be material. Therefore, it does not qualify as *Brady* material. *See, e.g., United States v. Moyer*, 726 F. Supp. 2d 498, 513 (M.D. Pa. 2010) ("To obtain even an in camera inspection of evidence, a defendant must allege that the prosecution has withheld *Brady* evidence and must at least make a plausible showing that the inspection will reveal material evidence.") (internal quotation marks omitted). Accordingly, the motion to compel is denied,

except as to informant activity disclosure for Source 82467, which the Government shall provide to the Court for *in camera* review prior to trial.

## II.   Alleged *Brady* Violations

"[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The defendant seeking to prove a *Brady* violation must show that the evidence at issue: (1) is "favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) is "suppressed by the State, either willfully or inadvertently"; and (3) is "material such that prejudice resulted from its suppression." *Dennis v. Sec'y, Pa. Dep't of Corrs.*, 834 F.3d 263, 284–85 (3d Cir. 2016). The Government's duty to disclose *Brady* material is ongoing but such material *must* be turned over "in time for its effective use at trial." *Higgs*, 713 F.2d at 44. "If the government makes *Brady* evidence available during trial so that the defendant is able to effectively use it, there is no prejudice—and thus no *Brady* violation." *United States v. Henry*, 842 F. 'App'x 809, 814 (3d Cir. 2021).

Dr. Nikparvar-Fard argues that the Government has withheld both exculpatory and impeachment evidence. He contends that the statements and documents that show him treating patients and running AUC in a legal manner—e.g., the interviews and reports detailing how a patient was not prescribed medication until she proved that other doctors had earlier prescribed those medications, a recording of a confidential informant showing Dr. Nikparvar-Fard refusing to write a prescription without a urine sample, and the AUC billing department working with insurance companies—are all exculpatory as showing the defendants practicing medicine in the ordinary course. Dr. Nikparvar-Fard also points to the secretly recorded statements of cooperating witness Ms. Rivera, who stated that Dr. Nikparvar-Fard was not engaging in illegal prescribing

activity. He also cites to the late production of "voluntary recordings" made by Ms. Rivera that involve her making dozens of outgoing calls.

But none of these pieces of evidence constitute *Brady* material. Some are simply not "favorable" to the accused. For example, the voluntary recordings of dozens of outgoing calls made by Ms. Rivera that resulted in no recorded conversations cannot plausibly be said to be exculpatory or impeaching material for the defendants. Evidence of AUC operating properly as a medical facility with certain patients at certain moments is also immaterial. *See, e.g., De Peri*, 778 F.2d at 983–84 (3d Cir. 1985) ("Evidence that not all vendors were extorted is irrelevant to the charge that the defendants conspired to extort and did extort protection payments from certain vendors."). And while the Government concedes the secret recordings of Ms. Rivera ought to have been produced sooner because they are in fact exculpatory, they were produced before the May trial date, and will have been in the defense's possession eight months before the current January 9, 2023 trial date.

Dr. Nikparvar-Fard contends, however, that he was prejudiced by the withholding of evidence because the evidence was material, and the years' long delay prevented him from planning a comprehensive strategy. But the analysis in the Third Circuit regarding whether the defendants were prejudiced by a potential *Brady* violation is simple: "[i]f the government makes *Brady* evidence available during trial so that the defendant is able to effectively use it, there is no prejudice . . . ." *Henry*, 842 F. App'x at 814.

The Court awards no gold stars for the Government's negligence in producing documents in May 2022, mere weeks before trial was expected to begin.[4] But the Court's most recent continuance of the trial to January 9, 2023 gave the remaining defendants an opportunity to

---

[4] To continue with the report card metaphor, rather it would seem the notation should be "Needs Improvement," if not actually a demerit.

effectively use the newly provided evidence. Having given Dr. Nikparvar-Fard, Mr. White, and Mr. Dillinger several additional months to analyze the new production, the Court is confident that a trial in this matter will still "result in a fair verdict." *United States v. Alvin*, 30 F. Supp. 3d 323, 339 (E.D. Pa. 2014).

Dr. Nikparvar-Fard argues that dismissal is the appropriate remedy in this matter. The Government's conduct is outrageous, he says, because it represented twice that it was ready for trial (in January 2022 and May 2022) when it had not yet produced *Brady* impeachment evidence.

Dismissal of an indictment is a "rare sanction" that may be appropriate where there has been deliberate misconduct on the part of the Government and prejudice to the defendant. *Gov't of V.I. v. Fahie*, 419 F.3d 249, 254–55 (3d Cir. 2005). Again, the Court certainly shares in the defendants' frustrations with the Government's late production of this evidence, and the Government's behavior fell "far below the standard that [courts] expect and the public should demand." *Henry*, 842 F. App'x at 815. But the Court does not find that the Government engaged in willful misconduct,[5] and dismissal of an indictment is appropriate only in exceptional circumstances, "in response to particularly egregious due process violations." *Fahie*, 419 F.3d at 252.

There is no prejudice here nor evidence of egregious misconduct relating to the alleged *Brady* violations, and so the Court will decline to dismiss the indictment on that basis.

### III.   Sixth Amendment Right to Speedy Trial

The defendants also argue that their constitutional right to a speedy trial has been violated and that dismissal of the indictment is warranted on that basis. Because the majority of the delay

---

[5]   The Court notes that current Government trial counsel was not managing the case at the time the material ought to have been produced. Indeed, the production was one of the first actions taken by current counsel. Prior Government counsel has taken a new position.

here is not attributable to the Government, this argument fails. The Sixth Amendment guarantees to the accused "the right to a speedy and public trial." U.S. Const. amend. VI. When a defendant alleges a speedy trial violation, the Court employs the four-part balancing test set forth in *Barker v. Wingo*, 407 U.S. 514 (1972), to assess the merits of the claim. The factors in the *Barker* test are: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530. "All factors must be considered and weighed as no one factor is dispositive nor 'talismanic.'" *Hakeem v. Beyer*, 990 F.2d 750, 759 (3d Cir. 1993). If the speedy trial right has been violated, the indictment must be dismissed. *Barker*, 407 U.S. at 522.

*First*, the Court looks to the length of the delay. If the delay to trial is of sufficient length, a complete analysis under the four-part test is triggered. *Id.* at 530. The four-year delay between indictment and trial prompts a further analysis under the other three *Barker* factors. This factor cuts in favor of finding a Sixth Amendment violation.

*Second*, as to the reason for the delay, the Government "bears the burden to justify the delay." *Hakeem*, 990 F.2d at 770. Rationales for delay are typically grouped into three categories:

> A deliberate effort by the Government to delay the trial "in order to hamper the defense" weighs heavily against the Government. *Barker*, 407 U.S. at 531, 92 S. Ct. 2182. A "more neutral reason such as negligence or overcrowded courts" also weighs against the Government, though "less heavily." *Id.* This is because "ultimate responsibility for such circumstances must rest with the [G]overnment," since it is the Government's duty to bring a defendant to trial. *Id.* at 527, 531, 92 S.Ct. 2182. Finally, "a valid reason, such as a missing witness, should serve to justify appropriate delay." *Id.* at 531, 92 S. Ct. 2182.

*United States v. Battis*, 589 F.3d 673, 679 (3d Cir. 2009). Dr. Nikparvar-Fard and Mr. White argue that the Government has been suppressing evidence since 2017, so this factor should weigh in favor of the defendants. But that is not a fair or nuanced assessment of the delays in this case. The majority of the delays here have been necessitated by official and public concerns about COVID-19 and the attendant risks to the health of the parties, their counsel, and jurors, and

tangential impacts to the efficiency and fairness of a trial. Even if all parties had been prepared for trial as of April 20, 2020 (the initial trial date), this District's Standing Orders and the motions of Dr. Nikparvar-Fard's and Mr. White's co-defendants to continue the trial due to upticks in infection rates would account for 25 months of delay. The Court will not attribute the majority of the delay here to the Government. *See United States v. Kaetz*, No. 21-cr-71, 2021 WL 1251711, at *6 (D.N.J. Apr. 5, 2021) (finding COVID-19 delays not attributable to the Government); *United States v. Okoro*, No. 12-cr-241, 2022 WL 402693, at *3–4 (M.D. Pa. Feb. 9, 2022).[6] The Court also considers at least a portion of the delay following the May 2022 trial date to be justifiable in light of all parties' (and the Court's) interest in the Supreme Court's decision in *Ruan*, given its possible relevance to the issues of this case. All told, the Court considers 26 months of delay to have been appropriate and justified. Seven months of delay have been occasioned by the Government's negligent late production of evidence, which weighs less heavily against the Government than would intentional misconduct. Given that the delay due to Government negligence is roughly only one-fourth the length of the delay due to events outside the Government's control, the delay is not largely attributable to the Government, and so this factor is at most neutral to finding a Sixth Amendment violation.

*Third*, the factor considering "[w]hether and how a defendant asserts his right [to a speedy trial] is closely related" to the other *Barker* factors. *Barker*, 407 U.S. at 531. "The strength of [a defendant's] efforts [in asserting his right] will be affected by the length of the delay,

---

[6]       Dr. Nikparvar-Fard argues that "any delay caused by the pandemic should still be counted as delay by the Government because even absent the pandemic, the same delay would have occurred." Supp. in Support of Mot. to Compel Discover, Doc. No. 503, at 6. This argument encourages an exercise in hypotheticals. As the Court sees it, even *if* all parties had been perfectly equipped to begin trial on April 20, 2020, a valid reason—a global pandemic—would have caused the delay of nearly 25 months. For the same reason, the Court will not factor in delays that *may* have been necessitated by the defendants' various pre-trial motions had we operated in a separate reality where COVID-19 did not exist.

to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable." *Id.*. Dr. Nikparvar-Fard points to his objection to the exclusion under the statutory speedy trial clock when the Court suspended the May 31, 2022 trial date as his first assertion of his speedy trial right. The fact that Dr. Nikparvar-Fard only asserted his speedy trial rights once, three and a half years after the indictment, weighs somewhat against finding a Sixth Amendment violation. Mr. White's case is closer, because he asserted his constitutional and statutory speedy trial rights in December 2021, approximately two years after the indictment, and before the trial continuance owing to the Omicron variant. However, Mr. White acquiesced to a short continuance of the January 2022 trial date, and later agreed that a brief postponement of the May 2022 trial date in anticipation of the Supreme Court's *Ruan* decision would be prudent. These could be read as at least mild "indicat[ions] that he [wa]s unwilling or unready to go to trial." *Hakeem*, 990 F.2d at 764. The Court finds that these factors cut against a finding of a Sixth Amendment violation as to both Dr. Nikparvar-Fard and Mr. White.

*Fourth*, the Court considers whether Dr. Nikparvar-Fard, Mr. White, and Mr. Dillinger have been prejudiced by the delay. *Barker*, 407 U.S. at 532. In *Battis*, the Third Circuit Court of Appeals held, by synthesizing the holdings in *Barker* and *Doggett v. United States*, 505 U.S. 647 (1992), that a defendant can establish prejudice in two ways. *Battis*, 589 F.3d at 682. First, he can affirmatively prove his suffering "oppressive pretrial incarceration," that he experiences "anxiety and concern" because of the impending trial, or, most importantly, that his defense has been "impaired as a result of the delay." *Id.* (quoting *Barker*, 407 U.S. at 532) (internal quotations omitted). Second, a defendant can claim presumptive prejudice based on "excessive delay [which] presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Battis*, 589 F.3d at 682 (quoting *Doggett*, 505 U.S. at 655–56). Where a

defendant relies on a presumption of prejudice to establish the fourth *Barker* factor and identifies a delay of sufficient duration to be considered presumptively prejudicial, the Government can mitigate the presumption by showing that the defendant acquiesced in the delay, or rebut the presumption by proving the defendant's ability to defend himself is unimpaired. *Battis*, 589 F.3d at 682. The *Battis* court held definitively that prejudice would be presumed where there had been a 45-month delay, "even when it could be argued that only thirty-five months of that delay is attributable to the Government." *Id.* at 683.

Dr. Nikparvar-Fard and Mr. White both argue that the presumption of prejudice applies here. Because there has been a 48-month delay between indictment and trial, the Court agrees that the presumption applies. But the Government has mitigated the presumption by showing that the defendants acquiesced in the delays. There is no indication that the defendants objected to the various pandemic-related and Court-ordered continuances of trial necessitated by the Standing Orders in 2020 and 2021. Dr. Nikparvar-Fard and Mr. White joined in their co-defendant Mr. Brown's motion to continue the January 20, 2022 trial date in light of another COVID-19 outbreak. And Mr. White's motion to suspend the trial date, joined by Dr. Nikparvar-Fard, albeit necessitated by the Government's late production of relevant evidence, noted that it would be prudent to briefly postpone the trial given the interest in the outcome of the Supreme Court's *Ruan* decision. Given this general history of acquiescence on the part of the defendants, Dr. Nikparvar-Fard and Mr. White cannot rely on the presumption of prejudice to have this factor weigh in favor of finding a Sixth Amendment violation. *See Okoro*, 2022 WL 402693, at *6; *United States v. Rodriguez-Mendez*, No. 17-cr-15-1, 2021 WL 3025898, at *12 (W.D. Pa. July 16, 2021).

To the extent that Dr. Nikparvar-Fard and Mr. White seek to affirmatively show prejudice, those attempts fall short. Although Mr. White was never detained, Dr. Nikparvar-Fard was

detained for a period of 43 months. Any suggestion that this period constitutes oppressive pre-trial incarceration is mitigated by the Court's order granting Dr. Nikparvar-Fard's release to home confinement, and he has not asserted "proof of sub-standard conditions or other oppressive factors beyond those that necessarily attend imprisonment." July 7, 2022 Order, Doc. No. 433; *Hakeem*, 990 F.2d at 761.

Dr. Nikparvar-Fard also reports an impact on his mental health, given that he has been unable to work while on house arrest and he is under financial strain due to legal fees associated with this case. Mr. White has also asserted bouts of anxiety and depression due to the pendency of the charges, the continuance of trial dates, and the disruption of his medical career. These concerns are not beyond that which "is inevitable in a criminal case, " *United States v. Dreyer*, 533 F.2d 112, 116 (3d Cir. 1976), nor has any defendant produced the requisite evidence of "psychic injury" needed to prevail on this issue. *Hakeem*, 990 F.2d at 762 ("Vague allegations of anxiety are insufficient to state a cognizable claim.").

Finally, neither Dr. Nikparvar-Fard nor Mr. White establish any specific impairment of their defense. They argue that witnesses will inevitably have difficulty recalling events that took place six to nine years ago. But they have offered up no evidence showing that specific witnesses no longer have recollections of the events at issue, despite Mr. White's statement that he was prepared to make such a showing. They do not point to any witness rendered unavailable by illness or death. *See United States v. Shulick*, 18 F.4th 91, 102–03 (3d Cir. 2021) (finding no prejudice was established when a witness was unavailable due to illness because the defendant did not explain what the testimony would be or whether it was favorable). Indeed, with the reported abatement of COVID-19 risks, witness availability may actually be enhanced and appearance in the courthouse less problematic. Defendants do not articulate any specific prejudice resulting from

18

evidence having been lost or destroyed during the pendency of this case. *United States v. Rinaldi*, No. 18-cr-279, 2020 WL 3288173, at *17 (M.D. Pa. June 18, 2020) (finding that the defendant's alleged loss of photos, documents, and a cellphone in his impounded car did not establish prejudice because he did not identify how the evidence would compromise the reliability of the trial).

On balancing the *Barker* factors, only the first factor weighs heavily in the defendants' favor. The Court therefore does not find that Dr. Nikparvar-Fard's, Mr. White's, or Mr. Dillinger's Sixth Amendment speedy trial rights were violated. Again, while the Government's actions in May 2022 were not admirable, and a four-year delay between indictment and trial is far from ideal, it is hard to find that the Government, rather than circumstances beyond either parties' control, was the main cause of the delay in this trial. For these reasons, the indictment will not be dismissed on the basis of a Sixth Amendment violation.

## IV.    Speedy Trial Act

Separate from his constitutional speedy trial right argument, Mr. White argues in the alternative that the indictment should be dismissed for violations of the Speedy Trial Act. The Speedy Trial Act, 18 U.S.C. §§ 3161–3174, requires a trial to begin "within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." *Id.* § 3161(c)(1). An indictment must be dismissed on the motion of a defendant if he is not brought to trial within the Act's time limits. *Id.* § 3162(a)(2). But to provide the necessary flexibility in criminal cases, "the Act includes a long and detailed list of periods of delay that are excluded in computing the time within which trial must start." *Zedner v. United States*, 547 U.S. 489, 497 (2006). Among those exclusions are:

> [a]ny period of delay resulting from a continuance granted by any judge . . . if the judge granted such continuance on the basis of his findings that the ends of justice

19

served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.

§ 3161(h)(7)(A). Case complexity is also an appropriate consideration for tolling Speedy Trial Act deadlines. *Id.* § 3161(h)(7)(B)(ii). The Act states that no "ends of justice" continuance may be granted for the Government's "lack of diligent preparation." *Id.* § 3161(h)(7)(C). "[A] discovery violation does not rise to the level of a 'lack of diligent preparation' unless it was in bad faith or the violations were chronic." *See Shulick*, 18 F.4th at 100; *see also United States v. Cianciola*, 920 F.2d 1295, 1300–01 (6th Cir. 1990) (finding no "lack of diligent preparation" where the "government inadvertently failed to comply with [a] request"); *United States v. Henry*, 698 F.2d 1172, 1174 (11th Cir. 1983).

Mr. White objects to the issuance of an "ends of justice" continuance on the speedy trial clock in May 2022, apart from the 30-day continuance to which he acquiesced while the parties awaited the decision in *Ruan* in late June 2022. He contends that the Government's discovery violations qualify as a lack of diligent preparation because they are chronic. He cites specifically to the Government's failure to produce all relevant patient files prior to the first April 2020 trial date, to retain agent rough notes of Mr. White's proffer, to produce statements by a Government witness whom Mr. White counseled to get off pain medications, to produce undercover recordings of cooperating witness Ms. Rivera, to produce surveillance tapes showing a vacant AUC parking lot, and to produce evidence about a cooperating witness's cooperation in eight other investigations.

Mr. White has not met his burden to show that the Government's late production in May 2022 qualifies as "lack of diligent preparation" not meriting an "ends of justice" continuance. First, for the reasons discussed above, some categories of evidence that Mr. White claims form a pattern of chronic discovery abuse—the evidence that Mr. White counseled one witness to get off pain

20

medications and surveillance tapes showing a vacant AUC parking lot—are not exculpatory or material. Second, the Government's nonproduction of agent rough notes of Mr. White's proffer are the result of a DEA agent's use of the notes to create the DEA-6 report, without preserving the initial notes for the Court's *in camera* review. This is an arguably negligent practice, but Mr. White does not claim that the rough notes were destroyed in bad faith, nor does he adequately articulate how the unpreserved rough notes are expected to be favorable to him or how a failure of the Government to conjure up and produce a document that does not exist shows "lack of diligent preparation." Third, while the Government did not affirmatively produce the AUC patient files until shortly before the April 2020 trial date, the patient files were available for the co-defendants' review from the early stages of discovery, and Mr. White's co-defendant, Dr. Nikparvar-Fard, took advantage of this availability to make copies of the files. Thus, the only discovery violations that merit further consideration as to whether there was a lack of diligent preparation on the Government's part is the information about Source 82467's involvement in unrelated and ongoing investigations and the recordings of a cooperating defendant containing exculpatory statements, which recordings the Government has acknowledged should have been produced earlier.

Based on these two discovery violations, the latter of which is particularly—as the Government admits—negligent, there is no "pattern" of chronic discovery violations. *See Shulick*, 18 F.4th at 101 (finding that the defendant failed to show "a lack of diligent preparation" on the part of the Government when he had never asserted speedy trial claims with respect to earlier productions, notwithstanding the Government's "slow, rolling productions" during discovery). The Court therefore properly continued the trial after finding that the "ends of justice . . . outweigh[ed] the other interests of the public and the defendants in a speedy trial," June 2, 2022

Order, Doc. No. 418, and there is no violation of the Speedy Trial Act that would warrant dismissal of the indictment.

## V.     Federal Rule of Criminal Procedure 48(b)

Dr. Nikparvar-Fard also argues that the indictment should be dismissed pursuant to Federal Rule of Criminal Procedure 48(b). Federal Rule of Criminal Procedure 48(b)(3) allows a court to dismiss an indictment "if unnecessary delay occurs in . . . bringing a defendant to trial." Fed. R. Crim. P. 48(b)(3). A court's decision to grant or deny a Rule 48(b) motion is discretionary. *Gov't of V.I. v. Lee*, 775 F.2d 514, 526 (3d Cir. 1985). The rule is "a vehicle for enforcing a defendant's speedy trial right" as well as "a restatement of the court's inherent power to dismiss a case simply for want of prosecution." *Dreyer*, 533 F.2d at 113 n.1. Under *Dreyer*, when a Rule 48(b) claim is based on prejudice arising from the delay, the case should be analyzed on constitutional grounds. *Id.* Therefore, to the extent Dr. Nikparvar-Fard's argument is merely a reiteration of his Sixth Amendment challenge, the Court declines to dismiss the indictment under Rule 48(b) because the Court found no violation of the defendants' Sixth Amendment speedy trial rights. *See United States v. Zabady*, 546 F. Supp. 35, 38–40 (M.D. Pa. 1982) (conducting an analysis under the *Barker* test to determine whether dismissal under Rule 48(b) was appropriate).

To the extent Dr. Nikparvar-Fard instead requests that the Court use its inherent power to dismiss the case for want of prosecution, "a court may dismiss an indictment . . . only if the Government engaged in misconduct, the defendant was prejudiced, and no less severe remedy was available to address the prejudice." *United States v. Wright*, 913 F.3d 364, 371 (3d Cir. 2019).

Here, again, dismissal of the indictment under Rule 48(b) is unwarranted. The Government's late production of some exculpatory evidence in May 2022 was negligent and merits internal office examination of practices, but there is no demonstration of bad faith suppression or

purposeful delay. *See Hunt v. United States*, 456 F.2d 582, 584 (3d Cir. 1972) ("An indictment should not be dismissed unless there has been deliberate or oppressive action by law enforcement officials."). As discussed above, the defendants have not persuaded the Court that they are prejudiced by the alleged *Brady* violations or under the *Barker* analysis. Finally, a less severe remedy has already been doled out—the Court has provided Dr. Nikparvar-Fard, Mr. White, and Mr. Dillinger with several additional months to become familiar with evidence produced in May 2022 so that they may use it effectively at trial.[7]

The Court therefore declines to dismiss the indictment under Rule 48(b).

## VI.    Remedial Sanctions

Mr. White argues in the alternative that, if dismissal is not granted on the above arguments, the Court should impose remedial sanctions on the Government. When a party fails to comply with Rule 16, the district court may order that party to provide the discovery, grant a continuance, exclude the evidence, or enter another order that is just given the circumstances Fed. R. Crim. P. 16(d)(2). However, Rule 16 "does not require a district court to do anything—[it] merely states that the court 'may' take such actions." *United States v. Lopez*, 271 F.3d 472, 483 (3d Cir. 2001). When considering Rule 16 remedies, "a district court should consider the reasons for the party's delay in producing the materials, including whether it acted intentionally or in bad faith, and the degree of prejudice to the opposing party." *United States v. Lee*, 573 F.3d 155, 161 (3d Cir. 2009).

---

[7]     Dr. Nikparvar-Fard relies on a 40-year-old, non-binding case, *Zabady*, to argue that the Court should dismiss the indictment under Rule 48(b). 546 F. Supp. at 37. That case is easily distinguishable from the case presently before the Court. In *Zabady*, because witnesses lived in eight foreign countries, it was clear that the Government could not bring the defendants to trial for at least a year, resulting in an open-ended indictment process where the Government could have an unlimited period to build its case. *Id.* at 39. Here, there is no concern of ongoing or unlimited prospective delay because there is a trial date certain of January 9, 2023. Therefore, the Court does not find the rationale in *Zabady* to be applicable to the facts now before it.

Mr. White suggests that the appropriate remedial measure here would be to preclude the Government from using against him the discovery produced in May 2022. Specifically, he believes that the Government should be precluded from using his proffer statement because the Government failed to keep agent rough notes to test against the final report on that proffer. In support of this, he merely states that he "has been generally prejudiced in many personal and substantive ways by the government's actions (and inactions)." White's Mot. to Dismiss, Doc. No. 464-1, at 18.

The Court does not find that sanctions are warranted at this time. Neither the May 2022 late production generally nor the DEA agent's failure to keep rough notes are alleged to be intentional or evidence of bad faith. The continuance of the trial should lessen any degree of prejudice imposed by the May 2022 production because Mr. White now has had over six months to review the produced evidence and endeavor to plan to use it effectively at trial. As to the absence of agent rough notes, Mr. White may compare the notes taken by his former counsel who was present during the proffer session and will have the opportunity to cross-examine the relevant agent at trial, if he so chooses. And as Mr. White suggests, it may be most appropriate to await a Government claim that the proffer agreement has been breached before Mr. White submits attorney work product for the Court's *in camera* review to substantiate his claim that the rough notes, if preserved, would have constituted *Brady* and *Giglio* material. *See United States v. Ramos*, 27 F.3d 65, 71 (3d Cir. 1994) ("[U]nless [a] defendant is able to raise at least a colorable claim that the investigator's discarded rough notes contained evidence favorable to [him] and material to his claim of innocence or to the applicable punishment . . . no constitutional error of violation of due process will have been established. Defendant may make such a showing by way of examination of the agents, interviewees, and other available documentary evidence.") (quoting *United States v. Griffin*, 659 F.2d 932, 939 (9th Cir. 1981)).

The Court finds that no sanction is presently warranted. Mr. White may supplement his claims as to the contents of the agent rough notes as may become relevant during trial.

**VII.    Testimony of Dr. Thomas**

Finally, Dr. Nikparvar-Fard contends that Counts One through Four of the superseding indictment must be dismissed because of the Government's failure to meet its burden of proof, or, alternatively, the Government's expert witness Dr. Thomas should be excluded from testifying.

The report issued by Dr. Thomas addresses the treatment of 174 patients, 142 of whom were treated by Dr. Nikparvar-Fard, at the four AUC locations specified in the superseding indictment. Dr. Thomas's report does not distinguish the treatment of the same patient by different practitioners, although most AUC patients did, in fact, see multiple practitioners. Mr. Brown, Ms. Cortez, Dr. DeMedio, and Ms. Hollis treated 86 of the patients that Dr. Nikparvar-Fard treated as identified in Dr. Thomas's report. Dr. Nikparvar-Fard argues that given the Government's dismissal of the charges against Mr. Brown, Ms. Cortez, Dr. DeMedio, and Ms. Hollis, the treatment of those 86 patients cannot be used to support charges against Dr. Nikparvar-Fard, because "the Government cannot now claim that the controlled substance prescribing of [the dismissed co-defendants] was proper, but that [Dr.] Nikparvar-Fard's was not." Nikparvar-Fard's Second Mot. to Dismiss at 4, Doc. No. 494. Once the patients seen by any of the dismissed co-defendants are removed from Dr. Thomas's Report, Dr. Nikparvar-Fard argues that only a handful of patients remain, which is insufficient to support a finding that the alleged drug activity was a significant or important reason for him to maintain his clinics.

This argument rests on a fundamentally flawed assumption that is fatal to the motion to dismiss Counts One through Four on this basis: the Government nowhere asserts that Mr. Brown, Ms. Cortez, Dr. DeMedio, and Ms. Hollis were dismissed because they are innocent of the charged

conduct and because their prescribing practices were at all times proper, as Dr. Nikparvar-Fard contends. The Government may elect to dismiss defendants to focus its resources and prioritize individuals thought to be most culpable, as it argues it did in this instance. Dr. Nikparvar-Fard points to no legal authority that dismissal of Counts One through Four is warranted under this theory, much less any authority that would persuade the Court that Mr. Brown, Ms. Cortez, Dr. DeMedio, and Ms. Hollis should not be treated essentially as unindicted co-conspirators in these circumstances.

Dr. Nikparvar-Fard argues in the alternative that Dr. Thomas should be excluded from testifying as to any patient that the recently dismissed co-defendants treated under Federal Rule of Evidence 702. That rule states that an expert witness may only testify if his "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Again, the Court is not persuaded by Dr. Nikparvar-Fard's contention that the jury will be confused by Dr. Thomas's testimony "as they try to determine how a patient who is treated similarly by multiple practitioners is illegal as to one, but not to others," Nikparvar-Fard's Second Mot. to Dismiss at 5, Doc. No. 494, because there has been no contention that Mr. Brown, Ms. Cortez, Dr. DeMedio, and Ms. Hollis were dismissed due to their innocence. Rather, any arguments about the non-specificity of Dr. Thomas's report as to which practitioner prescribed which medications at what time will properly be a subject for vigorous cross-examination at trial.

The Court therefore declines to either dismiss Counts One through Four of the indictment or limit Dr. Thomas's testimony on this basis.

## CONCLUSION

For these reasons, the Court will grant in part Dr. Nikparvar-Fard's Motion to Compel Discovery and Dismiss the Superseding Indictment only as it relates to the Government's

submission to the Court of further information relating to Source 82467 for *in camera* review. The Court will deny in part the Motion to Compel Discovery and Dismiss the Superseding Indictment on all other issues. The Court will also deny Dr. Nikparvar-Fard's Second Motion to Dismiss the Superseding Indictment and Mr. White's Motion to Dismiss the Charges Against Him. An appropriate order follows.

BY THE COURT:

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**