UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | HON. GENE E.K. PRATTER |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MEHDI NIKPARVAR-FARD | : | CRIM. NO. 18-101 |

_____

ORDER

AND NOW, this _____ day of _____, 2023, upon consideration of the defendant's *Second Motion to Withdraw Guilty Plea*, it is hereby **ORDERED** that the said Motion is **GRANTED** and the defendant is permitted to withdraw his plea of guilty to Count Five of the Superseding Indictment.

By the Court:

_____
HON. GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | HON. GENE E.K. PRATTER |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MEHDI NIKPARVAR-FARD | : | CRIM. NO. 18-101 |

---

SECOND MOTION TO WITHDRAW GUILTY PLEA

The defendant, Mehdi Nikparvar-Fard, by his counsel, Caroline Goldner Cinquanto, Esquire, respectfully requests that this Court allow Mehdi Nikparvar-Fard to withdraw the guilty plea he entered to Count Five of the Superseding Indictment on January 6, 2023, and in support thereof states the following:

I.      PROCEDURAL HISTORY

On March 14, 2018, the defendant, Mehdi Nikparfar-Fard, was charged in a one count Indictment alleging a violation of 21 U.S.C. §846, conspiracy to distribute a controlled substance [Doc. No. 1]. The Indictment was sealed until December 20, 2018, when an unsealing order was entered [Doc. No. 4]. Dr. Nikparvar-Fard had been in federal custody since September 1, 2017, following his arrest for false statements and retaliating against federal official by threats—charges which arose out of an encounter between Dr. Nikparvar-Fard and United States Deputy Marshals who appeared at his place of business with an arrest warrant relating to his medical practice [Crim. No. 17-

2

513, Doc. No. 1]. He was convicted of both charges following a jury trial and sentenced to concurrent prison terms of 18 months on March 29, 2018 [Crim. No. 17-513, Doc. No. 154]. On December 26, 2018, Dr. Nikparvar-Fard was arraigned on the Indictment in Crim. No. 18-90 and entered a plea of not guilty [Doc. No. 8]. Dr. Nikparvar-Fard was ordered detained pending trial following a detention hearing on January 4, 2019 [Doc. No. 12].

On January 9, 2019, a five-count Superseding Indictment was filed, charging Dr. Nikparvar-Fard with four counts of a violation of 21 U.S.C. § 856, maintaining a drug-involved premises (Counts One - Four), and one count of a violation of 21 U.S.C. § 846, conspiracy to distribute a controlled substance (Count Five) [Doc. No. 14].

On February 5, 2019, attorneys Frank DeSimone and Joseph Poluka entered their appearance on behalf of Dr. Nikparvar-Fard [Doc. No. 81 & 82]. On March 12, 2019, Ann Querns entered her appearance on behalf of Dr. Nikparvar-Fard [Doc. No. 109].

On July 7, 2022, the Court granted Dr. Nikparvar-Fard's motion for reconsideration of the pretrial detention order, and he was released with conditions [Doc. No. 433]. Trial was set for January 9, 2023 [Doc. No. 442].

Three days prior to trial, on January 6, 2023, Dr. Nikparvar-Fard pled guilty to Count Five of the Superseding Indictment, charging him with a violation of 21 U.S.C. §846, conspiracy to distribute a controlled substance [Doc. No. 535]. Sentencing was scheduled for April 21, 2023 [Doc. No. 542].

On January 26, 2023, Dr. Nikparvar-Fard filed a *pro se* motion to withdraw his guilty plea [Doc. No. 570]. On February 24, 2023, attorneys Joseph Poluka, Ann Querns,

and Frank DeSimone filed a motion to withdraw as counsel [Doc. No. 588]. The Court denied Dr. Nikparvar-Fard's motion to withdraw his guilty plea without prejudice on February 24, 2023 [Doc. No. 589]. On February 27, 2023, the Court ordered that prior counsel would be allowed to withdraw and that undersigned counsel was appointed to represent Dr. Nikparvar-Fard. At the request of undersigned counsel, sentencing was continued to June 21, 2023, and then again until September 19, 2023 [Doc. No. 599, 617].

II.   THE LAW

A defendant can withdraw his guilty plea after it has been accepted but before sentencing upon a showing of a "fair and just reason."  Fed. R. Crim P. 11(d)(2)(B) What constitutes a "fair and just reason" is not defined in the Rule, and notwithstanding case law which suggests that the Rule should be liberally construed. *e.g.*, *Government of the Virgin Islands v. Berry*, 631 F.2d 214 (3d Cir. 1980) "[M]otions to withdraw guilty pleas made before sentencing should be liberally construed in favor of the accused and should be granted freely". The application in practice imposes a fairly high bar on a defendant who seeks to withdraw his plea. Indeed, the defendant "bears a substantial burden of showing a fair and just reason for the withdrawal of his plea." *United States v. Rivera*, 62 F.4th 778, 788, 3rd Cir.2023 (quoting *United States v. Siddons*, 660 F.3d 699, 703 (3d Cir. 2011) (internal quotation marks and citation omitted); *United States v. Kwasnik*, 55 F.4th 212, 217 (3d Cir. 2022).

To determine whether a defendant should be permitted to withdraw a guilty plea, a court must consider three factors . . . (1) whether the defendant asserts his innocence; (2) the strength of the defendant's reasons for withdrawing the plea; and (3)

4

whether the government would be prejudiced by the withdrawal." *United States v. Jones*, 336 F.2d 245, 252 (3d Cir. 2003). "A shift in defense tactics, a change of mind, or the fear of punishment are not adequate reasons to impose on the government the expense, difficulty, and risk of trying a defendant who has already acknowledged his guilt by pleading guilty." *United States v. Jones*, 336 F.2d 245, 252 (3d Cir. 2003); *United States v. Brown*, 250 F.3d 811, 815 (3d Cir. 2001). "Bald assertions of innocence ... are insufficient" to support withdrawal of a guilty plea; instead, "[a]ssertions of innocence must be buttressed by facts in the record that support a claimed defense." *United States v. Kwasnik*, 55 F.4th at 217; *United States v. Brown*, 250 F.3d at 818. Moreover, a defendant must also "give sufficient reasons to explain why contradictory positions were taken before the district court and why permission should be given to withdraw the guilty plea." *United States v. Kwasnik*, 55 F.4th at 217.

Of the three factors that the Court must consider, the most important is an assertion of innocence which must be based upon reference to substantial factual or legal issues. *United States v. Rivera*, 62 F.4th at 788-89. Factual innocence means that based upon all the facts before the court, the defendant is not guilty of a crime that has been charged.  For example, the defendant has an airtight alibi or the actual acts performed by the defendant do not amount to a crime. Under both situations, the defendant is innocent of the crime charged. Legal innocence, on the other hand, asks the court to disregard certain incriminating evidence in order to establish the defendant's innocence. For example, the only evidence linking the defendant to the crime was illegally seized or obtained in violation of the defendant's right against self-

incrimination. Without that evidence, the prosecution cannot go forward, and the defendant will be found not guilty. "Legal innocence alone can support withdrawal of a guilty plea." *United States v. James*, 928 F.3d 247, 253-54 (3d Cir. 2019).

The important question is "whether the defendant asserts his innocence[.]" *United States v. Jones*, 336 F.3d at 252. "If a defendant is not legally culpable, it stands to reason that he should be able to withdraw his guilty plea before sentencing because he is exempt from any punishment for the alleged acts constituting the crime, regardless of whether he committed them." *United States v. James*, 928 F.3d at 253-54. However, a mere claim of innocence will not suffice, a defendant must present a credible theory of legal innocence. *Id.* at 1205 (quoting *United States v. Thompson-Riviere*, 561 F.3d 345, 353 (4th Cir. 2009) (noting that the defendant's burden "is to credibly assert his legal innocence: that is, to present evidence that (1) has the 'quality or power of inspiring belief,' and (2) tends to 'defeat the elements in the government's prima facie case' or to 'make out a successful affirmative defense' "(citations omitted)).

Delay and prejudice to the government are also circumstances that courts consider when deciding a motion to withdraw a guilty plea. If a defendant acts to assert his innocence without undue delay, courts then consider whether the government would be prejudiced by permitting the defendant to withdraw the guilty plea. Prejudice can arise where the government would have difficulty presenting its case at a subsequent trial - because witnesses have dispersed, cannot be located, or where evidence has already been destroyed. See, e.g., *United States v. Buckles*, 843 F.2d 469 (11th Cir. 1988) (considering the time, money, and effort the government would have to

devote to reassembling witnesses and evidence that were allowed to scatter after the acceptance of the guilty plea); *United States v. Kobrosky*, 711 F.2d 499, 455 (1st Cir. 1983) (The most common form of prejudice is the difficulty that the government would encounter in reassembling its witnesses); *Government of the Virgin Islands v. Berry*, 631 F.2d 214, 221 (3d Cir. 1980) (finding prejudice where one key witness could not be located and others had dispersed).  More mundane tasks, such as the re-assembly of trial preparation materials, have also been deemed to establish prejudice to the government. In fact, the same factors considered in whether a defendant gained a strategic benefit through delay also can establish prejudice to the government. For example, waiting to withdraw a plea until the eve of trial or waiting until after the government has presented its case against a co-defendant might support finding of prejudice to the government. The longer the delay, the more likely the defendant has gained a tactical advantage at the government's expense. *United States v. Rivera*, 62 F.4th at 788-90 (fading memories of witnesses constitutes prejudice to the government).

III.    ARGUMENT

Dr. Nikparvar-Fard moves to withdraw his plea of guilty pursuant Fed. R. Crim P. 11(d)(2)(B) for fair and just reason. Specifically, Dr. Nikparfar-Fard maintains that he is factually innocent of the crime to which he pled guilty, and that he only pleaded guilty under the duress occasioned by his inability to comply with the financial demands made by prior counsel on the eve of trial; duress which was compounded by their ineffective assistance of counsel.  Dr. Nikparfar-Fard also maintains that the

burden of trial in the circumstances of this case, while real and hardly negligible, is more of an inconvenience than a source of significant prejudice to the government.

a. The Guilty Plea

On January 6, 2023, Dr. Nikparvar-Fard pled guilty to Count Five of the Superseding Indictment charging him with a violation of 21 U.S.C. §846, conspiracy to distribute a controlled substance. In its Factual Basis, the government alleged that had the case proceeded to trial against Dr. Nikparvar-Fard, the United States would have presented both physical evidence and witness testimony that would have demonstrated the following:

> Between May 2014 and July 2015, Dr. Nikparvar-Fard was aware that his employee H.C. 's DEA number was suspended. Dr. Nikparvar-Fard knew that H.C. could not issue legitimate prescriptions for controlled substances while H.C.'s registration number was suspended. Nevertheless, Dr. Nikparvar-Fard agreed with co-defendants Michelle White and Jason Dillinger and others to provide pre-signed prescription pads to H.C. Using the pre-signed pads provided by Nikparvar-Fard, Michelle White and Jason Dillinger and others, H.C. continued seeing pain customers at Advanced Urgent Care and issuing prescriptions for Schedule II controlled substances. These prescriptions were outside the usual course of professional practice and not for a legitimate medical purpose.

The Change of Plea Memorandum states that H.C. issued prescriptions while employed at Advanced Urgent Care from May 2014 through July 2015. This is incorrect. H.C. testified, and DEA analysis has confirmed, that H.C. did not start issuing prescriptions for Advanced Urgent Care until August 29, 2014, after his medical license was reinstated although his DEA number remained suspended. (Exhibit 1, H.C. Grand

Jury Testimony, March 14, 2018, p. 22, lines 3-11.)  H.C. also testified that he stopped

issuing prescriptions on February 14, 2015, when he was terminated by Dr. Nikparvar-

Fard. (Exhibit 1, H.C. Grand Jury Testimony, March 14, 2018, p. 24, lines 19-21). That

said, Dr. Nikparvar-Fard did not contest the accuracy of the government's description

of the events when he entered his guilty plea.

> b.  <u>Dr. Nikparvar-Fard Is Factually Innocent</u>

Between August 29, 2014 through February 14, 2015, the time frame during

which H.C. was issuing prescriptions while employed at Advanced Urgent Care, H.C.

had a valid medical license issued by the state of Pennsylvania. H.C., therefore, was

considered a qualified healthcare provider able to treat patients.

> 50 PA Code §5422 defines a health care provider as:
>
> A person who is licensed, certified, or otherwise authorized
> by the laws of this Commonwealth to administer or provide
> health care in the ordinary course of business or practice of a
> profession. The term includes personnel recognized under the
> act of July 3, 1985 (P.L.164, No.45), known as the Emergency
> Medical Services Act.

H.C., by virtue of the fact that he was a qualified healthcare provider, was

trained to, among many things, take medical histories, perform physicals (including an

evaluation of the heart, lungs, blood pressure, and body functions that related to a

patient's specific complaint), conduct follow-up appointments, counsel patients, and

compile accurate medical records.

Even though H.C. was a qualified healthcare provider according to Pennsylvania law, his DEA registration was suspended and he was waiting for his application for renewal of DEA registration. In order to lawfully address this unique situation – a physician who has a valid medical license but not a valid DEA registration - Dr. Nikparvar-Fard created a protocol that he believed allowed H.C. to legally  generate prescriptions in limited circumstances for patients who were evaluated by a registered provider and were placed on contingency prescribing of  controlled substance:

- H.C. was never allowed to prescribe pain medication on an initial visit.

- H.C. was only allowed to treat pain patients on a follow-up visit *after* a pain management regime had been established. (Exhibit 1, H.C. Grand Jury Testimony, March 14, 2018, p. 30, lines 5-7)

- H.C. must present his examination and evaluation to a registered physician before issuing the controlled prescription. (Exhibit 8, M.D. Grand Jury testimony, p 28 line 14-21.)

- When treating a pain patient on a follow-up visit, H.C. would ascertain that there were no new complaints, perform a physical examination of the patient, and make sure there were no anomalies in the urinalysis results.

- Then, and only then, would H.C. write a prescription using a pre-signed prescription pad. (Exhibit 1, H.C. Grand Jury Testimony, March 14, 2018, p. 22, lines 9-16.)

- H.C. did not have the discretion to determine the type of medication or the dosage, instead he relied on prior prescription found in the patient's

10

file, as well as instructions given to him by the patient's primary physician. (Exhibit 1, H.C. Grand Jury Testimony, March 14, 2018, p. 22, Lines 16-22.)

- The only discretion H.C. had in regard to prescription writing was *not* to write one.

Dr. Nikparvar-Fard did not create this protocol out of whole cloth or with a criminal intent – the protocol is set forth in many learned treatises on the subject. One such learned treatise is *Bonica's Management of Pain*. This treatise is considered one of the leading textbooks and clinical references in the field of pain medicine. Written by an international group of the foremost experts in the field, *Bonica's Management of Pain* is one of the many treatises upon which Dr. Nikparvar-Fard relied in his pain management practice to provide him with comprehensive, current, clinically oriented guidance of the pain management field.

In particular, *Bonica's* advises that pain management physicians follow a practice called "boundary setting" which includes interval dispensing and contingency prescribing of controlled substances. Interval dispensing requires the patient to see other members of the health care team *such as staff members of the prescriber* or the pharmacist on a more frequent basis than the actual prescriber. (emphasis added) (Exhibit 3, *Bonica*, Part IV: Pain Conditions, p. 848.) Physicians utilize interval dispensing and contingency prescribing to ensure that patients are not abusing their medication. These practices are specifically intended to ferret out patients who are simply drug seeking or diverting their drugs.

Another learned treatise upon which Dr. Nikparvar-Fard relied is *The ASAM Principles of Addiction Medicine*, a publication of the American Society of Addiction Medicine. In the context of addiction medicine, that treatise also recommends medication monitoring visits which can be performed by a nurse. (Exhibit 4, Miller, Fiellin, Rosenthal, Saitz, *The ASAM Principles of Addiction Medicine Sixth Edition*, Section 14, p. 1732. *2018.*)

Other medical practices rely on medical staff who do not have a registered DEA number to prescribe controlled substances. For example, the Massachusetts Bureau of Substance Abuse Services implemented a successful initiative to combat opioid addiction whereby nurses, working with physicians, play a central role in the monitoring and evaluation of patients, including the prescribing of Buprenorphine a Schedule-III narcotic Analgesic. In that program, physicians are not present during Buprenorphine induction but were available by pager for consultation. Physicians are kept apprised of a patient's treatment through medical records, clinical documentation, and the tracking of prescriptions. (Exhibit 5, LaBelle, Choongheon Han, Bergeron, Samet, *Office Based Opioid Treatment with Buprenorphine (OBOT-B): Statewide Implementation of the Massachusetts Collaborative Care Model in Community Health Center*s, p.3-6, 12, *2016.*)

This collaborative model, where a nurse or pharmacist provide controlled substances, is also implemented at Albert Einstein College of Medicine, (Exhibit 6, Jakubowski et al., *Same-day vs. Delayed Buprenorphine Prescribing and Patient Retention in an Office-based Buprenorphine Treatment Program,* p.4, p.6-7, p.15, *2020.)* and Boston

Medical Center. (Exhibit 7, Alford et al., *Five Year Experience with Collaborative Care of Opioid Addicted Patients Using Buprenorphine in Primary Care,* p.2-4, 2011.).

In this case, Dr. Nikparvar-Fard had implemented in his own practice the same practices set forth and recommended in *Bonica, The ASAM Principles of Addiction Medicine,* and followed by other medical practices. Dr. Nikparvar-Fard required his patients to come into the office at two-week intervals where they saw other members of his staff, i.e., H.C. And even though *The ASAM Principles of Addiction Medicine* approved of medical monitoring visits conducted by nonphysicians, i.e., nurses and other staff, Dr. Nikparvar-Fard went above and beyond by hiring H.C., a qualified healthcare provider with a valid medical license, to treat his established pain patients at their follow-up medication monitoring visits. Taking his cue from *Bonica, The ASAM Principles of Addiction Medicine* and other medical practices, Dr. Nikparvar-Fard allowed H.C. to continue treatment of stable patients, who had been physically examined and who had successfully provided a urine sample while he was waiting for his DEA registration number. And like the nurse in *The ASAM Principles of Addiction Medicine*, H.C. had no discretion as to the type of medication or dosage, he could only prescribe the same type of medication and dosage found in the patient file which had been determined to be appropriate by the patient's primary physician.

Dr. Nikparvar-Fard was not the only medical professional in his office who thought his protocol was valid. Another physician at Advanced Urgent Care, M.D., also

signed prescriptions for H.C. even though he knew that H.C. did not have a valid DEA

registration number. M.D. testified before the Grand Jury that:

> I really didn't consider that I was doing something that was
> criminal. In retrospect . . . if I would have thought about it, I
> would say that, yeah, those actions were – I didn't know there
> were rules against them.  But that's just what I knew at the
> time. I didn't – it wasn't – it wasn't an intent to actually -

(Exhibit 8, Grand Jury Testimony of M.D., p. 57, Lines 8-14)

M.D. further testified that:

> I thought I was doing what I needed to do with each patient
> and without other motivation for what I was doing. So that's
> how I looked at it.

(Exhibit 8, Grand Jury Testimony of M.D., p. 56, Lines 6-9)

This protocol is not only taught in medical school, set forth in learned treatises,

and followed by other medical practices. This protocol has also been endorsed by the

government's expert, Dr. Stephen Thomas. Dr. Thomas has previously testified that the

very course of conduct engaged in by Dr. Nikparvar-Fard, which formed the basis of his

guilty plea—the issuance of a prescription to a stable patient under the physician's DEA

number by staff in his office —is, in fact, not a crime.

Approximately four years ago, Dr. Thomas testified in the matter of *United States*

*v. Aggarwal*, Case No. 18-16. In that case, Dr. Thomas testified that it was appropriate for

a patient to be given a prescription in the absence of a physician visit if all relevant

medical conditions were stable and there were no dosage changes or other

developments that would require medical decision-making to occur. (Exhibit 9,

Testimony of Dr. Stephen Thomas, *United States v. Aggarwal*, Case No. 18-16, June 10,

2019, p. 64, lines 20-23.)

Based upon his medical training (as evidenced by the learned treatises cited

above), as well as his experience in the field (as evidenced by the testimony of Dr.

Thomas cited above), Dr. Nikparvar-Fard did not have the requisite *mens rea* to

knowingly or intentionally act in an unauthorized manner as required by *United States*

*v. Ruan*, 142 S. Ct. 2370, 2382 (2022), the prosecution of a doctor for conduct similar to

that charged here. This is so even if Dr. Nikparvar-Fard was mistaken about the legal

effect of the protocol which he established. The Court in *Ruan* framed its analysis by

noting that

> as a general matter, our criminal law seeks to punish the " 'vicious will.' " *Morissette v. United States*, 342 U.S. 246, 251, 72 S.Ct 240, 96 L.ED. 288 (1952); see also *id.*, at 250 n.4, 72 S.Ct. 240 (quoting F. Sayre, Cases on Criminal Law, p. xxxvi (R. Pound ed. 1927)). With few exceptions, " 'wrongdoing must be conscious to be criminal.' " *Elonis v. United States,* 575 U.S. 723, 734, 135 S.Ct, 2001, 192 L.Ed.2d 1 (2015) (quoting *Morissette,* 342 U.S. at 252, 72 S.Ct. 240). Indeed, we have said that consciousness of wrongdoing is a principle "as universal and persistent in mature systems of [criminal] law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." Id., at 250, 72 S.Ct. 240.
>
> *United States v. Ruan*, 142 S. Ct. at 2376-77.

15

With this as the context for the question of whether the government was required to prove that the *subjective* intent of a defendant-doctor who was issuing prescriptions was to act in an unauthorized manner and with a criminal purpose to support a drug distribution conviction, the Court determined that such proof was required. *Ruan*, 142 S.Ct. at 2376-77. A doctor's good faith belief that the issuance of prescriptions was legitimate would therefore be a defense to the charges which the government would be required to overcome with proof negating the defense. *Id.*, at 2380-81, The Court rejected the government's argument that proof of subjective intent would allow doctors to avoid conviction by constructing a façade of feigned belief in the lawfulness of a particular distribution scheme. *Id.*, at 2379-80.[1]

c.   <u>Prior Counsel Provided Constitutionally Deficient Advice</u>

Dr. Nikparvar-Fard further maintains that his assertion of innocence and of a good faith belief in the lawfulness of his conduct was subverted by prior counsels' constitutionally deficient advice. Counsel advised Dr. Nikparvar-Fard that he would not be permitted to introduce testimony about his reliance upon learned treatises and textbooks to support his defense.

This advice and explanation of the law was simply wrong, but it was used to convince Dr. Nikparvar-Fard to surrender his trial rights, abandon his good faith defense, and plead guilty.

---

[1] Dr. Nikparvar-Fard notes that the Third Circuit, in at least one unpublished opinion, has rejected arguments similar to those raised here. *See United States v. Kraynak*, 2023 WL 4636419 (3d. Cir. July 20, 2023).

A guilty plea that rests upon ineffective assistance of counsel can be withdrawn because the deficient advice negates the intelligent and voluntary nature of the plea. *United States v. James*, 928 F.3d 247, 258 (3d Cir. 2019); *United States v. Jones,* 336 F.3d 245, 254 (3d Cir. 2003); *Hill v. Lockhart,* 474 U.S. 52, 56-58 (1985). A defendant will be allowed to withdraw a guilty plea based on ineffective assistance of counsel only if (1) the defendant shows that his attorney's advice was under all the circumstances unreasonable under prevailing professional norms; and (2) the defendant shows that he suffered "sufficient prejudice" from his counsel's errors. *United States v. Jones,* 336 F.3d at 254; *United States v. Day,* 969 F.2d 39, 45 (3d Cir. 1992) (*citing Strickland v. Washington*, 466 U.S. 668, 687-91 (1984)).

Here, Dr. Nikparvar-Fard not only explained to prior counsel the protocol that he established for H.C., but he also provided prior counsel with the detailed and specific sources of information that he relied upon in a good faith effort to comply with the law. He further explained that at no time did he act with intent to violate the law and that, instead, it was his belief that his conduct was permissible. This is exactly the nature of the defense recognized by *Ruan*, so there can be no question that the defense itself was one that could be presented. Notwithstanding the legitimacy of the defense, prior counsel advised Dr. Nikparvar-Fard that he would not be allowed to explain the basis for his belief and actions because reference to learned treatises and textbooks would not be permitted. That advice was wrong. Federal Rule of Evidence 803(18) clearly allows the introduction of the contents of learned treatises with a proper

foundation and offer of proof, though the treatise or textbook itself would not be admissible. *See e.g., Maggipinto v. Reichman,* 481 F.Supp. 547, 550-51 (E.D.Pa. 1979).

Moreover, a defendant raising a good faith defense is permitted to explain and identify the basis for his belief. *See Ruan v. United States*, 247 S.Ct. at 2377-2380; *Cheek v. United States*, 481 U.S. 547 (1991). Prior counsel's advice and explanation was both wrong and material to Dr. Nikparvar-Fard's decision to plead guilty. Consequently, the voluntariness of his guilty plea was undermined, and at a minimum he is entitled to an evidentiary hearing to consider the nature of the advice provided by prior counsel.

d.    Dr. Nikparvar-Fard Has Strong Reasons For Withdrawing Plea

Dr. Nikparvar-Fard respectfully submits that not only has he established a colorable claim of actual innocence, but his reasons for withdrawing his guilty plea are strong. As Dr. Nikparvar-Fard explains in his Declaration that on January 2, 2023, one week before trial, prior counsel demanded a $190,000.00 "trial fee", after having been paid over $800,000.00. Dr. Nikparvar-Fard was unable to pay the entire fee and prior counsel would not accept a payment plan. On January 3, 2023, the day after being told that Dr. Nikparvar-Fard could not pay the $190,000.00 trial fee, and one week before trial was to begin, prior counsel *first* recommended that Dr. Nikparvar-Fard plead guilty. On January 5, 2023, prior counsel threatened to withdraw from the case because Dr. Nikparvar-Fard would not plead guilty, still owed prior counsel 190,000.00, as well as other disagreements. Between January 5, 2023 and January 6, 2023, Dr. Nikparvar-Fard had numerous conversations with prior counsel, all witnessed by his wife, in which Dr. Nikparvar-Fard stated such things as "do you want me to lie under oath and

18

say I am guilty?" and "you are forcing me to plead guilty". During this time, he was also repeatedly told by prior counsel that he would not be able to introduce testimony about his reliance upon medical journals and textbooks in support of his defense. Prior counsel even threatened to withdraw from his case unless Dr. Nikparvar-Fard pleaded guilty. Finally, overcome with stress, hopelessness, and fear, due to prior counsel's threat to withdraw from his case, as well as his insistence that he would not be able to introduce testimony about his reliance upon medical journals and textbooks in support of his defense, Dr. Nikparvar-Fard succumbed to prior counsel's threat to withdraw and pled guilty.  See Exhibit 10, Declaration of Mehdi Nikparvar-Fard.

Within days of pleading guilty, Dr. Nikparvar-Fard immediately communicated his desire to withdraw his guilty plea to his prior counsel. They responded by withdrawing from the case. Dr. Nikparvar-Fard was then forced to file his own, uncounseled, *pro se* motion to withdraw his guilty plea. In his motion, Dr. Nikparvar-Fard explained that he only plead guilty because of the duress he experienced when his attorneys presented him with what he understood was an either-or proposition, *i.e.*, either plead guilty or come up with substantially more money for attorney fees. He further explained that notwithstanding his belief that the protocol he had established provided a lawful means to allow H.C. to issue prescriptions in limited circumstances, he acquiesced to the demands of his attorneys and entered the guilty plea. Acquiescence that was further clouded and coerced by the fact that his attorneys were providing him with constitutionally ineffective assistance of counsel throughout the course of trial preparation.

e.    <u>The Government Will Not Be Prejudiced By Withdrawal Of Guilty Plea</u>

Dr. Nikparvar-Fard further maintains that any prejudice to the government is not substantial enough to outweigh his claim of innocence. Certainly, the government will be required to reassemble its case which requires time and expense. But the key factor in this regard is that the government will be reassembling a case it was already prepared to try. *See e.g., United States v. Baker*, 247 F.Supp.3d 535, 545 (M.D.Pa. 2017) (granting motion to withdraw and rejecting assertion of undue prejudice to the government.) The government witnesses, other than perhaps an expert, are all local and are presumably available. Therefore, the government will not be required to start from scratch to construct a prosecution that was never ready to proceed, a circumstance that would no doubt impose a more significant burden. Consequently, Dr. Nikparvar-Fard respectfully submits that he should be permitted to withdraw his guilty plea and proceed to trial.

Respectfully submitted,

*/s/ Caroline Goldner Cinquanto*
Caroline Goldner Cinquanto
The Law Office of Caroline Goldner Cinquanto
3331 Street Road, Suite 450
Bensalem, PA  19020
(215) 910-2732; carrie@cgclegal.com

Date:   August 23, 2023

<u>CERTIFICATE OF SERVICE</u>

I, Caroline Goldner Cinquanto, hereby certify that on this date I delivered by electronic means a true and correct copy of the foregoing Motion to the following counsel:

MARY KAY COSTELLO
UNITED STATES ATTORNEY'S OFFICE
615 CHESTNUT STREET
SUITE 1250
PHILADELPHIA, PA 19106-4476

*/s/ Caroline Goldner Cinquanto*
Caroline Goldner Cinquanto
The Law Office of Caroline Goldner Cinquanto
3331 Street Road, Suite 450
Bensalem, PA  19020
(215) 910-2732; carrie@cgclegal.com

Date:  August 23, 2023