UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA   : | |
| : | HON. GENE E.K. PRATTER |
| : | |
| v.                                               : | CRIM. NO. 18-101 |
| : | |
| : | |
| MEHDI NIKPARVAR-FARD           : | |

SENTENCING MEMORANDUM ON BEHALF OF MEHDI NIKPARVAR-FARD

The defendant, Mehdi Nikparvar-Fard, by his attorney, Caroline Goldner Cinquanto, Esq., hereby submits the following memorandum in mitigation of sentence in the above-captioned matter.

I. INTRODUCTION

Dr. Nikparvar-Fard comes before this Court for sentencing on December 20, 2023, after having pled guilty before the Honorable Gene E.K. Pratter on January 6, 2023 to Count Five of the Indictment. A final Presentence Investigation Report (PSR) was prepared in this case on December 15, 2023. There are a total of nine objections to the PSR, only three of which potentially impact the guideline range.  The defense also has six corrections to the PSR which are set forth below.

II. PRESENTENCE REPORT

A. Criminal History Computation

Dr. Nikparvar-Fard's Criminal History has been correctly calculated as II.

B. Offense Level Computation

The Total Offense Level has been calculated as 34. As is set forth in detail below, the defense objects to this calculation and maintains that the Total Offense Level is 25.

   C. Guidelines Calculation

If the Court sustains the objections by the defense, the revised guideline range is 63-78 months incarceration (Offense Level 25, CHC II).

III.     OBJECTIONS

As an initial matter, the defense objects to any information in the PSR which concerns counts of the indictment other than the count of conviction. Although U.S.S.G. §6B1.2(a) states that a plea agreement that includes the dismissal of a charge . . . shall not preclude the conduct underlying such charge from being considered under the provisions of U.S.S.G. §1B1.3 (Relevant Conduct), this guideline provision does not apply to the case at hand. The parties agreed during plea negotiations that the dismissed counts would *not* be considered at sentencing and, as a result, the government removed the language from the plea agreement which allowed the government to "*bring to the court's attention all facts relevant to sentencing including evidence related to dismissed counts, is any*". [Exhibit 1, First Plea Agreement, Paragraph 2(c), *compare* with Second Plea Agreement, Doc. No. 536]. Consequently, it would be a violation of the terms of the plea agreement to consider any information regarding dismissed Counts One through Four when calculating the guidelines, including any adjustments to the Base Offense Level.

The government's Sentencing Memorandum supports this position. In its Memorandum, the government focuses only on the behavior underlying Count Five:

> This case arose from Dr. Nikparvar-Fard's operation of four Advanced Urgent Care (AUC) facilities located in the Eastern District of Pennsylvania. From May 2014 to July 2015, Dr. Nikparvar-Fard was aware that his employee H.C.'s DEA registration number was suspended. The Dr. Nikparvar-Fard knew that H.C. could not issue legitimate prescriptions for controlled substances while H.C.'s registration was suspended. Nevertheless, Dr. Nikparvar-Fard agreed with co-Dr. Nikparvar-Fards Mitchell

> White, Jason Dillinger, and others to provide pre-signed prescriptions to H.C. *Using the pre-signed prescriptions provided by Mitchell White, Jason Dillinger, Dr. Nikparvar-Fard, and others, H.C. continued treating pain customers at AUC and issuing prescriptions for Schedule II controlled substances. These prescriptions were outside the usual course of professional practice and not for a legitimate medical purpose.* (emphasis added)
> [Gov. Sentencing Memo, Doc. 662, p. 2].
>
> . . . .
>
> In this case, the Dr. Nikparvar-Fard and co-conspirators distributed powerful drugs to purported patients outside the usual course of professional practice and not for a legitimate medical purpose. *They did so by providing pre-signed, but otherwise blank, prescriptions to a person they knew had no legal authority to issue prescriptions for controlled substances.* (emphasis added)
> [Gov. Sentencing Memo, Doc. 662, p. 5].

It is obvious that the government is limiting its comments to the criminal conduct underlying Count Five and purposely avoids any alleged conduct underlying Counts One through Four of the indictment pertaining to the medical assessment and treatment of patients by Dr. Nikparvar-Fard and other physicians and staff at AUC.

If the Court overrules this objection, the defense provides the following information in rebuttal.

The primary allegation underlying Counts One through Four was that, even though patients at AUC would occasionally submit urinalyses that tested positive for illicit drugs or failed to test positive for the prescribed medication, physicians at AUC would still prescribe the patients controlled substances. Specifically, the government's expert, Dr. Stephen Thomas, stated that "under either circumstance, continued prescription of controlled substances to such patients would not be for a legitimate medical purpose in the usual course of professional practice. [PSIR, p. 13, ¶29]. Dr. Thomas is incorrect. There is a legitimate medical purpose for continuing to prescribe controlled medications under these circumstances.

Dr. Charles McClure, an expert retained by the defense, states:

> Based on my training and practice in addiction medicine, the worst thing you can do both ethically and medically when a person is on high dose chronic opioids is to cut them off. They would immediately experience severe withdrawal, with the most common outcome being the seeking of illicit opioids such as fentanyl with a high risk of overdose, Hepatitis C, HIV and other physical and social problems. Determining the best course of treatment for the patient is a complex decision even for the experienced practitioner.
> [See Exhibit 2, Expert Disclosure Statement – Dr. Charles McClure]

Dr. McClure's position is supported by the medical literature, excerpts of which have been attached collectively as Exhibit 3. For example, the CDC recommends that "[C]linicians should not dismiss patients from care based on a urine drug test. This result could have adverse consequences for patient safety, including missed opportunities to facilitate treatment for substance use disorder. [Exhibit 3, page 2]. The American Society for Addiction Medicine advises, "[T]he most draconian response to an inappropriate drug test result – discharging the patient from a practice – is only rarely an acceptable option". [Exhibit 3, page 4]. Finally, the National Institutes of Health states in the context of Buprenorphine diversion, "[A] punitive "no tolerance" approach with automatic discharge from treatment is highly unlikely to help patients because untreated opioid addiction is characterized by relapse and increased morbidity and mortality. [Exhibit 3, page 8].

Moreover, the evidence in this case shows that the patients at AUC did not test positive for illicit drugs at an inordinate rate. Dr. Imran Mungrue, Ph.D., a graduate from the Department of Laboratory Medicine and Pathobiology from the University of Toronto, was retained by the defense to ascertain the percentage of AUC urine tests which tested positive for illicit drugs and/or did not test positive for the prescribed medication. [Exhibit 4 – Rule 16(b)(1(iii) Disclosure and Expert C.V]. Once these percentages were established, Dr. Mungrue compared

his results with the percentages from other medical institutions and urgent care clinics. [Exhibit 5 – Summary Charts]. This comparison shows that the percentage of failed urine tests at AUC, in general, were lower than any of the comparison facilities.

Dr. Thomas Simopoulis, another defense expert and a Professor in the Department of Anesthesiology at Harvard Law School, determined that Dr. Nikparvar-Fard acted in good faith and in the usual course of professional practice when prescribing opioids. [Exhibit 6 – Rule 16(b)(1)(iii) Disclosure, C.V. and Expert Report]. Specifically, after a full review of the medical records in this case, Professor Simopoulis found:

> Based upon his twenty-plus years of clinical experience treating pain management patients and teaching in this area, his review of the patient records, and other evidence produced by the Government, in his expert opinion, Dr. Nikparvar-Fard acted in the usual course of professional practice, and in good faith, when prescribing opioids to patients, because Dr. Nikparvar-Fard used the following treatment techniques to evaluate the appropriateness of prescription opioids on a patient-by-patient basis: (A) evaluation of medical history, including pharmacy records, and later online prescription drug monitoring program; (B) physical examinations; (C) diagnoses; (D) use of informed consents and pain management agreements; (E) non-opioid treatments; (F) referrals to other physicians; (G) regular appointments and adjustment of frequency depending on drug test results; (H) undertaking witnessed drug testing (both point of care testing and send out confirmations); (I) pain assessments; (J) tracking patient responses to medications; (K) continuing adjustment of medications; (L) use of diagnostic tests that must be verified by nurses; (M) ceasing prescription opioids as necessary; (N) requiring referrals from primary care doctors; and (O) operating an insurance-based practice. Overall, Dr. Nikparvar-Fard was making clinical judgments and practicing medicine.
>
> Dr. Simopoulos further opines that Dr. Nikparvar-Fard exhibited appropriate vigilance in response to patient "red flags" as to opioid treatments, including: (A) questioning of the patient about "red flags"; (B) discussion of "red flags" with the patient; (C) requiring urine drug screens in office; (D) requiring confirmatory drug screens be sent for lab analysis; (E) repeating drug screens; (F) changing prescribed medications; (G) adjusting medication dosage; (H) decreasing duration of prescribed medications; (I) ceasing

medication as deemed necessary; (J) adding non-opioid medications and treatments; (K) ordering more diagnostic testing; (L) using pain management agreements; and (M) repeating physical examinations.

Dr. Simopoulos further opines that the urine drug screening in chronic pain patients is known to have a high incidence of abnormal or aberrant findings. These findings can be a single or combination of lack of the prescribed substance(s), illicit substance(s), or other controlled substances. There was a significant proportion of patients in Dr. Nikparvar-Fard's practice that manifested in aberrant urine toxicology results. Given the well-documented lack of standards in the medical literature on how to exactly respond to these results, Dr. Nikparvar- Fard had to develop his own treatment approach to address these test results. The clinical approach he used was to enhance monitoring and perform very frequent return visits. Prescriptions were therefore for a limited supply of 1-2 weeks depending upon clinical judgement. This is now a common method to manage patients who have mixed substance abuse and pain disorders. Dr. Nikparvar-Fard appropriately employed the following approaches to abnormalities in patient urine samples: (A) for indications of heroin, there was evidence of transitioning to methadone or suboxone; (B) for indications of cocaine abuse, weekly appointments with counseling; (C) for indications of marijuana, no action needed; (D) for indications of alcohol abuse, close monitoring; (E) if indications of diversion are proved, discharge the patient; (F) for indications of prescribed benzodiazepines, no action needed; (G) for indications of benzodiazepines or other opioids without a prescription, place patient on closer monitoring for a 1-2 week period; (H) if prescribed suboxone is not present in urine without explanation, patient is discharged; and (I) if suboxone is present in urine along with multiple substances, then patient is placed on weekly monitoring and referred to drug rehabilitation. In summary, discharge of a patient from the practice was used as a last resort, recognizing that the patient population at hand would likely deteriorate further into deeper substance abuse and overdose. This is well documented in the current literature and published in medical peer reviewed New England Journal of Medicine. In fact, it is now widely recognized that requiring strict compliance of these types of patient populations has led to an increase in deaths from opioid overdoses. That none of Dr. Nikparvar-Fard's patients died from an overdose is evidence that his approach was successful.

Dr. Simopoulos further opines that his review of these patient records is consistent with his opinion that Dr. Nikparvar-Fard acted at all times within the usual course of professional practice, and in

> good faith. His review of these patients' records shows that each patient complained of pain symptoms to Dr. Nikparvar-Fard, and that, in Dr. Simopoulos' opinion, Dr. Nikparvar-Fard appropriately attempted to objectify that each patient's pain symptoms were legitimate, which is particularly difficult to do in these types of patient populations.
>
> Finally, Dr. Simopoulos opines that the government's expert, Dr. Thomas, overlooked the realities of the challenging patient population that Dr. Nikparvar-Fard was treating. Dr. Thomas's approach would require the discharge of any patient who shows even the most remote sign of substance abuse, regardless of whether that individual had legitimate pain complaints. This stringent approach does not account for the risk of discharging such patients or for the differing views in the medical community on how to best treat patients in this type of community.

Finally, Mr. Vincent Rupp was retained by the defense to summarize reports from Millennium Lab Reports to ascertain the number of pain management visits for each AUC location from 2013-2017. [Exhibit 7 – Rule 16(b)(1(iii) Disclosure and Expert C.V.] Collectively, these reports indicate that 57% of the pain management patients only came to the office between 1-3 times, hardly an indication that AUC was a pill mill. [Exhibit 8 – Pain Management Client Visits]. Mr. Rupp also analyzed the urine test results from Millennium Lab to compare the percentage of patients testing positive for illicit drugs with the percentage of patients testing positive for illicit drugs in the Northeast region of the United States. [Exhibit 9 – Positive Tests]. These reports show that, in general, AUC pain patients, tested positive for illicit drugs at a lower rate than pain patients in the Northeast region.

Mr. Rupp was also tasked to create summary charts of an analysis conducted by another defense expert, Ms. Roto Patel. [Exhibit 10 – Patel Rule 16(b)(1(iii) Disclosure and Expert C.V.]. Ms. Patel, a certified medical biller, conducted a review of 11,567 patient charts from the AUC Montgomeryville location. This review proves that AUC was a legitimate medical practice

and was not simply in the business of prescribing opioid medication. Between 2014 to 2017, 10,656 urgent care patients were treated AUC Montgomeryville where a total of 1,818 X-rays were performed, 1,874 laboratory tests were conducted, 237 electrocardiograms were given, 1,052 minor were surgeries performed, and 774 patients received casts. [Exhibit 11- Pain Management v. Urgent Care].

In conclusion, Dr. Nikparvar-Fard ran a legitimate medical practice and, when necessary, took appropriate steps to manage noncompliant, drug-seeking patients. Between 2013 and 2017 alone, Dr. Nikparvar-Fard discharged 400 patients from his pain management clinic. In addition, Dr. Nikparvar-Fard's opioid prescribing rate was lower than that of other physicians in community. Finally, the evidence shows that Dr. Nikparvar-Fard did not have a financial motive when prescribing narcotics. For example, Dr. Nikparvar-Fard *twice* declined to prescribe oxycodone to a patient who provided insufficient medical documentation regarding a back injury, even when this patient offered Dr. Nikparvar-Fard a Rolex and money in exchange for a prescription.

A. OBJECTIONS WHICH AFFECT THE GUIDELINE RANGE[1]

  1. <u>Objection to Adjustment for Leadership Pursuant to U.S.S.G. 3B1.1(a)</u>:

---

[1] Despite his stipulation to the converted drug weight in the plea agreement, Dr. Nikparvar-Fard now objects to this stipulation because it includes prescriptions underlying Counts One through Four of the indictment. In *United States v. Cianci*, the Third Circuit held that a defendant cannot renege on the stipulations in his/her agreement; however, Dr. Nikparvar-Fard maintains that his case can be distinguished from *Cianci* because the stipulated amount includes conduct underlying Counts One through Four which, as discussed above, should not be considered. The only conduct underlying Count Five were 19 prescriptions written by Campbell and signed by Dr. Nikparvar-Fard which totaled 16,320 mg (or 16 milligrams) of prescribed oxycodone, resulting in a converted drug weight of 107.20 kilograms. If the 107.20 kilogram converted drug weight is used, the base offense level is 24.

The plea agreement precludes consideration of evidence outside the count of conviction. Count Five includes only two participants – Dr. Nikparvar-Fard and Campbell.

2. <u>Objection to Adjustment Abuse of Trust Pursuant to U.S.S.G. §3B1.3</u>:

The abuse of trust adjustment is unwarranted. The practice of allowing medical staff without a DEA registration to prescribe medication is a known and accepted practice in the medical community. Based upon his experience, education, and training, Dr. Nikparvar-Fard knew that pain management patients were at serious risk of becoming addicted to their medication. To combat this risk, Dr. Nikparvar-Fard implemented a practice called "boundary setting". Boundary setting includes the practice of interval dispensing, which means that a patient comes to the medical office every week or every other week to obtain his or her medication. Interval dispensing limits the ability of a patient to take more than the prescribed amount. Because it is impracticable for the prescribing physician to be present at each of a patient's interval appointments, nurses, physician's assistants, or other staff may issue prescriptions in the absence of physician visit. Numerous medical journals and publications describe instances where non-DEA-registered medical office staff were allowed to prescribe medication in an interval dispensing situation[2]. Dr. Nikparvar-Fard relied on these publications to formulate an interval dispensing protocol in his office, which included Campbell issued prescriptions under certain limited circumstances. Specifically, this protocol required that Campbell only prescribe controlled substances to pain patients

---

[2] This issue has been fully briefed in the numerous filings related to the defendant's motion to withdraw guilty plea and the defense respectfully requests that the arguments and exhibits contained in those filings be incorporated and considered herein.

during an interval visit, the quantity, type, and dosage of which were already predetermined by a licensed physician with a valid DEA registration number. Dr. Nikparvar-Fard required that Campbell present the patient and the chart to the attending physician who was present at the clinic. If the patient was stable, the attending physician or Dr. Nikparvar-Fard would instruct Campbell to issue the prescription to the patient. If the patient was not stable, Campbell was not allowed to give the prescription to the patient and Dr. Nikparvar-Fard, who was present in the office, would be summoned to see the patient. This practice is not only routinely accepted in the pain management and addiction fields, but was condoned by the government's own expert, Dr. Stephen Thomas, who previously testified at another trial that it was appropriate for a patient to be given a prescription in the absence of a physician visit if all relevant medical conditions were stable and there were no dosage changes or other developments that would require medical decision-making to occur. Because Dr. Nikparvar-Fard implemented a protocol which is universally accepted in the medical field, he did not abuse the trust of his patients who came to him for medical assessment and advice.

3. Objection to Denial of Acceptance of Responsibility Pursuant to U.S.S.G. §3E1.1: Both the defense and government object to the denial of the three-level reduction for acceptance of responsibility which was stipulated to in the plea agreement. The defense respectfully maintains that this stipulation should be honored, despite Dr. Nikparvar-Fard's motion to withdraw his guilty plea.

B.  MISCELLANEOUS OBJECTIONS TO CONTENT OF THE PSR

1.  Page 11, Paragraph 24: Dr. Nikparvar-Fard objects to any consideration of evidence outside the count of conviction.  In the alternative, Dr. Nikparvar-Fard denies that physicians and physicians assistants were prescribing controlled substances outside the usual course of professional practice and for a medically illegitimate purpose.

2.  Page 11-13, Paragraphs 25-29: Dr. Nikparvar-Fard objects to any consideration of evidence outside the count of conviction.

4.  Page 16-17, Paragraphs 47-48; Page 20-22, Paragraphs 66-77 re:  Vincent Thompson: Dr. Nikparvar-Fard objects to any consideration of evidence outside the count of conviction.  In the alternative, the prescriptions written for C.S., O.B., K.B. were medically necessary and did not fall outside the usual course of professional practice.

5.  Pages 17 - 18, Paragraphs 51-55 re:  Matthew DiGirolamo: Dr. Nikparvar-Fard objects to any consideration of evidence outside the count of conviction.  In the alternative, the prescriptions written for C.B., A.S., CS-1 were medically necessary and did not fall outside the usual course of professional practice.

6.  Page 19, Paragraph 60: Dr. Nikparvar-Fard objects that characterization that he was leader of the conspiracy.

7.  Page 19, Paragraph 61: Dr. Nikparvar-Fard objects to any consideration of evidence outside the count of conviction.  In as much as this paragraph relates to patients for whom Campbell signed a prescription from the blank, pre-signed prescriptions provided by Dr. Nikparvar-Fard, this is not an abuse of trust.  Finally, the prescriptions written for J.C. and H.C. were medically necessary and did not fall outside the usual course of professional practice.

8. <u>Page 22-26, Paragraphs 78-97 re: Avrom Brown</u>: Dr. Nikparvar-Fard objects to any consideration of evidence outside the count of conviction. In the alternative, Dr. Nikparvar-Fard denies telling Brown in Paragraph 92 that Brown was to prescribe opioids for patients even if she felt that it was not justified because, "you are there to take care of my needs because I can't be everywhere", as well as the insinuation in Paragraph 93 that Dr. Nikparvar-Fard criticized Brown for her "decisions" [not to prescribe opioids] and that Dr. Nikparvar-Fard had a direct line to the patients. Finally, the prescriptions written for A.M., A.J., E.M., and R.J. were medically necessary and did not fall outside the usual course of professional practice.

8. <u>Pages 26-27, Paragraphs 100-105 re: Jason Dillinger</u>: Dr. Nikparvar-Fard objects to any consideration of evidence outside the count of conviction. In the alternative, the prescriptions written for A.B. and K.B. were medically necessary and did not fall outside the usual course of professional practice.

9. <u>Pages 28-30, Paragraphs 108-121 re: Marcus Rey Williams</u>: Dr. Nikparvar-Fard objects to any consideration of evidence outside the count of conviction. In the alternative, Dr. Nikparvar-Fard denies in Paragraph 121 that Williams pleaded with him to stop overprescribing opioids and that the Dr. Nikparvar-Fard hired "impaired" or "convicted" doctors and physician's assistants who were struggling to find work and then instruct them to treat all the pain patients who came to the practice. Finally, the prescriptions written for R.J., J.C., and S.M. were medically necessary and did not fall outside the usual course of professional practice.

10. <u>Page 30, Paragraphs 124-121 re: Joanne Rivera</u>: Dr. Nikparvar-Fard objects to any consideration of evidence outside the count of conviction. In the alternative, Dr.

    Nikparvar-Fard denies that he was the "leader" of the conspiracy (Paragraph 124); that Dr. Nikparvar-Fard yelled at Witness 1 for failing to prescribe medication when a patient did not present a legitimate medical need for pain medication (Paragraph 127); that patients would go see Dr. Nikparvar-Fard if Witness 1 refused to prescribe pain medication (Paragraph 128); and that Dr. Nikparvar-Fard would give patients additional chances to stay in the practice even after they had failed numerous drug tests (Paragraph 129).

11. <u>Page 32, Paragraph 132</u>:  Dr. Nikparvar-Fard objects to the conclusion that he is a leader pursuant to U.S.S.G. §3B1.1(a), as well as the conclusion that he abused a position of trust pursuant to U.S.S.G. §3B1.3.

IV.    CORRECTIONS

Dr. Nikparvar-Fard did not allow Campbell to write prescriptions when his medical license was suspended.  Campbell only worked at the City Line Office. (Page 9, paragraph 23; Page 15, Paragraph 38; Page 15, Paragraph 40; Page 16, Paragraph 45).

V.    HISTORY AND CHARACTERISTICS OF MEHDI NIKPARVAR-FARD

Dr. Nikparvar-Fard was born in the Islamic Republic of Iran.  His father had a company that exported carpets, to Germany, and his mother was a homemaker. At times, his family struggled financially and Dr. Nikparvar-Fard grew up in a tense family environment.  After graduating high school in 1989, Dr. Nikparvar-Fard obtained a medical degree from the Tehran University of Medical Sciences in Tehran. Shortly thereafter, he joined the Iranian military to fulfill his obligatory military service.  In 2000, Dr. Nikparvar-Fard immigrated to the United States, where he eventually enrolled at Drexel University School of Medicine. In July 2014, Dr. Nikparvar-Fard became a United States citizen and, in 2015, he legally changed his name to "Mehdi

Armani."

In 1995, Dr. Nikparvar-Fard married Niusha Houshmand. They have two children: son Matin Armani (age 20) and daughter Dorin Armani (age 18). According to Dr. Nikparvar-Fard, he has a close and supportive marriage, and he is very involved in his children's lives. Dr. Nikparvar-Fard's son is a full-time student at Pennsylvania State University and lives in State College, Pennsylvania. Dr. Nikparvar-Fard's daughter is a full-time student at Drexel University and lives in Philadelphia, Pennsylvania. ████████████████████████████████████████████████

Niusha Houshmand confirms that she enjoys a close and supportive relationship with her husband. Ms. Houshmand added that Dr. Nikparvar-Fard is a good father ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

VI.    REQUEST FOR A VARIANCE FROM THE GUIDELINE RANGE

   A.    CONDITIONS OF INCARCERATION DURING COVID

While awaiting trial in this matter, Dr. Nikparvar-Fard was an inmate at the Federal Detention Center. While incarceration is not supposed to be easy, in March 2020 the conditions of Dr. Nikparvar-Fard's incarceration became much more difficult after the outbreak of the Covid-19 pandemic. During Covid, conditions at the FDC deteriorated as the facility's administration took unprecedented, yet necessary, steps to control the spread of Covid-19 within its walls. From March 2020 through November 2020, detainees were subjected to constant lockdowns, restricted access to legal counsel, and limited family visits. Programming was canceled. Jobs were terminated. The draconian prison conditions endured by Dr. Nikparvar-

Fard during Covid unquestionably support the defense request for a variance from the guideline range.

  B.  FAMILY RESPONSIBILITIES

 Dr. Nikparvar-Fard is the sole provider for his family. ███████████████████ ████████████████████████████████████████████ To compound these issues, Dr. Nikparvar-Fard's house suffered serious fire damage when his house caught fire earlier this year. A variance from the guideline range is respectfully requested for these reasons.

VII. REQUEST TO FILE UNDER SEAL

 Based upon the nature of the information provided in this memorandum regarding confidential patient information, the defense respectfully requests this Sentencing Memorandum be filed under seal. A proposed form of sealing order is attached.

        Respectfully submitted,

        */s/Caroline G. Cinquanto*
        The Law Firm of Caroline Goldner Cinquanto
        Two Greenwood Square
        1331 Street Road, Suite 450
        Bensalem, PA  19020
        215.910.2732; carrie@cgclegal.com

Date: December 18, 2023

CERTIFICATE OF SERVICE

I, Caroline Goldner Cinquanto, Esquire, certify that I have caused to be delivered a copy of this Sentencing Memorandum upon the following parties on this date:

Mary Kay Costello, Esquire
Christopher Parisi, Esquire
Office of the United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

*/s/Caroline G. Cinquanto*
Caroline Goldner Cinquanto

Date: December 18, 2023

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | :    HON. GENE E.K. PRATTER |
| | : |
| v. | :    CRIM. NO. 18-101 |
| | : |
| | : |
| MEHDI NIKPARVAR-FARD | : |

## ORDER

AND NOW, this _____ of December 2023 after balancing the public right of access to documents with the interest in protecting the confidential patient information, it is hereby ORDERED that the attached Sentencing Memorandum is SEALED and IMPOUNDED until further Order of the Court.

By the Court:

_____
HON. GENE E.K. PRATTER
Judge, United States District Court Judge